Michael Cukor, Esq.
**McGeary Cukor LLC**
150 Morristown Road
Bernardsville, NJ 07924

Evelyn A. Donegan, Esq.
**Rubin, Kaplan and Associates**
20 Centennial Ave
Piscataway, NJ 08854
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| VISION INDUSTRIES GROUP, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v, | : | Case No. **2:18-cv-06296-ES-CLW** |
| | : | |
| ACU PLASMOLD, INC., | : | |
| and ABC COMPANIES 1-10, | : | |
| and XYZ CORPORATIONS 1-10, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SANCTIONS
FOR DEFENDANT'S FAILURE TO COMPLY WITH DISCOVERY ORDERS**

## TABLE OF CONTENTS

TABLE OF CONTENTS...........................................................................................................II

TABLE OF AUTHORITIES.................................................................................................. III

1.   PRELIMINARY STATEMENT ..................................................................................... 1

2.   FACTS ................................................................................................................................ 4

Quach testified truthfully about financial information on thumb drives ............................ 13

ACU has been withholding more than the Quach Financials .............................................. 14

Someone loaded data erasing software on the Quach computer .......................................... 15

ACU Hardware withheld Invoices........................................................................................ 16

ACU is currently not in compliance with the Court's last discovery Order........................ 17

ACU cannot be trusted ......................................................................................................... 18

ACU's Extortion Attempt Also Proves it is Untrustworthy ................................................ 19

3.   ACU'S CONDUCT MEETS THE STANDARD FOR SANCTIONS AND ACU SHOULD BE SANCTIONED ................................................................................................ 20

4.   CONCLUSION ............................................................................................................... 24

# TABLE OF AUTHORITIES

**CASES**

*Days Inns Worldwide, Inc. v. Al Noor Corp.*, Civil Action 10-479 (ES) (CLW), at *3 (D.N.J. Mar. 5, 2012) ........................................................................................................... 8

*Gallant v. Telebrands Corp.*, 35 F. Supp. 2d 378, 404 (D.N.J. 1998). .......................................... 5

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 429 U.S. 639, 643 (1976). ............................. 5

*Poulis v. State Farm Fire and Cas. Co.,* 747 F.2d 863 (3d Cir. 1984) ........................................... 6

*Virtual Studios, Inc. v. Flock*, Civil Action No. 11-0622 (KSH)(CLW), at *5-6 (D.N.J. Oct. 19, 2015) ............................................................................................................................. 5

*Wachtel v. Health Net, Inc.,* 239 F.R.D. 81, 84 (D.N.J. 2006). ...................................................... 5

**RULES**

Federal Rule of Civil Procedure 37(b) ............................................................................................ 4

## 1. PRELIMINARY STATEMENT

Plaintiff Vision Industries Group, Inc. ("Vision") moves with the permission of the Court for sanctions against defendant, ACU Plasmold Inc. ("ACU"). Sanctions are warranted because ACU willfully disobeyed about a dozen Court Orders, and is currently still willfully disobeying an Order to produce electronic documents. Dkt. 213.

On November 3, 2015 Vision and ACU entered into an Exclusive Distribution Agreement. Vision contends ACU breached the agreement. Vision's damages include lost sales and breach of the exclusivity provisions of the Exclusive Distribution Agreement.

In September 2019, the Court compelled ACU to produce financial information showing its sales into the United States. The hearing transcript reflected the ongoing cooperation between then counsel for ACU and counsel for Vision in discovery.

> MR. CUKOR: I want to just point out, Your Honor, that Mr. Kaufman has been exceedingly kind and a great member of the bar in terms of Ms. Donegan was on trial and really unavailable, and she continues to amazingly be on trial again in another case, and even though she was victorious in her trial last Friday, and there was a lot of documents that I just didn't have access to, and Mr. Kaufman graciously supplied them to me very nicely. And I appreciate it. So our working arrangement, I believe, is good and will continue to be so.
> THE COURT: Good. That's good, because it's been pretty good up to now, so I'm sure it will continue.

September 23, 2019 Transcript 32:25-33:11.

About a week later, ACU fired Mr. Kaufman and Mr. Gately, because they did not believe their client, Mr. Zhuo[1]. This began a pattern of ACU's hiring and firing counsel that continued for four years until hiring its latest counsel in July 2023.

---

[1] Docket Entry 110 Pg. 5 ("It is true that Defendant Zhuo fired his first attorneys; and, it is true that he fired them because they didn't believe him.).

In those four years, the Court repeatedly issued Orders compelling the production of financial information. For four years ACU dodged, obfuscated and refused to cooperate in producing it. Today, Vision still does not know how many sales ACU made into the U.S. in violation of the Exclusive Distribution Agreement.  The parties have attended three pretrial conferences and Vision still does not have the complete financial information that was compelled in 2019.

There is no doubt ACU possessed un-produced financial information. In October of 2020, Mr. Quach (ACU's sole employee in the U.S.) testified to the routine creation of QuickBooks sales reports that were so large that he had to mail them to ACU on USB drives.  ACU first fought production of these reports, then bizarrely argued that they were produced, and then alleged they did not exist.  Even more bizarrely, ACU argued that Mr. Quach, was "mentally unstable" and that his testimony regarding the existence of QuickBooks and financial reports and USB drives was not true.  ACU then, possibly with the support of its counsel,[2] attempted to delete the data.

ACU was eventually compelled to retain CFS and its principal Mr. Lanterman to image the hard drive of Mr. Quach.   The imaged Quach computer showed that someone loaded data erasure software on the Quach computer before it was imaged. The image also confirmed Mr. Quach's testimony about QuickBooks and USB drives and contradicted ACU's principal's (Mr. Zhuo's) sworn declaration.

ACU has disregarded this Courts unambiguous Orders in bad faith. Defendant continues to cycle through one counsel after another, and to show a callous disregard for the truth to prevent Vision from pursuing its claims and proving its damages. In addition to flouting multiple Court orders, ACU attempted to extort a settlement and a payment to ACU of three million dollars from Vision, which resulted in the criminal conviction and jailing of ACU's factory manager in China,

---

[2] Dkt. 166.

2

the freezing of ACU's assets in China and other pending criminal investigations throughout the world.[3]

ACU's pre-trial misconduct further includes: counsel disclosing Vision's Highly Confidential AEO customer information to its client, failing to appear for Court Ordered conferences, attempting to permanently erase information that was compelled, violating discovery Orders, failure to pay CFS, failure to prepare its portion of the pretrial order (three times), attempted extortion, and currently violating the Court's last discovery Order requiring the production of the Quach Financial Information from CFS. ACU's delays and disregard for the Court's schedule derailed this case to Vision's prejudice.  Its refusal to comply with Orders and its misrepresentations to the Court suggest that all of ACU's acts are a calculated attempt to increase Vision's litigation expense and prevent it from reaching a trial.

ACU's misbehavior meets all of the *Poulis* factors, and sanctions are warranted. Vision, therefore, seeks an order awarding it the costs and fees expended pursuing what should have been routine discovery for four years, including the costs and fees of its sanction motions. Vision also seeks an order barring ACU from challenging Vision's damages expert on the basis of the underlying financial information Vision's expert relies on to form opinions.

Costs and fees are necessary to make Vision financially whole. Sanctions limiting ACU's ability to challenge Vision's damages expert are reasonable to overcome the disadvantages arising from Vision relying on other financial information and because ACU has abused the discovery process and cannot be trusted to present its case honestly.

---

[3] See Criminal Judgments of Nanhai District People's Court of Foshan City, Guangdong Province at Dkt. 109-2.

## 2.  FACTS

ACU sells goods through its United States affiliate, ACU Hardware U.S.A.  Mr. Quach had been the affiliate's only employee.[4] He was the salesman, bookkeeper and liaison with ACU Plasmold in Canada and ACU's factory in China. Today, despite ACU's claim that he is "mentally unstable", ACU made him the owner of ACU Hardware U.S.A. and extended him a large credit line.  Mr. Quach has made all the U.S. sales for ACU Hardware U.S.A. and he kept all the documents and records to show the product cost, sale price, profit, customers and his salary and compensation.

When opposing Vision's 2019 motion to compel the ACU sales information showing sales into the U.S., Mr. Zhuo submitted a declaration stating:

> With over 20 sales a day, over a four-year period, each sale involving several different documents (purchase orders, customs, shipment, etc.), responding to such demand would require the review of at least 80,000 documents.

Dkt. 46 ¶5.

ACU never produced anywhere near that quantity of documents. At his October 13, 2020 deposition Mr. Quach testified unequivocally that he prepared detailed quarterly and annual sales reports, which he provides to ACU on a USB drive because the files are too large to email. According to Mr. Quach:

1. the reports specified the sales and profitability[5],
2. the reports were so large that he mailed them to Mr. Zhuo on a USB flash drive[6], and
3. that he could easily turn them over to ACU's counsel[7].

---

[4] Quach Tr. Pg. 10, Ln. 16-18. Exhibit 1 Dkt. 104-2.

[5] Q. I think you told me that you prepared annual reports and quarterly reports about sales and profitability that you sent to Alvin;  is that correct? A       Yes.  Quach Tr. Pg. 67, Ln. 4-9
? A Yes, it does. Yes. Quach Tr. Pg. 83, Ln. 25-84, Ln. 5.

[6] Q. Is that the email that you use to send Alvin the end-of-year report? A No. Normal I mail him a copy because I put on -- because it's too large so normally I send him a USB, a flash drive, because the end of year is normally -- I've done before but it's too big so I send it flash drive.
Quach Tr. Pg. 68, Ln. 2-12.

[7] Q. And it would not be a big deal for you to send those to your lawyer? A Yeah, I can provide. Q That's not very hard? A No. We can provide you. Quach Tr. Pg. 84, Ln. 20-24.

The documents ("Quach financials") were the subject of discovery requests but to this day as a result of ACU's attempted data erasing, its withholding of electronic information, its failure to pay the imaging vendor, and the evidence showing that there are likely more invoices that have not been produced, Vision cannot know the full extent of ACU's sales into the U.S. As previously established with the Court, the Quach financials would establish both the fact of breach and the basis of damages arising from the breach.

The chart below lists ACU's actions and the Orders ACU disregarded in connection with Vision's pursuit of the Quach financials and preparing for trial.

| DATE | PROCEEDING/HEARING |
|------|-------------------|
| September 24, 2019 ORDER | Plaintiff's motion to compel the records of Defendant's U.S. affiliate's sales in the U.S. <br><br> Ruling: <br><br> "For the reasons stated on the record during oral argument on 9/23/19, Plaintiffs Motion to Compel (DE 41) is granted in its entirety." <br><br> Docket Entry 53. |
| November 4, 2019 ORDER | "The Defendant shall produce John Quach for deposition [and] Defendant shall produce all documents requested in Plaintiff's Motion to Compel, including all sales records to all customers in the U.S. by November 11, 2019." <br><br> Docket Entry 61. |
| November 4, 2019 | ACU Fires and hires new counsel |
| November 12, 2019 | [ACU makes motion to stay production of the financials] <br><br> "Discovery shall proceed. The Motion to Stay is denied." <br><br> Docket Entry 65. |
| December 5, 2019 ORDER | "Defendants failure to supply and cooperate with discovery is ongoing. … Failure to cooperate with discovery and this Order |

|  | **will result in the striking of defenses**. … Defendant will have 14 days from receipt of the deficiency letter to comply and respond on the docket." <br><br> Docket Entry 72. |
| --- | --- |
| January 2, 2020 ORDER | "Defendant will provide a certification as to the reasons for large redactions in the documents provided. … These extensions [to the schedule] are given in light of new counsel for Defendant as well as the delay in providing discovery, and translation of same. No further extensions will be entertained." <br><br> Docket Entry 76. |
| September 2, 2020 | ACU Hires new counsel who files a motion to compel. <br><br> Docket Entry 83 and 88. |
| November 4, 2020 ORDER | "The Court denies dkt. # 88 defendants [motion to compel] in its entirety. This Court will not entertain tit for tat discovery. Defendants requests are wholly irrelevant. Defendants shall produce sales reports, records and financials from Mr. Quach by November 17, 2020." <br><br> Docket Entry 91. |
| November 23, 2020 | [Defendant Refuses To Produce Quach Records] The Quach documents produced were "a fair reading of the Quach deposition" and no additional information will be produced. <br><br> Docket Entry 92. |
| November 25, 2020 ORDER | "Defendant shall produce discovery from Mr. Quach before 12/10/20." <br><br> Docket Entry 94. |
| January 25, 2021 | ACU Hires new counsel (Ed Miller). <br><br> Docket Entry 102. |
| April 26, 2021 <br><br> ORDER | "Defendant has defied all Court orders, and now has entered yet another attorney in this case. Defendant now claims that the sole employee and partner of defendant lied in his deposition about the existence of records." <br><br> Docket Entry 113. |

| June 29, 2021<br>ORDER | "Defendant did not show up for the deposition of plaintiffs expert, without any notice. Defendant did not produce their expert for deposition by the June 1, 2021 [deadline, DE 97]."<br><br>Docket Entry 117. |
|---|---|
| July 16, 2021<br>ORDER | "Defendants request for the undersigned to recuse herself from this matter is DENIED as meritless. The parties will abide by all Court orders and litigate this case on behalf of their respective clients in a professional manner."<br><br>Docket Entry 121. |
| July 26, 2021 | ACU counsel admits violation of the Protective Order but alleges he did not understand that Attorney's Eyes Only designations prohibited disclosure to his client by his expert.<br><br>ACU submits to Consent Order regarding admitted violation of the Protective Order.<br><br>Docket Entry 122 and 134. |
| October 27, 2021<br>ORDER | "Defendant will deliver the Quach materials both the imaging and the report by November 3, 2021, in the event they are not delivered this Court will take appropriate action."<br><br>Docket Entry 143. |
| January 3, 2022<br>ORDER | "The parties shall instruct the [Quach imaging] vendor [Mr. Lanterman] to preserve all work and work product, and not distribute such work to any party, until the Court rules on the sanctions application. **Neither party shall contact the vendor ex parte**."<br><br>Docket Entry 155. |
| February 2, 2022 | Letter from Mr. Lanterman<br><br>"On December 1, 2021, [Mr. Miller] contacted CFS and posed a number of substantive questions to CFS, without opposing counsel on the line. At the start of the call you asked one question about billings (why some tasks were billed at a different hourly rate), and then asked [many substantive questions].<br>We asked if you would put your questions in an email, to which you responded that "I can't do an email. I had an agreement with my counter parties not to communicate with you without them...I need it verbally over the phone." We did |

7

| | |
|---|---|
| | not answer your questions. I think that your position now that you only contacted CFS regarding billing is disingenuous and, based on our records, at best, you simply used our billings as a pretext for a direct, substantive communication. You put us in an awkward situation, Ed." Docket Entry 166. |
| January 25, 2022 ORDER | [ACU fails to pay the Court Ordered costs to Mr. Lanterman DE 132] "Mr. Miller will notify the Court within 24 hours when his client will pay the full expenses for computer imaging. Mr. Lanterman is directed to continue to preserve all information and data related to this matter." Docket Entry 160. |
| February 1, 2022 | Letter from Mr. Lanterman "In an October 12, 2021 phone call between Nate, [Mr. Miller], and Mr. Quach discussing the mass deletions (again, not about billing), [Mr. Miller] acknowledged [Mr. Miller] had advised Mr. Quach that he could delete files before sending the device to CFS. As it turns out, many of the deleted files were germane to this litigation, including entire QuickBooks files…[Mr. Miller] mislead the Court." Docket Entry 166. |
| May 10, 2023 ORDER | "Defense counsel did not appear for settlement conference. He shall show cause on the docket as to why he disregarded a Court Ordered conference by May 12, 2022 to avoid consequences." Docket Entry 172. |
| July 11, 2023 ORDER | "The parties shall submit to the Court their joint final pretrial order via email to CLW_Orders@njd.uscourts.gov no later than five (5) business days before the conference [on 11/7/23]." Docket Entry 195. |
| July 20, 2023 | ACU fired and hires new counsel Docket Entry 196. |
| September 11, 2023 ORDER | "By 9/15/23, the parties shall submit a proposed stipulation and order reflecting their agreement as to the data presently being maintained by CFS [Lanterman]" |

| | [No response received from ACU]<br><br>Docket Entry 208. |
|---|---|
| September 20, 2023<br>ORDER | "By 9/26/23, Mr. Miller shall state in writing any objection to Plaintiffs proposed stipulation. If no such objection is received, the proposed stipulation will be entered."<br><br>Docket Entry 211. |
| September 29, 2023<br>ORDER | "ORDER Regarding Quach Computer Imaging. Defendant shall arrange for Mr. Lanterman to produce copies of all the imaging he performed in regard to Mr. Quach's computer to both the Plaintiff and the Defendant."<br><br>[**ACU has not complied with this Order**].<br><br>Docket Entry 213. |
| October 31, 2023 | ACU requests extension for filing the pretrial order.<br><br>Docket Entry 214. |
| November 1, 2023<br>ORDER | Extension Granted to November 3, 2023<br><br>Docket Entry 215. |
| November 3, 2023 | ACU requests extension for filing the pretrial order.<br><br>Docket Entry 216. |
| November 6, 2023<br>ORDER | Extension Granted to November 6, 2023<br><br>Docket Entry 217. |
| November 7, 2023<br>ORDER | First Final Pretrial Conference attended and rescheduled to November 28, 2023 because ACU was not prepared.<br><br>Docket Entry 218. |
| November 28, 2023<br>ORDER | Second Final Pretrial Conference attended and rescheduled because ACU was not prepared.<br><br>"Counsel for defense did not file his final pretrial submissions. They will be incorporated into the final pretrial order filed by the plaintiff and submitted to the Court by December 6, 2023. In the event that does not |

| | occur plaintiffs final pretrial order will be executed by this court. Local counsel is instructed to advise Mr. Miller of all conferences as he has stated you have not met your responsibilities in this case. Local counsel must appear on ALL conferences. Failure to abide by the court rules will result in consequences. There will be no further adjournments of any kind in this case. The Court will continue the 11/28/23 zoom conference on 12/7/23 at 3:30pm"<br><br>Docket Entry 220. |
|---|---|
| December 7, 2023<br>ORDER | Third Final Pretrial Conference attended and rescheduled because ACU still has not created a proposed exhibit list.<br><br>Docket Entry 223. |

Vision deposed Quach in October 2020 without having received the requested financial information. Subsequent to Quach's deposition, ACU began cycling through litigation counsel, who would in turn further delay production or make specious arguments that had been previously rejected. ACU's counsel represented that their lack of production was "a fair reading of the Quach deposition" and no additional information will be produced. Dkt. 92. ACU's counsel then represented to the Court that it would produce the Quach information by December 10, 2020. Dkt. 94. ACU then attempted to extort a settlement and three million dollars from Vision. Dkt. 109-2.

Before the Court, ACU alternately took the position that the documents did not exist, or that the documents had already been produced. Prior to a January 25, 2021 conference, ACU sent Vision a USB drive with a cover letter claiming that it was received from Mr. Quach that day. Dkt. 105. Rather than containing the as yet produced Quach financials, the drive contained previously produced invoices with the Bates labels that had been applied by prior counsel. *Id*.

ACU also presented an alleged statement from Mr. Quach contradicting his deposition testimony. The Quach statement attempted to change his unequivocal deposition testimony that

he was never asked to collect any information for this case.  At his deposition, Mr. Quach was

clear that Mr. Zhuo and ACU never instructed him to collect financial information.

> Q     Did anyone ever ask you to collect information about ACU's sales to customers in
>        the United States and share it with a lawyer or with Alvin?
> A     No.
> Q     Okay. Do you know if you ever were involved in collecting any documents and
>        giving them to a lawyer or to Alvin that were produced in this case?
> A     No.
> Q     You were not?
> A     I am not.
> Q     As far as people that would know about sales to customers in the United States
> you're the best one, right?
> A     Yes.
> ...
> Q     Mr. Quach, you are the person most knowledgeable about ACU's sales to
> customers in the United States, correct?
> A     Yes.
> Q     And you were never asked to collect any documents about those sales for this case?
> A     No.

Quach Tr. Pg. 50 Ln. 6 – Pg. 51, Ln. 6.

The Quach Declaration of December 10, 2020, prepared with counsel three months after his

deposition simply stated.  "I was asked to collect related documents and produced the sale

invoice before the deposition. I was confused with the question asked. The answers for these

questions are YES." Dkt 109-1.  The Quach Declaration completely contradicted his deposition

testimony and stated "I do not have QuickBooks reports on sale revenue." *Id.*

Defendant's counsel had ample opportunity to redirect Mr. Quach at his deposition, and,

presumably to prepare Mr. Quach before his deposition. But he did not. Mr. Quach had further

opportunity to review and revise his deposition pursuant to Fed. R. Civ. P. 30. He did not.

Instead, counsel crafted a new declaration for Mr. Quach stating that he did not "have

QuickBooks reports on sale revenue" while the QuickBooks reports were literally still on

Quach's computer.

Four months later, on March 22, 2021, while responding to another motion to compel the same information, Mr. Zhuo submitted a sworn declaration claiming to "believe John Quach is mentally unstable" and that he "never received USB/flash drive sticks in the mail from John Quach." Dkt. 108-1. ACU and Mr. Zhuo never explained at that time, through today, why none of this was mentioned in the Quach declaration prepared by ACU's counsel.

Undisclosed to Vision or the Court, apparently, Mr. Zhuo also sold ACU Hardware USA completely to Mr. Quach while Vision's first sanctions motion was pending and less than two months after Mr. Zhuo filed his March 22, 2021 Declaration alleging that Mr. Quach was unstable. Dkt 147 Exhibits E and F.

The terms of that agreement are mysterious, but further confirm that Zhuo and Quach are still working together to hide information. The fact that Zhuo entered into an agreement with Quach (right after he called him mentally unstable) that extends Quach a large amount of credit and ensures that the two will be working together for another eight years, after the 14 they have already worked together, shows that ACU does not really believe Quach is a rogue employee. The imaged Quach computer shows that Quach routinely put large amounts of financial data on USB drives, including QuickBooks reports and that Zhuo's declaration cannot be trusted.

In November of 2021 ACU's counsel hypothesized to the Court that if Zhuo was not credible and Quach and Zhuo were hiding information then "ACU Hardware USA would have to have had (1) a second set of books, (2) a separate secret bank account, (3) cheated on its taxes, and, (4) lied to this Court." Dkt. 144 Pg. 5. It seems that ACU's counsel was likely correct.

On November 3, the parties received the declaration of Mark Lanterman, the forensic expert from CFS. Mr. Lanterman showed that someone loaded two different data eraser

programs on the Quach computer before it was imaged.  The Lanterman Declaration explained that there were many QuickBooks files on the Quach computer, one of the reports for ACU Hardware USA showed millions of dollars in sales.  Dkt. 147.  This is significantly more than any of the other reports.  ACU's counsel has argued, without any evidence, that this report does not fairly represent annual sales but it is impossible for Vision to explore this because discovery has long closed, expert reports were exchanged, and the missing financial reports Mr. Quach testified he sent to Zhuo have still never been produced.

Mr. Lanterman at CFS still has the original Quach imaged data but he has done no further reviewing of it.  ACU has not complied with the Court's September 29, 2023 Order requiring the information to be shared with Vision.  Mr. Lanterman reviewed less than a third of the QuickBooks files he found so neither party knows what information will be revealed by those additional files.  Dkt. 146-2 ¶18.  Mr. Lanterman has done no additional work because despite being Ordered to pay for the cost of imaging the Quach computer, ACU has not paid.  Dkt 132 ("Defendant shall bear the cost for the imaging of Mr. Quach's computer.").

*Quach testified truthfully about financial information on thumb drives*

The Lanterman production showed that Quach had used dozens of USB devices or thumb drives in the last nine months of 2021. From 2019 to 2021, Quach loaded more than 250 ACU financial related files onto thumb drives. Dkt. 147 (Exhibit H).   Many of these file names are also found in the Recycle Bin Report from the Lanterman Declaration showing that Quach loaded the files onto thumb drives and then deleted them.

The above supports accepting as truth Mr. Quach's original testimony that he prepared financial reports and sent them to Mr. Zhuo on thumb drives and rejecting Mr. Zhuo's after the fact allegation that Mr. Quach was "mentally unstable" and that he "never received USB/flash

drive sticks in the mail from John Quach." Dkt. 108-1.  The Lanterman evidence stands in stark contrast to ACU's argument in opposition to Vision's first sanctions motion when ACU called Quach's testimony regarding the USB drive "inconceivable" and "beyond the improbable".  Dkt 108 Pg. 2 ("That John Quach testified that he had to send Alvin Jor a USB/flash drive stick, was the first sign that Mr. Quach was testifying things that go beyond the improbable.").

*ACU has been withholding more than the Quach Financials*

One of the more telling zip files produced with the Quach imaging documents is titled "2018acuhardwareusasalesinvoicesbilledfromacucanada.zip". Vision had long suspected that Mr. Zhuo has been able to manipulate sales, price, profits and tax records by controlling the pricing between his three owned entites, ACU USA Hardware Inc., ACU Plasmold Inc. (Canada) and Jiangmen Plastic & Mold LTD (the factory in China). As a result of the Quach imaging Vision learned that there is a portion of ACU Hardware USA invoices that were billed directly from the Canadian entity. This is contrary to the ACU deposition testimony claiming that all sales to U.S. customers proceeded through Quach.

> Q.      Mr. Quach, you are the person most knowledgeable about ACU's sales to customers in the United States, correct?
> A.      Yes
> …
> Q.      Do all sales from ACU Plasmold, Inc. that are to U.S. customers go through you?
> A.      Yes.

Quach Deposition Transcript Pg 50 Ln. 25 – Pg. 51 Ln.25.

Invoices processed through ACU's Canadian entity would have not been visible in the records of ACU Hardware USA and are further evidence that Mr. Zhuo has consistently manipulated sales information to suit his needs.

ACU's counsel has argued that "there is nothing to worry about" with regard to the

billing directly by ACU but has not explained the contradicted Quach testimony, has offered no

evidence from ACU as to why those invoices were billed by ACU instead of its subsidiary, and

has offered no explanation for how the profits from those invoices were captured in any ACU

report.  Dkt. 154 Pg. 7.

*Someone loaded data erasing software on the Quach computer*

The Lanterman production showed that a program called BitRaser was installed on

September 21, 2021. BitRaser is advertised as having one function: "100% Data Erasure Beyond

Recovery." (www.bitraser.com).  The program was installed seven days *after* the Court ruled

that "[b]y September 21, 2021, Defendant shall submit any response as to the alleged disclosure

of Attorneys Eyes Only materials [and] Defendant shall bear the cost for the imaging of Mr.

Quach's computer." Dkt. 132.

Counsel for ACU repeatedly argues that he does not represent Mr. Quach and that Mr.

Quach "is his own man with his own will [who] attempted to send CFS a computer with no data

(G-d knows why he would have done such a thing)."  Dkt. 154 Pg. 6.  However, Quach is an

ACU employee controlled by ACU that currently owes ACU and Mr. Zhuo a substantial debt.

Further, after it became clear that someone attempted to permanently delete the Quach hard

drive, Mr. Lanterman wrote to Mr. Miller and the Court alleging that ACU participated in the

spoliation.

> In an October 12, 2021 phone call between Nate, [Mr. Miller], and Mr. Quach discussing
> the mass deletions (again, not about billing), [Mr. Miller] acknowledged [Mr. Miller] had
> advised Mr. Quach that he could delete files before sending the device to CFS. As it turns
> out, many of the deleted files were germane to this litigation, including entire
> QuickBooks files…[Mr. Miller] mislead the Court."

Docket Entry 166.

Accordingly, while the Lanterman production of the Quach imaged documents shows that ACU has been withholding documents in violation of the Orders, it also shows that data erasure software was loaded and the extent of the data destruction is not fully known.  None of Mr. Quach's emails were recovered nor were any of his Telegram or WeChat conversations[8], nor were the documents loaded on to three on-line data storage systems he used: GoogleDrive, DropBox and OneDrive.  CFS - 1.1 Lenovo T470 - Cloud Services – Report.

Further, Mr. Lanterman explained that he only reviewed less than a third of the QuickBooks files he found so neither party knows what information will be revealed by those additional files. Dkt. 146-2 ¶18.  Mr. Lanterman also only attempted to recover files that matched certain search terms.  Files, such as bank statements that do not use the search terms were not attempted to be recovered and were not reviewed.

Whatever new explanations ACU submits, it is undisputed that data that was Ordered to be produced multiple times may have been permanently erased by at least an ACU employee.

*ACU Hardware withheld Invoices*

The Lanterman production also showed that a significant number of invoices on the Quach computer were not produced during discovery and were not part of Vision's damages calculations. There are thousands of recovered documents in the Lanterman production.  Vision has attempted to review all of them but given that ACU has still not directed Lanterman to share the information with Vision, the information below is only preliminary.  Based solely on the

---

[8] WeChat is a Chinese instant messaging, social media, and mobile payment app. https://en.wikipedia.org/wiki/WeChat.  ACU's employee was convicted of extortion based on WeChat evidence between the employee and Mr. Zhuo.  Dkt. 109-2

Lanterman production to date, Vision has identified at least the following more than 30 invoices

from 2019 and 2020 alone as never produced by ACU.

> ACU190419; ACU190430-A; ACU180719B; ACU190107B; ACU190430-B;
> ACU190309; ACU190913; ACU200106; ACU200133; ACU200207; ACU20031-B;
> ACU200402-A; ACU200402-C; ACU200417; ACU200518-E; ACU200518-F;
> ACU200717; ACU200728; ACU200814A4; ACU200905; ACU200905-A; ACU201021-
> A; ACU201203-A; ACU201203-B; ACU201203-C; ACU201203-D; ACU201204;
> ACU201207; ACU201208; ACU201217-A; ACU201217-B

The above invoices total more than $100,000.00 and does not include the unknown number of

invoices that ACU created in Canada that were never loaded onto the Quach computer.  The

scope of ACU's sales in violation of the agreement with Vision is still completely unknown

given ACU Canada's refusal to provide information, data erasure software on the Quach

computer, and Mr. Lanterman's limited review of the recovered QuickBooks files.

*ACU Withheld Import Records*

The Lanterman production also shows what appears to be hundreds of previously unproduced

packing slips and other import records that existed on the Quach computer. Vision has not

reviewed those records in detail since the full Quach image has not been shared but it clear that

the import records represent another large amount of information that was compelled, and not

produced.

<u>*ACU is currently not in compliance with the Court's last discovery Order*</u>

On September 29, 2023 the Court Ordered ACU to direct Lanterman to share the preserved

Quach information with Vision.  Dkt. 213 ("Defendant shall arrange for Mr. Lanterman to produce

copies of all the imaging he performed in regard to Mr. Quach's computer to both the Plaintiff and

the Defendant.").  On October 10 and October 18, counsel for Vision wrote to counsel for ACU,

reminding him that "Judge Waldor Ordered that [the Quach information] be produced on

17

September 29" and asking for an update.  Mr. Miller represented that he would handle securing

the information from CFS, but to date, Vision has not received any of that information.

### *ACU cannot be trusted*

When Mr. Lanterman was retained, Ms. Donegan (for Vision) and Mr. Miller (for ACU)

made an agreement, in front of Mr. Lanterman, that neither party was to have ex parte

communications with Mr. Lanterman.  Dkt 153.

On December 29, 2021 Mr. Lanterman wrote to all parties and subsequently the Court.

> It has always been my understanding that all communications, whether written or
> telephonic, were to include opposing counsel. You apparently have operated
> under a different understanding since you have contacted CFS no fewer than 17
> times without opposing counsel's participation or knowledge. On occasion you
> had your client call CFS and then conference you into the call, commenting that
> technically you weren't the one calling CFS.
>
> You were told we were uncomfortable with this practice but you said it was just a
> "verbal agreement that didn't extend to conversations with CFS." You and I both
> know this is not true.
>
> During our conversation today, you told me that you were not going to pay your
> outstanding invoice despite instructing us to work on your multiple requests well
> past midnight some evenings. Given your breach of our contract, we are no longer
> bound by our confidentiality agreement.
>
> On our call today you asked me to share statistics regarding deleted data. When I
> refused to share my work product without payment, you told me that the judge
> was going to "ream" you out and you asked if I could "help you out with that
> information" because your "client isn't an asshole." I told you that opposing
> counsel should be added to the call. You responded that I had no right contacting
> the parties and that if I wanted to be paid I should simply sue your client.

Dkt. 153.

ACU responded, writing to the Court that "The Court has no authority to police a

voluntary verbal agreement between attorneys …That being the case, Defendant needs to make a

few points. Firstly, communications concerning cost was excluded from the oral agreement."

Dkt. 163.

Mr. Lanterman responded.

> On December 1, 2021, [Mr. Miller] contacted CFS and posed a number of substantive questions to CFS, without opposing counsel on the line. At the start of the call you asked one question about billings (why some tasks were billed at a different hourly rate), and then asked [many substantive questions].
>
> We asked if you would put your questions in an email, to which you responded that "I can't do an email. I had an agreement with my counter parties not to communicate with you without them...I need it verbally over the phone." We did not answer your questions. I think that your position now that you only contacted CFS regarding billing is disingenuous and, based on our records, at best, you simply used our billings as a pretext for a direct, substantive communication. You put us in an awkward situation, Ed.
> …
> Furthermore, it is frustrating that you cite information about our flat fees for forensic imaging (creating a forensic copy of Quach's laptop). These fees are between $300 and $750. You know well that that cost was associated with the initial task of copying Quach's laptop hard drive and was never intended as a cap on project fees, **yet you mislead the Court**.

Docket Entry 166.

ACU sought ex parte communication with Lanterman regarding the Quach documents to control the narrative about what was found on the Quach computer.  It was improper, violated counsels' agreement, and evidences a lack of trustworthiness.

*ACU's Extortion Attempt Also Proves it is Untrustworthy*

The Order of the Chief Judge of the People's Court of Foshan City China lays out the details of the ACU extortion scheme as masterminded and controlled by ACU's principal Alvin (Xiaolu**)** Zhuo.  Dkt. 109-2.  Specifically, the extortion Order states:

> On June 8, 2020, as entrusted by Xiaolu **Zhuo** from the company, Linqiang Dai sent the document "Whistle-blower Letter on Vision's Tax Fraud and Its Calculations", which was customs information, via WeChat to Dan Huang, the purchasing officer of Guangdong Vision Industrial Company (hereinafter referred to as the Vision Company) at Songgang, Shishan Town, Nanhai District, Foshan City. Later, Linqiang Dai forwarded the messages Xiaolu **Zhuo required** to send to Dan Huang of the Vision Company through WeChat, phone, and other channels, using the threat of revealing the whistle- blowing materials to demand the Vision Company to pay USD 3 million.

…

Linqiang Dai truthfully confessed his crime after he has committed the crime.

…

This case was caused by a commercial dispute in the United States which was between Xiaolu **Zhuo** and the Vision Company in North America.

…

Xiaolu **Zhuo** [is] (charged in a separate case)

…

The defendant Linqiang Dai is guilty of the crime of extortion, and is sentenced to fixed-term imprisonment of one year and six months and fined RMB Five Thousand Yuan.

The above finding of the court, based on indisputable evidence and a confession, shows that ACU and Zhuo have no respect for any law and will say and do anything to win an advantage against Vision.

### 3. ACU'S CONDUCT MEETS THE STANDARD FOR SANCTIONS AND ACU SHOULD BE SANCTIONED

Federal Rule of Civil Procedure 37(b) provides that a court may award sanctions for a party's failure to comply with an order for discovery. *See*, F.R.C.P. 37(b)(2)(A). The sanctions a court may award include striking pleadings, taking facts as established, and prohibiting a disobedient party from supporting or opposing designated claims or defenses or from introducing matters into evidence. *See*, F.R.C.P. 37(b)(2)(A(i, ii and iii). As per F.R.C.P. 37(b)(2)(C), "[i]nstead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

There is no dispute that ACU flouted the Court's orders to produce the Quach financials. The Court ordered financial discovery including production of the Quach financials on September 24, 2019, November 4, 2019, December 5, 2019, November 4, 2020 and November 25, 2020, October 27, 2021, and September 29, 2023. Dkt. 53, 61, 72, 91, 94, 143, and 213.  Vision still does not

20

have the Quach imaged hard drive and Vision cannot know the extent of ACU's sales into the U.S. in violation of the Exclusive Distribution Agreement.

Vision is still identifying lists of invoices that have not been previously produced.  However, even if that were not true, and even if there were no QuickBooks files discovered, and no USB flash drives revealed, ACU forced Vision and the Court to spend four years chasing and compelling what ACU should have produced in response to Vision's first document demand. Instead of producing the basic information showing ACU's sales into the U.S. in violation of the Exclusive Distribution Agreement, ACU filed false sworn declarations, defied multiple orders and attempted to permanently delete the compelled information before CFS imaged the hard drive that may have stored the information. ACU's misconduct in unconscionable in federal court litigation. The Court, therefore, should exercise its broad discretion and sanction ACU.

The purpose of sanctions is to enforce discovery, both in the context of a party that failed to comply in a given case and to discourage transgressions in other matters. *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 429 U.S. 639, 643 (1976). Sanctions may be appropriate when a party has pointedly withheld, despite orders to produce, especially relevant or detrimental documents. *Gallant v. Telebrands Corp.*, 35 F. Supp. 2d 378, 404 (D.N.J. 1998). "The Court has broad discretion regarding the type and degree of sanctions it can impose, but the sanctions must be just and related to the claims at issue." *Wachtel v. Health Net, Inc.,* 239 F.R.D. 81, 84 (D.N.J. 2006).  *Virtual Studios, Inc. v. Flock*, Civil Action No. 11-0622 (KSH)(CLW), at *5-6 (D.N.J. Oct. 19, 2015) ("The Court may impose on a party or its attorney those expenses, including attorneys' fees, caused by unjustified failure to comply with discovery orders or pretrial orders.").

Vision requests a modest sanction designed to prevent it from unfairly bearing the burden of ACU's violations and preventing ACU from securing a litigation advantage from its conduct. Vision requests an Order sanctioning ACU as follows:

1. ACU shall be precluded from challenging Vision's damages expert on the basis of the underlying financial information Vision's expert relies on to form opinions;
2. ACU shall be precluded at trial from presenting testimony and/or evidence as to sales or expenses of ACU Hardware USA or ACU Plasmold;
3. ACU Plasmold shall be precluded from introducing documents that were not produced prior to the fact discovery deadline, as evidenced by a proper production number; and,
4. ACU Plasmold shall pay all counsel fees and costs of Vision for the discovery of the Quach financials including the motions to compel discovery and sanctions.

The Third Circuit Court of Appeals addressed the factors a court should consider in deciding sanctions in *Poulis v. State Farm Fire and Cas. Co.,* 747 F.2d 863 (3d Cir. 1984) ("the *Poulis* factors"). The Court considers: (1) [T]he extent of the party's personal responsibility;  (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery;  (3) a history of dilatoriness;  (4) whether the conduct of the party or the attorney was willful or in bad faith;  (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions;  and (6) the meritoriousness of the claim or defense.

ACU is solely responsible for ignoring this court's Orders. It has possessed the financial information showing its sales into the U.S. during the term of the Exclusive Distribution Agreement the entire time. The Defendant's principal, Mr. Zhuo, exercises final control over ACU's operations in the U.S., Canada and China. Mr. Quach testified he provides the financials to ACU electronically and that in any event they are easy to collect from electronically stored records. Vision has been prejudiced in its ability to establish breach of the Exclusive Distribution Agreement and the damages arising from ACU's breach. Vision has also been deprived of customer lists and a basis of establishing ACU's reach in the market. Since Vision still does not know the extent of ACU's sales into the U.S., Vision also cannot tell if ACU has used Vision's

Attorney Eyes Only customer information (that was admittedly disclosed to ACU) to attempt to unfairly compete with Vision.

The conduct was willful and in bad faith. No outside reason or forces caused any of the delays. The Defendant is in complete control of its own documents and simply mischaracterizes what it is in its possession, or claims it has complied. To avoid proceeding fairly in this litigation, Defendant sought to extort a settlement from Vision and Defendant's affiliated factory manager was convicted in China, and on information and belief, Mr. Zhuo is currently wanted by the Chinese authorities. Mr. Quach's testimony concerning the existence, location, and format of the financials was precise and unequivocal. Defendant changes or adds an attorney at each juncture where production of the discovery was required. ACU just refused to comply with orders to produce them.

The fifth *Poulis* factor directs the Court to consider sanctions other than dismissing a claim. Vision does not seek dismissal of any claims. Vision has offered the alternative sanction of limiting the evidence ACU may present. Such sanctions are tailored to correct ACU's withholding of the underlying information, which, in addition to proving damages, could provide information relevant to liability and to the credibility of Mr. Zhuo. Further, ACU has long been cognizant of the possibility of sanctions for failing to make discovery, and apparently believes sanctions are preferable to producing the requested information.

The district court in *Wachtel* provided guidance in deciding whether to exclude evidence. The Court considers: 1) prejudice;  2) the ability of the offending party to cure that prejudice;  3) the extent to which the evidence would disrupt the orderly and efficient trial of the case or other cases in the court;  and 4) bad faith or willfulness of the offending party in failing to comply with the Court's order. *Wachtel*, 239 F.R.D. at 105. All of these factors favor the requested sanction of

limiting ACU's ability to present evidence attacking Vision's damages expert. Without such a sanction, ACU will reap the benefits of its disobedience of court orders and withholding of the Quach financials.

Factor 4 in particular, must be viewed in the context of ACU's criminal behavior. ACU has demonstrated its disrespect for laws. ACU attempted to blackmail Vision and Vision's vendor in China. An ACU employee served time for blackmail. ACU's assets are frozen in China because of its crimes against Vision and Vision's vendor. The purpose of the extortion was to force settlement of this matter. ACU's bad faith infected the entire litigation.

The reality is that ACU has willfully withheld the information and disobeyed court orders. *Days Inns Worldwide, Inc. v. Al Noor Corp.*, Civil Action 10-479 (ES) (CLW), at *3 (D.N.J. Mar. 5, 2012) ("Defendants' actions have clearly been willful . . . There is no evidence to suggest that the failure to produce discovery or comply with court orders resulted from inadvertence, neglect or mistake."). Vision has also spent thousands of dollars attempting to procure the same basic damages information, and has come to the Court many times. As another court stated in analogous circumstances:

> There is no question that Plaintiff is prejudiced by Defendants' failure to produce discovery. Plaintiff has been deprived of the information it needs to support its claims and has additionally been forced to file several motions, expending both time and resources, to obtain relevant discovery. *See Hoxworth v. Blinder Robinson & Co., Inc.,* 980 F.2d 912, 920 (a court may impose a default as a permissible sanction for violating a discovery order); *Ramada Worldwide Inc. v. NPR Hospitality Inc.,* No. 06-4966, 2008 WL 163641, at *4 (D.N.J. Jan. 16, 2008) (finding prejudice where plaintiff was unable to obtain discovery or pursue its claims "due to Defendants' failure to actively participate in the litigation of [the] case").

*Days Inns Worldwide,* at *2.

## 4. CONCLUSION

For the foregoing reasons, the Court should enter an Order for Sanctions as follows:

24

1. ACU shall be precluded from challenging Vision's damages expert on the basis of the underlying financial information Vision's expert relies on to form opinions;

2. ACU shall be precluded at trial from presenting testimony and/or evidence as to sales or expenses of ACU Hardware USA or ACU Plasmold;

3. ACU Plasmold shall be precluded from introducing documents that were not produced prior to the fact discovery deadline, as evidenced by a proper production number; and

4. ACU Plasmold shall pay all counsel fees and costs of Vision for the discovery of the Quach financials including the motions to compel discovery and sanctions.

Respectfully submitted,

/Michael Cukor/s
Michael Cukor, Esq.
**McGeary Cukor LLC**
150 Morristown Road
Bernardsville, NJ 07924

Evelyn A. Donegan, Esq.
**Rubin, Kaplan and Associates**
20 Centennial Ave
Piscataway, NJ 08854
Attorneys for Plaintiff