# EDWARD W. MILLER

Attorney at Law
821 Franklin Avenue, Suite 209
Garden City, New York 11530

―――――――――――――――

(917) 770-9016
EdMillerLaw@gmail.com

January 26, 2024

Hon. Cathy L. Waldor
Martin Luther King Jr. Courthouse
50 Walnut Street
Room 4040, Courtroom 4C
Newark, New Jersey 07101

RE:  Vision Industries Group, Inc. v. ACU Plasmold, Inc.
Case No.: 2:18-cv-06296-ES-CLW

Dear Judge Waldor,

The undersigned represents Defendant ACU in this case.  This letter is written as a sur-reply to Plaintiff's Reply Brief (Doc No. 229; "Plaintiff's Reply," herein).

**In its Reply, Plaintiff Deceptively Put Admissions into Defendant's Mouth**

Defendant opened its Brief in Opposition with over two pages detailing how Plaintiff falsely claimed that Defendant's attorney had "admitted" that Defendant wrongly withheld documents and refused to produce them.[1]  In its Reply, Plaintiff did not respond to that accusation of intentional misquoting.  Instead, Plaintiff opened its Reply with a new false claim:

| **Defendant's Actual Statement** | **Plaintiff's New False Representation** |
| --- | --- |
| "Plaintiff identifies only one group of 30 **inconsequential** sales invoices adding up to $100,000 in gross sales which should have been, but were not, produced. [Doc No. 224-1, Plaintiff's Brief, 4].  That's it – 30 documents.<br><br>*Inconsequential*, because the 30 invoices adding up to $100,000, do not change the bottom line.  The amounts reported on the 30 invoices jibe with the monthly sales and annual sales figures in the sales reports that were produced by ACU; when the 30 not produced invoices are added to the produced | "**ACU's Opposition admits**…that the imaged Quach computer shows at least $100,000 of invoices and sales made in the U.S. **[in violation of the Distribution Agreement]** that were never produced [5]<br><br>[5] ACU admits this but still inexplicably claims that, "after over 8,000 documents responsive to their search words [produced from the imaged Quach computer], Plaintiff has failed to |

---

[1] Doc No. 225, Brief in Opposition to Motion for Sanctions for Defendant's Failure to Comply with Discovery Orders, 1 to 3 ("Defendant's Opposition," herein).

1

| | |
|---|---|
| invoices, the total is equal to that in the produced monthly and annual sales reports. **In other words, the 30 invoices confirm Mr. Zhuo's (and Mr. Quach's) testimony regarding the amount of sales per year**." | identify a single document that contradicts the total sales numbers in the sales reports which Defendant produced." |
| Doc No. 225, Defendant's Opposition, 13-14. | Doc No. 229, Plaintiff's Reply, 1, 4 fn5 |

Defendant never "admitted" that the thirty invoices evidence a, "violation of the Distribution Agreement." To the contrary – Defendant argued that, "the 30 invoices confirm Mr. Zhuo's (and Mr. Quach's) testimony regarding the amount of sales per year." (Plaintiff has been reduced to misrepresentations in a desperate attempt to "prove" unreported sales of $100,000, whereas it is claiming tens of millions in unreported sales).

In Plaintiff's Initial Brief in Support of Sanctions, Plaintiff falsely represented that Alvin Zhuo admitted there were, "80,000 sales documents *relating to ACU sales in the U.S.A.*," when in fact Zhuo had stated that there were 80,000 sales documents *relating to ACU sales in Canada*. [Doc No.224-1, Memorandum in Support of Motion for Sanctions, 4 ("Plaintiff's Initial Brief," herein); Doc No. 225, Defendant's Opposition, 7, 8]. Defendant made this point in his Opposition; Plaintiff totally ignored it in its Reply.

As will be seen, misrepresentations are not the exceptions in Plaintiff's argumentation. Intentional misrepresentations have been an integral part of Plaintiff's form of legal argument.

**In its Reply, Plaintiff Deceptively Put Words into Defendant's Mouth Concerning the Law**

On pages 2 and 4 of its 9 page Reply, Plaintiff represents that, "ACU argues 'no harm, no foul,'" in connection to Defendant's attorney's disclosure of confidential information (to Defendant). [Doc No. 229, Plaintiff's Reply Brief, 2 and 4].

But Defendant never argued "no harm, no foul." Rather, Defendant analyzed the situation under the *Poulas* factors, one of which is "prejudice to the party." [Doc No. 225, Defendant's Opposition, 24-25]. Another factor is intentionality. Thus, a situation where no harm resulted from a mistake (like the present disclosure of classified documents to Defendant), would be treated very differently than a situation where intentional wrongdoing caused real harm.

**Plaintiff does not Respond to Fifteen of the Sixteen Points Made in Defendant's Opposition; Besides a Flagrant Misrepresentation, Plaintiff Ignores Defendant's Main Point**

Plaintiff's Reply does not respond to fifteen out of the sixteen arguments in Defendant's Opposition. Exhibit A is a copy of Defendant's Opposition, with all the points that were not responded to high-lighted. As can be seen, Plaintiff completely ignored over 90% of the points made in Defendant's Opposition, picking just one out of sixteen to respond to.

2

Instead of replying to the points raised in Defendant's Opposition, Plaintiff used his Reply to introduce new facts and arguments. For example, on pages 6 and 7 of its Reply Plaintiff raises for the first time, new facts and arguments concerning *Value Window and Door, Inc*. It is the first time this company has been mentioned in the litigation.

Plaintiff ignores Defendant's argument that the two documents relied upon by Plaintiff to support its position (that Defendant is concealing sales), actually prove Defendant's position (that Defendant is not concealing any sales). The two documents were an April 20, 2021 three page Valuation of ACU and a May 18, 2021 draft contract for sale of Mr. Zhuo's interest in ACU U.S.A. to Mr. Quach.[2] [Doc No. 147, Exhibits C and E (via email to Court)].

The Valuation of "PROFIT AND LOSS - ALL TRANSACTIONS FOR ACU," shows total gross sales over 14 years of $2,814,636.19, which comes out to an average of approximately $200,000.00 in gross sales per year. [Doc No. 147, Exhibit C, at 1 (third figure under "sales")]. The Valuation's gross sales and losses were picked up in the draft contract. Another necessary figure to value the company in a sale to Quach, was Quach's personal debt to the company, which is listed as $77,000 on page 3 of the Valuation, and, is picked up in Section 2E of the draft contract. [Doc No. 147, Exhibit C, at 3; and, Exhibit E, Section 2E].

The second page of the Valuation was an "Accounts Receivable Aging Summary" for ACU U.S.A.'s seven customers, showing all unpaid customer invoices grouped by the number of days outstanding – information necessary to place a value on the company. [Doc No. 147, Exhibit C, 2]. These two documents – the **April 20, 2021** Valuation and the **May 18, 2021** draft contract of sale – obviously went together. However, Plaintiff insists on referring to the Valuation as a "sales report" for one year. In its Initial Brief, Plaintiff threw a *Hail Mary of deception* on top of this outrageously false claim, by falsely putting the words into Mr. Lanterman's mouth:

> "The Lanterman Declaration explained that there were many QuickBooks files on the Quach computer, one of the reports for ACU Hardware USA showed millions of dollars in sales. This is significantly more than any of the other reports."

Doc No. 224-1, Plaintiff's Initial Brief, 13.

In fact, the Valuation is not mentioned at all in Lanterman's Declaration, let alone being described as a "QuickBooks report." [Doc No. 156-1, November 3, 2021 Affirmation of Mark Lanterman (via email to the Court)].

---

[2] Originally, Plaintiff reasoned that Zhuo was in cahoots with Quach because, "Zhuo did not state that he has addressed the issue and fired Quach," and, "they are working together, as they have for more than 14 years, and as they continue to do today." [Doc No. 109, at 3; and, Doc No. 147, at 4]. Now that Plaintiff has learned that Zhuo terminated his 14 yearlong partnership with Quach, Plaintiff reasons: "Today, despite ACU's claim that Quach is 'mentally unstable,' ACU made him the owner of ACU Hardware U.S.A. and extended to him a large credit line." But the reason for the credit line is that Mr. Quach cannot possibly pay his portion of the accumulated losses because he doesn't make enough money from the company (which grosses no more than $300,000 a good year).

In its Opposition Defendant exposed these misrepresentations. [Doc No. 225, Defendant's Opposition, 3-7]. But, in the face of Defendant's 5 page detailed explanation of exactly how Plaintiff had attempted to deceive the Court, Plaintiff maintained a stoic silence in its Reply. *Cum tacent, clamant* – 'When they are silent, they shout.' By its silence, Plaintiff admits everything it ignores. Plaintiff is playing ostrich in the hope that the court will join. But, Plaintiff cannot expect the Court to ignore Defendant's arguments, or to figure out rebuttals. The Valuation, in fact, confirms Defendant's numbers.

**Plaintiff's Response to One of Plaintiff's Sixteen Points, Flagrantly Misrepresents Facts**

In its Initial Brief Plaintiff emphasized its claim that Quach, "downloaded large amounts of financial data to USB drives between December 14, 2019 and September 22, 2021." Unable to ignore this irrelevant point (since Plaintiff made such a big deal out of it), Defendant hired a computer forensic analyst who demonstrated that, in fact, the files Quach had downloaded contained very little data – they consisted primarily of 1 or 2 page documents.

In an effort to discredit Defendant's computer expert as an incompetent novice, Plaintiff falsely represented that Defendant's analyst was working with the wrong data. Once again falsely putting their words into the mouth of Mr. Lanterman:

> "Mr. Lanterman further explains that Mr. Popkin, ACU's declarant, **did not yet have access to the Quach data from Lanterman at the time Popkin made his declaration**. This would explain why **documents attached to the Popkin Declaration (alleged to be printed from the Quach imaged files) contain ACU Bates numbers** as they were previously produced by ACU's counsel. **In any event, Popkin's declaration does not explain how supposedly original data files from Quach's computer bear production numbers presumably affixed by ACU's counsel.**"
> [Doc No. 229, Plaintiff's Reply, 5, f.n. 6 (emphasis added)].

Plaintiff's above statement is blatantly false:

- **The documents attached to Mr. Popkin Declaration were not bates stamped** (they had been marked "Attorneys Eyes Only" by Lanterman);

- Mr. Popkin **did** have "access to the data produced by Lanterman"; and,

- The 374 page exhibit attached to Mr. Popkin's affirmation **was** "printed from the Quach imaged files."

Defendant's counsel provided Mr. Popkin with: (1) The link (given by Mr. Lanterman to both attorneys) to the 8,462 files retrieved by Mr. Lanterman that matched the search words provided by Plaintiff; and, (2) a list of 250 file and folder names evidently compiled by Plaintiff''s attorney from the link provided by Lanterman, and presented to the Court as a list of files that had been downloaded onto USB drives (the list had first been attached as Exhibit H to Plaintiff's November 22, 2021 letter to the court, Doc No. 147).

4

The list was just that, a list of file names, not links to printable documents. The way Mr. Popkin got the documents was by meticulously cross indexing the 250 files on the list, against the 8,462 files in Lanterman's link. Of the 250 files, Mr. Popkin located 374 PDF documents that were not duplicates, consisting primarily of one or two page invoices and shipping documents (consistent with a low grossing business). Mr. Popkin printed up those documents and attached them as an exhibit to his declaration.[3] Contrary to Plaintiff's bald-faced misrepresentation, the documents were not bates-stamped; the documents had been marked "Attorneys Eyes Only" by Lanterman.

Even Plaintiff's titles are deceptive: *Quach Loaded Thousands of Financial Reports onto USB Drives*. [Doc No. 229, Plaintiff's Reply, 5]. Defendant is referring to the 2,000 files that are mainly 1 or 2 page invoices or shipping records, not *Financial Reports* (In its Initial Brief, Plaintiff represented that 250 files had been downloaded to USB drives since 2019; in its Reply the number jumps to 2,000). Plaintiff makes a big deal out of the large amount of memory taken up by the Quick Book folders; but Quick Book folders take up huge amounts of memory and that is the reason they have to be compressed. If any of the Quick Book reports contained any information evidencing unreported sales, Plaintiff would have certainly printed them up and produced them. Instead, Plaintiff prefers to speculate about what they might contain.

Plaintiff insists that, "Vision cannot disentangle the mess of the Quach production or decipher deleted data from produced data." [Plaintiff's Reply, at 5]. However, as Mr. Lanterman's February 1, 2022 letter made clear, all of the deleted data had probably been restored and returned to a printable form. Of 11,462 documents, Plaintiff has identified only two specific documents as support for its position (that Defendant has concealed sales). Those two documents – the company Valuation and the draft sale contract – actually prove Defendant's position (that Defendant has not concealed sales).

**Conclusion**

In its Opposition Defendant detailed sixteen examples (from Plaintiff's Initial Brief), of Plaintiff misrepresenting facts, mischaracterizing evidence, and, misquoting Defendant. In its Reply, Plaintiff simply ignored Defendant's points, and, launched into yet another round of new misrepresentations. Plaintiff has repeatedly attempted to mislead this Court (at times, it appears to have succeeded). As such, Plaintiff lacks the clean hands necessary to invoke the equity powers of the Court. *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 83 (3d Cir. 2012) ("without the benefit of clean hands here, UPS should not be the beneficiary of a sanction that we are, under most circumstances, already loathe to affirm.").

Very Truly Yours,

/s/ Edward W. Miller
Edward W. Miller, Esq.

---

[3] So much for Plaintiff's efforts to knock Defendant's computer forensic analyst as a lightweight, "a recent college graduate, contradicting a world-class forensic expert." [Doc No. 229, Plaintiff's Reply, 2 f.n. 2].