**EXHIBIT A**

Case No. 1:05-cv-01858-EWN-MJW    Document 1-4    filed 09/23/05    USDC Colorado
Case 2:18-cv-06296-JKS-CLW    Document 301-5    Filed 03/17/25    Page 2 of 62 PageID:
3372

## APPENDIX C (Plaintiff is a qualifying person with a disability)

**1.** Plaintiff has been variously diagnosed, by different psychiatrists over the past five years, with one or more of the following, in different concurrent combinations: bi-polar disorder with "mixed features," clinical depression, cyclothamic personality disorder, narcissistic personality disorder and "adult ADHD." Each of the foregoing is enumerated in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (a/k/a DSM IV).

**2.** A history of Plaintiff's disability dates back to Plaintiff's age of 9, at which time he was placed into a therapeutic milieu group-home for one year, followed by irregular out-patient therapy. He was later hospitalized when he was of the age of 15 for one year, placed on various medications, including Navane™, Prolixin™, Artane™ and Thorazine™. This year-long occurrence turned out to be an extremely traumatic experience for the teenager-Plaintiff.[1] Plaintiff avoided psychotherapy and psychotropic medications until the fall of 1999, when he sought medication therapy for depressive symptoms that were affecting major life activities. Between the November of 1999 and July 2000, Plaintiff was placed on numerous different medications (at different times), including Xanax™, Risperdol™, Klonapin™, ristoril, Zyprexa™, Paxil™, Tegratol™, Ritalin™, Halodol™ and Depakote™. None of these products had measurable efficacy and some actually produced adverse side-effects. For example, the Klonapin, which is a benzodiazepine, had an adverse disinhibitive effect, which the CMHIFL State doctor believed contributed to Plaintiff's behavioral problems in the spring of 2000. The Halodol™ caused an unexplained convulsive effect. In January of 2001, Plaintiff was switched to lithium and Wellbutrin™ which had an improved (but short-lived) efficacy. During the year of 2000, Plaintiff was hospitalized for a duration of four months on three separate occasions, two of, which were at the behest of Defendant Ryan. All three were a direct and proximate result of the "environmental stressors,"[2] brought about by Ryan's petitioning activities, fraudulent allegations and abuse of process, the foregoing, which resulted in the loss of Plaintiff's contact with daughter, his home, his liberty and his possessions. However, although Defendant Ryan and Wilson activities have clearly had the capacity to exacerbate Plaintiff's disability, the disability existed, does now exist and will likely exist for the foreseeable future, irrespective of their influence.

---

[1] At this same facility, in 1997, state investigators found medical neglect after adolescent-patient filed 15 requests for medical attention before staff discovered her back was fractured. The patient alleged that a staff member injured her back while restraining her a month before; In 1998, another patient, aged 15, died of "oxygen deprivation caused by a harmful restraint," 2 days after being held in a prone position by 2 staff members. She was subjected to restraints after refusing to hand over an "unauthorized" personal item. The item was a family photograph. (Lieberman, Dodd and De Lauro, 1999).

[2] September 2001 "Report of the Special Advocate," filed in Jefferson County Case No. 99DR3717: "this advocate concurs with Drs. Pyle and Gordon, that Mr. Harrington's behaviors last year reflected the severe nature of the environmental stressors under which he was placed, in combination with adjustment disorder and personality disorder traits." Plaintiff's 7/19/01 psychiatric evaluation sets forth his Axis IV diagnosis as, "Severe – separation from daughter."

**3.**  Since November of 1999, and at all times relevant, Plaintiff's disability has substantially limited life activities, including interpersonal relations, sleep, work and eating. These limitations have not been adequately relieved through medications.[3] Plaintiff's disability has and does cause both severe depression and elation, which is exacerbated or "triggered" by environmental stimuli (rather than predictably cyclical in nature).[4] Plaintiff's disability has and does manifest in compulsive and obsessive behavioral patterns, chronic and often severe depression, inat tentiveness and difficulty in with certain cognitive functions, such as managing overt emotional manifestations, which have created reoccurring and, sometimes, insurmountable challenges to employment and interpersonal transactions. Plaintiff's disability caused Plaintiff to become both unemployed and unemployable for approximately 15 months between February of 2000 and January of 2003. Plaintiff's disability has and does require reasonable accommodations from an employer including, but not limited to, time off from work, occasional leave and adjustment to the level of supervision. Plaintiff's disability had, on occasion, resulted in suicidal ideation and, on one occasion, a failed attempt at carbon monoxide poisoning (May 31st of 2000). Plaintiff's disability has not resulted in homicidal ideation or physical violence directed towards persons other than Plaintiff and Plaintiff further asserts that his disability, with specific accommodations,[5] does not and has not affected his ability to care for his daughter.

**4.**  At all times relevant, Plaintiff has been regarded as gravely disabled by all Defendants, including the State Defendants.  As examples:

> o    Most recently (July 2nd 2003), Judge Tidball terminated Plaintiff's parenting time and accepted Defendant Ryan and Wilson's speculative notions of future harm, without requiring expert witness testimony, stating: "The evidence also before the Court is that the respondent has testified, and previously testified, and there's been evidence before the Court that the respondent has been under the care of a psychiatrist, that he has been diagnosed with bipolar, and he has been placed on medications. . . .The petitioner has taken the position that she has concerns

---

[3]  Some of Plaintiff's symptoms have appeared to have been temporarily ameliorated at times, providing a false sense of hope, but never with consistency or long-term effect. For these reasons, psychiatrists often "experiment" with a flexible and shifting medication regimen, which may include varying dosages or different medications.

[4]  "The Court makes the following findings . . . the Court finds persuasive [Plaintiff]'s testimony that this divorce has constituted what's called a 'trigger,' which has, as a result, caused him to have manic episodes that have –that have essentially resulted, in part at least, in the loss of his job and in his inability to work over the last few months." Transcript, "Judges Ruling and Order," May 31st 2000, *Id.* at pp. 4 ~ 5.

[5]  Plaintiff has greatly benefited from palpable physical and emotional support from his spouse (who now has also become the target of Jefferson County judiciary's spleen). Plaintiff's disability, when not exacerbated by Defendant's Ryan and Wilson, does not affected Plaintiff's parenting skills (*e.g.,* inability to work, sleep and eat regularly or consistently, while causing fatigue and financial hardship, does not necessarily render one unfit to care for his child).

2

Case No. 1:05-cv-01858-EWN-MJW    Document 1-4    filed 09/23/05    USDC Colorado
Case 2:18-cv-06296-JKS-CLW    Document 301-5    Filed 03/17/25    Page 4 of 62 PageID:
3374

that he's not taking his medication on a regular basis, and that that affects his ability to communicate with her and to parent the minor child."[6]

o    Defendants Ryan and Wilson have alleged, consistently, for the past five years that Plaintiff is mentally ill.[7] Defendants Ryan and Wilson have argued that

---

[6] Reproduction and raising (parenting) children is a major life activity.

[7]    Ryan & Wilson's June 06, 2005 Answer Brief to the Colorado Court of Appeals in Case Nº 04 CA 1161 argues, "[T]he father is paranoid and potentially homicidal when he does not take his medication." *Id.* at p. 2, lines 12 ~ 13; "The Father's own exhibit from a psychiatrist tendered to the Trial Court states the father's diagnosis is 'bipolar disorder, mixed, complicated by a mixed personality disorder with narcissistic features.' The Father's psychiatrist goes on to state that the father has spent over three non-consecutive months in mental-health hospitalization and that the psychiatrist recommended he 'consider psychiatric disability.' The record contains the Motion wherein the father was involuntarily committed shortly after Permanent Orders by order of Judge Zimmerman. After his commitment, he was certified to remain at the mental health facility for ninety days; his physician [sic] wrote that 'he has many factors suggesting high danger' he was found to be adversarial and the team feared he would again become suicidal.' " *Id.* at p. 3. "The totality of the evidence is clear that the father suffers from a mental illness that, when uncontrolled, results in dangerous behavior." *Id.* at p. 9, lines 14 ~ 17. Their July 1st 2004 Answer Brief to the Colorado Court of Appeals in Case Nº 03 CA 1825 argues, "[T]he father . . . appeared to have discontinued his medication for his well documented mental illness(es) . . . the father's mental illness was affecting the child . . . The mother was very concerned that the father had discontinued his medication for his bi-polar condition . . . the father has been diagnosed as bi-polar and he has been prescribed medication for that condition . . . the father's mental illness apparently greatly impairs his judgment . . . There is evidence the father became paranoid and potentially homicidal when he does not take medication. . . To infer that his mental illness is not to be considered is simply absurd . . . The totality of the evidence is clear that the father suffers from a mental illness that, when uncontrolled, results in dangerous behavior . . . The record is filled with evidence of the father's mental illness(es)." Their June 30, 2003 "Emergency Verified Motion to Return Child to Mother or Motion to Restrict Parental Contact" (Jefferson County Case Nº 99DR3717) argues, "The mother believes the father has been diagnosed in the past as bi-polar and is currently prescribed mediation to deal with this condition. . . The mother is very concerned that the father has discontinued his medication . . . The mother believes that the father became dangerous in the past when he discontinued his medication." Defendant Ryan's July 7, 2000 Affidavit in support of § 27-10-106 Petition for Mental Health hold (Jefferson County Case Nº 00MH243) alleges, "Mr. Harrington has had several hospitalizations at West Pines at Lutheran Medical Center and St. Joseph's PsychCenter due to mental illness. He has been diagnosed with Bipolar Disorder, with psychotic features, and Narcissistic Personality Disorder. He has also has a past diagnosis of schizophrenia. Mr. Harrington has been prescribed anti-psychotic and mood stabilizing medications, which he has refused to take. Consequently, he has deteriorated. . . He has many weapons and has threatened to use them on anyone he perceives as a threat." Her Dec 9th 1999 Affidavit in support of a

Case No. 1:05-cv-01858-EWN-MJW    Document 1-4    filed 09/23/05    USDC Colorado
Case 2:18-cv-06296-JKS-CLW    Document 301-5    Filed 03/17/25    Page 5 of 62 PageID:
3375

Plaintiff is unable to care for his daughter.[8]  Defendant Ryan has testified that
Plaintiff is unable to make responsible decisions regarding his own care and that
he is chronically suicidal.  Defendant Wilson has been quoted as stating to per-
sons unconnected to the proceedings that Plaintiff, "has a few screws loose," and
is, "deranged."

o        Defendant Fyfe also regards Plaintiff as having a disability that substan-
tially limits the major life activity of interacting with others and raising his child,
as found in his Report: "[Ms. Ryan] has raised significant issues about Sean's
mental health. These issues have been investigated thoroughly by the SA. Ac-
cording to the first SA report, Sean was at the time functioning without men-
tal health difficulties and had a diagnosis of an adjustment disorder. Data re-
viewed for this report, however, suggested otherwise. Despite objections to the di-
agnosis, Sean was diagnosed with a bipolar disorder early in the separation.
There are also several indications in the materials reviewed that there were per-
sonality disorder problems of a narcissistic nature with Sean. . . Sean has,
however, minimized the historical record concerning mental health and per-
sonality difficulties . . . [His] obsessive behavior is . . . most likely indicative
of the kinds of psychological problems Sean exhibits, i.e., manic behavior, ob-
sessive rumination and narcissistic preoccupation . . . The SA believes that fa-
ther clearly has mental health problems, which should be addressed by a local
psychiatrist in order to determine the appropriateness of ongoing treatment
and/or medication. . . The current SA has concluded that the past SA erred in
not properly expressing concern about father's emotional and mental health
functioning. . . His intense focus on himself is narcissistic and hints at a per-
sonality disorder."

o        The Supreme Court Regulatory Counsel, to whom Plaintiff had provided
documentation, including mental health records (containing quotations made by
Defendant Wilson to the State psychiatrist), has responded to Plaintiff's repeated
and clarified written requests for an inquiry, stating, "*I apologize if I failed to state
my position clearly enough for you to remember or comprehend*," indicating some per-
ception of limited intellectual capacity. The Counsel, `though refusing to conduct
a fact-finding inquiry, has adopted Defendant Wilson's allegations, as presented
in Plaintiff's complaint to them, because the Counsel has declared that, despite re-
ceipt of contradicting third-party affidavits or Plaintiff's contentions, Defendant
Wilson's allegations were neither fraudulent or untrue merely because Plaintiff
declared them to be.  Thus, the Supreme Court Regulatory Counsel has made a
*prima facie* finding regarding the credibility of parties without holding a hearing

---

civil restraining order (Jefferson County Case N° 99C15402) alleges a, "History of mental
illness (untreated)"

[8]  Ryan & Wilson's July 1st 2004 Answer Brief to the Colorado Court of Appeals in Case No.
03CA1825: "it is clearly not in the best interests to have parenting time with
an unmedicated [sic] mentally ill father." *Id.* at p. 18, lines 14 - 15

or interviewing witnesses; has determined that there is no material issue of fact; and has adopted Defendant Wilson's allegations by reference. Defendant Culberson-Smith of the ARC has also represented that she has thoroughly poured over all of the cases that Plaintiff and Wilson has been involved.[9] <u>Therefore, all of the evidence made available to the state trial court regarding Plaintiff's disability was also available to Defendant Culberson-Smith.</u>

**5.** Aside from Plaintiff's own testimony before the state court (in the years 2000 and 2003), the state court was presented with expert testimony regarding Plaintiff's disability and affect on major life activities by and through the Report of the Special Advocate (Natalie Van Note) in September of 2001. The court was provided with an exhibit disclosure on August 4th 2003, which contained a March 25th 2003 letter written by Chris Gordon, M.D. The letter contains a concise diagnostic statement and establishes a nexus between Plaintiff's disability and/or the perception of his disability to, "significant difficulties maintaining gainful employment, as well as interpersonal relationships and other aspects of life." *Id.*

**6.** The testimonies and exhibits described in the preceding paragraph were unopposed and none has been stricken or otherwise discredited by the court.

**7.** On the 27th of July, 2005, Defendant Wilson sent a fax to Plaintiff's appellate attorney, Karen Renne, Ph.D., and wrote, "Please consider appointing a guardian for Sean under C.R.P.C. 1.14(c) because it appears that he is mentally impaired." On the same day, she sent a fax to Attorney Regulation Counsel, John Gleason, and wrote, "I have asked his attorney to have a guardian appointed for Mr. Harrington under C.R.P.C. 1.14(c) because it appears that he is mentally impaired.

---

[9] *E.g.,* In her August 21st 2003 letter, Culberson-Smith wrote, "*I re-reviewed the information you provided to us by telephone. I also reviewed the written information and documents attached to your recent letters. In addition, I reviewed court documents and records from a number of your Jefferson county court cases, including case numbers 99 C 15402, 99 DR 3717, 00 C 2389, 00 C 7880, 00 C 8748, 01 CV 1376, 01 CV 1377, and 03 C 11619.*" *Id.* at p. 2

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

---

| | |
|---|---|
| SEAN HARRINGTON | CASE NO. 05-_____ |
| Plaintiff, | |
| vs. | COMPLAINT |
| MADELINE WILSON and the "LAW OFFICE OF MADELINE WILSON"; CHRISTY RYAN; BILL J. FYFE and COLUMBINE COUNSELING CENTER, P.C.; LAURA ARCILISE, in her personal capacity; LOUISE CULBERSON-SMITH, in her personal capacity; JOHN GLEASON in his personal capacity and his official capacity (as Attorney Regulation Counsel); WENDELL PRYOR in his official capacity as Director of the Colorado Civil Rights Division & Colorado Civil Rights Commission; ROBERT EVANS, in his official capacity as ADA Coordinator and Court Administrator for the First Judicial District; the JEFFERSON COUNTY COMBINED COURT, through the COLORADO ATTORNEY GENERAL, JOHN SUTHERS (in his official Capacity). | |
| Defendants | |

---

Plaintiff, for his Complaint against above-captioned defendants, alleges as follows:

# I. NATURE OF THE ACTION

## INTRODUCTION

1.      This case is a civil action seeking injunctive relief, declaratory judgment and damages and costs (nominal, compensatory and punitive), for tort recovery and to vindicate and safeguard civil rights pursuant to or arising from: 28 C.F.R. §§ 35.105(a) & (b), 35.130, 42 U.S.C. §§ 1981, 1983, 1985(3), 1986, 1988, 2000d-7; 42 U.S.C. 12131 ~ 12134, 42 U.S.C. §§ 10801, 10805(a)(9) & 10841; Colo.Rev.Stat.  §§ 6-1-105(1), 24-34-601(2), 27-10-104, 27-10-115 & 14-10-123.8, 29 U.S.C. § 794, U.S. Const. amend. XIV, § 1, 28 U.S.C. §§ 2201 & 2202 and Colo.R.Civ.P. §§ 251.1, 251.9, 251.11 & 251.12.

2.      A Procedural History is made part hereof by reference as **Appendix A** and is provided for the express convenience of the Court to place the within claims in context.

3.      The within claims for relief are predicated upon defendants' conduct since September 2000 until present. Any conduct that occurred during or before August 2000 (including un-charged conduct, conduct collateral to the within claims or transactions from which claims could be barred pursuant to *res judicita*), as set forth in the within Complaint, is expressly alleged as: (a) *res gestae* and inextricably intertwined with the conduct complained of, herein; (b) providing relevant background information to the instant case; (c) probative of essential elements of the within claims necessary to establish material facts that occurred later that were predicated on the earlier acts; or (d) evidencing Defendants' opportunity, consonant motives, intent, preparation in accord with intent, planning, knowledge, and absence of mistake, accident or coincidence.

4.      Plaintiff does not ask this Court to modify or change custody, "resolve" parental con-flicts over the custody of a minor child or adjust family status. Instead, Plaintiff seeks remedies that cannot obtained in State court domestic relations proceedings (*esp.,* damages for tortious conduct or conduct out of contract and civil rights violations). Plaintiff's allegations of civil con-spiracy to conceal the minor child, intentional infliction of emotional distress, aiding and abet-ting, and others are independent claims that could not have been properly put to a jury and must be brought in a collateral action.

5.      The within claims for relief do not require this court to issue any ruling that might con-flict with any state regulatory law or policy in connection with a complex state administrative process.  For example, where allegations of disparate treatment concern the Office of Attorney Regulatory Counsel ("ARC"), it should be noted that the ARC has <u>required</u> Plaintiff to first ob-tain a judicial ruling –from this court, for example– before they will conduct further inquiry.

6.      Plaintiff does not request this Court to interfere with any ongoing state proceedings and, in this case, there could be no ongoing proceedings in the state trial court, because the judge has not decided a pending recusal motion, filed over one year ago in August 2004.[1]  And, although, Plaintiff has pending State appeals, they are appeals of particular orders, to which appellate ju-risdiction and scope is narrowly focused, and the remedies sought herein are not germane to a reversal of said order[s]. The appellate proceedings neither implicate important state interests nor arose from an adequate opportunity to raise the within claims.

---

[1] Under Colo.R.Civ.P. § 97, the proceedings have been suspended and the State trial court lacks jurisdic-tion to take any action other than to decide that motion (and, even if the State court were to reinstate on-going proceedings in response to this federal suit, that would trigger the extraordinary circumstances and bad faith exceptions to abstention). This "indefinite suspension," combined with the appellate court's un-characteristic denial of motions for limited remand for the determination of restoration of parenting time, the Colorado Supreme Court's discretionary disinclination to grant prohibition or *mandamus* (to compel the trial court to decide the recusal motion) and the trial court's pattern of selectively (and illegally) con-ferring jurisdiction upon itself to issue or enforce orders against Plaintiff and waiving jurisdiction to en-force orders for Plaintiff amounts to a lack of an adequate state forum.

2

7.      Plaintiff asks the court to examine whether certain judicial proceedings, which happened to involve a divorce, comported with the federal constitutional guarantee of due process. This is a sphere in which the federal courts claim an expertise at least equal to that of the state courts. These claims are directed to the *procedures* used by the state court, as well as state administrative agencies, which procedures were justified by no countervailing state interest of overriding significance and necessarily implicate, not only the public accommodations and facilities use under Title II of the Americans with Disabilities Act, but also the right of access inherent in numerous constitutional provisions, including the Due Process Clauses, the Privileges and Immunities Clause of Article IV, and the First Amendment. The fact that judicial decisions are but one of the most visible aspects of the courts' public services is not an attack on the judgments, but an attack on the underlying policies and are cited only to the extent that they implicate those policies.

8.      Plaintiff is not seeking the federal court to: "sit in appellate review" of state court decisions; enjoin the State from enforcing any legitimate state court judgment; void, reverse, nullify, modify or "undo" state-court judgments; or otherwise restore him to a position he was before any particular judgment[s]. The examples that are cited, herein, that implicate state court judgments should not be viewed as an island,[2] because such judgments cited are those that were procured through fraud and deception or were void *ab initio* (not merely voidable), which judgments have no preclusive effect and may be attacked collaterally.

9.      Other judgments or decisions, implicated herein, also do not meet the "actually decided" test. For example, in August of 2000, a "judgment" in the County court was rendered without affording Plaintiff an opportunity to be present, which, by definition, was not a judicial determination of his rights. Each and every claim of fraud or deception submitted by Plaintiff to the state trial court has been disregarded and not decided on the merits. Because the federal court's jurisdiction is circumscribed only by decisions that were "actually decided" and that have a preclusive effect within the state's court's, Plaintiff's claims are within this Court's jurisdiction.

10.     Plaintiff raises federal claims and other matters that:  (1) Plaintiff had neither a reasonable opportunity to raise nor a full and fair opportunity to litigate, (2) the state courts declined to reach and concern injuries that the state court failed to remedy; (3) concern a systemic policy that exceeds the scope, jurisdiction and inclination of the state's trial and appellate courts; (4) are separable from and collateral to state divorce court judgment[s]; and (5) raise the question of whether Plaintiff is entitled to damages, which is a question for the Jury.

## THE DEFENDANTS

11.     The tort claims are against Defendants Ryan, Wilson, Fyfe and Arcilise; the civil rights claims are against Defendants Ryan, Wilson, Fyfe, Arcilise, Gleason (in his official and individual capacity) and Culberson-Smith (in her individual capacity); the breach of contract claims are

---

[2] Plaintiff sets forth extra-judicial corroborating examples, including, but not limited to: administrative agency decisions and inaction; statements; deliberate indifference; court employee conduct; and attributes of an inherently discriminatory implementation of a state judicial system.

[separately] against Defendants Ryan and Fyfe; the claims for prospective injunctive relief are against the Attorney General, Gleason and Pryor, all in their official capacities; the Americans with Disabilities Title II (hereinafter, "ADA Title II") claims are against Defendant Evans, the Jefferson County Combined Court, the Attorney General and Defendant Pryor.

12.     Defendants are joined under Fed.R.Civ.P. § 20(a) by a common question of law and dissimilar claims are joined under Fed.R.Civ.P. § 18(a) to avoid future application of *res judicata* (for failure to litigate issues arising from the same transaction that should have been litigated).

### THE CLAIM OF DENIAL OF ACCESS TO COURT

13.     This case is a prototypical Title II ADA claim of denial of access to the court on a basis of a psychiatric disability.  Plaintiff alleges both individual conduct and systemic discriminatory customs, policies and practices resulting from invidious animus; failure to both adopt and implement methodology to eliminate discriminatory practices; failing to acknowledge requests for reasonable accommodations; and failing to reasonably accommodate disabilities.  Plaintiff also alleges a conspiracy among Defendants Ryan, Wilson, Arcilise and the state trial court (treated here as the civil equivalent of an "unindicted co-conspirator") to deny access to the courts.

### THE CONSPIRACY CLAIMS

14.     To support these claims, Plaintiff will not allege an express agreement, but rather will set forth the facts tending to show agreement and concerted action. The agreements as to the conspiracies may be inferred from the circumstances, including, but not limited to: the evidence in the Record; comments, statements and prior actions of the defendant parties; the repetitive pattern of conduct; and the fact that the acts are not indicative of spontaneity, but rather of cool deliberation from which a prior agreement should be inferred.

15.     All Defendants so named as actors in the conspiracy are within the meaning of section 1985(3) involving the state to influence state activity –both the court proceedings in the domestic case, the civil commitment proceedings and the state grievance processes.

### DUE DILIGENCE (COMMON LAW DUTY OF EXHAUSTION)

16.     Plaintiff has exhausted every reasonable means —far beyond what should be required of any ordinary person — to seek redress by placing dozens of calls and writing scores of letters to numerous divisions of county and district Colorado courts and agencies over the past five years regarding the matters complained of herein.

4

**17.**    If and as necessary, Plaintiff will demonstrate that the state courts and other agencies have declined to remedy, settle, rectify, adjudicate and, in most instances, acknowledge the issues complained of herein. Issues that have been tangentially acknowledged have been suppressed or disposed of with the intent to suppress justiciable controversies.

**18.**    Because the State has made unavailable any remedy available for the purpose of a fact-finding inquiry, Plaintiff comes now to obtain a, "court's decision regarding [his] fraud claims," and to provide an, "indication that the court addressed the issue," which has been specifically required by the Colorado Attorney Regulation Counsel.

**19.**    In May of 2005, Plaintiff emailed a draft copy of the within Complaint to Ms. McCann (of the Attorney General's Office) and Defendants Gleason, Pryor and Arcilise, and asked, "*If you believe that one or more of these claims* [contained in the attached Complaint draft] *are frivolous, please contact me at this email address and explain why you believe that to be the case.*" As of the date of this filing, no response has been received.

**20.**    Plaintiff has, without success, made numerous *bona fide* efforts to retain an attorney for this case, but has been unable to locate an attorney with self-professed knowledge in all of the areas of tort, contract, domestic relations, ADA, civil rights and ethics (which this case consists of) and Plaintiff is without sufficient resources to afford a "dream team" of attorneys, in addition to those already he has already retained for the state proceedings. Plaintiff has, concurrent with this filing, requested the clerk of the Court to seek volunteer counsel to represent Plaintiff. The clerk maintains a list of *pro se* cases for, which the Court is seeking volunteer counsel.

**21.**    Plaintiff has submitted a draft copy of the within Complaint and conferred with attorney Susan Stefan regarding the ADA aspects of this case.[3] Ms. Stefan informally concluded, in writing, that, "*I think your ADA claims should survive a motion to dismiss.*" [4]


## II. JURISDICTION AND VENUE

**22.**    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, 1343 and 1367; the amount in controversy, which exceeds seventy-five thousand dollars, exclusive of costs and pre and post judgment interest; and Plaintiff's claims for injuries attributable to deprivation of Constitutional rights and privileges.

---

[3] Ms. Stefan is an attorney with the Center for Public Representation in Newton, Massachusetts and is one of the country's most highly regarded experts in mental disability law. From 1986 until 1990, she worked for the Mental Health Law Project (n/k/a the Bazelon Center for Mental Health Law). From 1990 until 2001, Ms. Stefan was a professor of law at the University of Miami Law School, where she taught mental health and disability law. She has published two books, including Unequal Rights: Discrimination Against People With Mental Disabilities and the Americans With Disabilities Act. She has contributing chapters to others and publishing numerous law review articles.

[4] Plaintiff's inclusion of this allegation is not intended to waive any attorney-client privilege or any work product privilege that may now exist or that may exist in the future between himself or Ms. Stefan.

**23.**    Venue in this Court is proper under 28 U.S.C. § 1391(a) as Plaintiff's claims arose primarily in this district. Plaintiff is not a resident of Colorado,[5] whereas Defendant Ryan is now domiciled in Texas[6] and all other herein named defendants are domiciled in Colorado.

## III. FACTUAL ALLEGATIONS

### ALLEGATIONS REGARDING RYAN & WILSON (ABUSE OF PROCESS, FRAUD, DECEIT)

**24.**    "[I]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Fed.R.Civ.P (9)(b). The evidentiary factual allegations regarding Ryan & Wilson's abuse of process and fraudulent petitioning relative to lunacy proceedings, domestic proceedings and civil restraining order proceedings are contained in **Appendix B**, which is incorporated by reference, herein.

### ALLEGATIONS CONCERNING DISREGARD OF REQUEST FOR REASONABLE (ADA) ACCOMMODATION

**25.**    Under the ADA, Plaintiff is a person with a qualifying disability and who has a record of a qualifying disability and has been regarded as disabled by the defendants named herein. The evidentiary factual allegations regarding Plaintiff's disability are contained in **Appendix C**, which is incorporated by reference, herein.

**26.**    On December 3rd, 2004, Plaintiff filed a Motion asking to be present (as the complainant) at a hearing by telephone, pursuant to Colo.R.Civ.P. § 43(i). Plaintiff further requested this as a "reasonable accommodation." On December 29th, 2004, the Motion was denied by the state trial court without comment (as to the reasonable accommodation request).

**27.**    Colorado Chief Justice Directive 04-07, provides:

> Upon notification by a person with a disability of the need for accommodation, the court shall, at no charge, provide reasonable accommodation that will enable the person to access and/or effectively participate in or enjoy the benefits of any court or probation service or program . . . The local administrative authority, with the assistance of the ADA coordinator, shall determine what reasonable accommodation will be made. Consultation shall occur with the individual to explore his or her limitations and the options available for accommodating the disability. Primary consideration shall be given to the requested accommodation.

---

[5] Plaintiff's domicile in Colorado ended in January 2001; Plaintiff's domicile in Texas ended in 1994.

[6] She registered the parties' daughter in Wise County Independent School District in January 2005; she registered her 2004 Saturn automobile in Texas on March 8th 2005; she was issued a "Compact" license, upon her application, by the Texas Board of Nurse Examiners on January 31st 2005.

**28.**     In compliance with CJD 04-07, Plaintiff wrote to Robert Evans, the ADA Coordinator for the First Judicial District (Jefferson County Combined Court) on January 19th 2005 (by email) and again on January 26th 2005 (by letter with Certificate of Service (Postal Service Form 3817)). Plaintiff's correspondence established the limitations of his disability and asserted the need for a reasonable accommodation as contemplated by Chief Justice Directive 04-07.

**29.**     The document, "Colorado Judicial Department - Access to the Courts:  A Resource Guide to Providing Reasonable Accommodations for People with Disabilities for Judicial Officers, Probation and Court Staff,"[7] provides that, for persons with a psychiatric disability:

> Depending on the needs of the individual and the nature of the disability, accommodation may include: scheduling court proceedings at certain time to coincide with medication requirements or effects; presenting information in a different manner to be better processed by the individual such as providing instructions in a written or recorded format; changing procedures as they relate to the interaction with witnesses and court staff in the courtroom; eliminating distractions; speaking slowly and distinctly; or allowing videotaped testimony or the use of video conferencing technology in lieu of a personal appearance.

**30.**     Mr. Evans disregarded the request for reasonable accommodation.

**31.**     The Record fairly supports Plaintiff's proposition that the requested accommodation would have ameliorated the aggravation of Plaintiff's symptoms brought on by disputatious court appearances, which impair his ability to maintain decorum, focus on or contemplate the issues at bar and to communicate effectively, all of which are essential to participation in orderly court proceedings.

**32.**     Plaintiff complied with the notice provisions of the Colorado Governmental Immunity Act, C.R.S. § 24-10-109 *et. seq.,* by sending, via certified mail, a claim notice regarding Mr. Evans and the Jefferson County Combined Court on March 17th 2005.

### ALLEGATIONS OF ADA VIOLATIONS, DENIAL OF ACCESS TO THE COURTS, DISPARATE TREATMENT AND DISPARATE IMPACT, INCLUDING PROCEDURAL DUE PROCESS DEPRIVATIONS, RELATIVE TO STATE COURT PROCESSES AND POLICIES

**33.**     In keeping with Fed.R.Civ.P. 8(a), Plaintiff will not here produce prolix evidentiary details, incidents, examples and chronology.  All related allegations are applicable from the time period of December 1999 to present, unless otherwise specified.

---

[7] This document is intended for, "judicial officers, probation, and court staff." *Id.* at ¶ 2 of  § Purposes of This Guide. It is maintained on a UNIX operating-system and was "last modified," on January 25th 2005 (thus, not made available to the public in its current form (if at all), prior to that date).

34.     Over these past five years, Plaintiff's access to the state courts has been inadequate and ineffective as a direct and proximate result of both official and private actions, directly attributable to perceptions of Plaintiff's disability and the stigma surrounding such disabilities. These claims include both Equal Protection and Due Process considerations.

35.     The state trial court has repeatedly attempted to deter Plaintiff from seeking redress in its court system through "unlawful" means, including, for example, retaliating against Plaintiff for complaining about disability discrimination,[8] punishing Plaintiff by awarding attorneys' fees to his ex-spouse because of his "`mental health` and the fact that he's been pro se throughout some of these proceedings," or "fining" Plaintiff for nothing other than the very act of filing a motion (that was not expressly found to be either frivolous or vexatious).

36.     The state court has not issued an "abusive litigant order," "case management order" or protective orders to justify the practices that have foreclosed or frustrated access, as more fully set forth hereinabove, or which might articulate some legitimate state interest.

37.     Although, under the Constitution and laws of the United States, a state court cannot enlarge or restrict its own inherent jurisdiction and powers, the state trial court has adopted a practice of selectively waiving and conferring jurisdiction with no relation to any event of jurisdictional significance, thereby foreclosing Plaintiff's access to the court. This practice of selective waiver and assumption of jurisdiction was also applied to create a forum for parties to the proceedings (*e.g.,* Defendant Ryan), and even for non-parties to the proceedings, such as the judge's chosen/appointed experts (*e.g.,* Defendant Fyfe).

38.     Although, a state court confronted by a motion authorized by the Rules must decide the motion within a reasonable time and issue a ruling that is meaningful (not simply dismiss a claim with little or no comment), the state trial court has (as of the date of this filing), refused to decide a Motion for Substitution of Judge filed in August 2004. Under Colo.R.Civ.P. § 97, this refusal suspends the proceedings. In theory, no party (including the court), may file any motions, although, in practice, any person other than Plaintiff (including non-parties, such as Defendant Fyfe) have been allowed to affirmatively seek relief during this time. Thus, the state court has consciously used the pendency of the August '04 recusal motion as a method to suspend the proceedings to indefinitely foreclose Plaintiff's access to the courts.

39.     All of Plaintiff's *pro se* motions have been consciously delayed, disregarded (ignored), axiomatically rubber-stamp denied (without consideration or reviewable findings) or denied on the basis of intentionally erroneous/fabricated or narrow technicalities by the state trial court, all to the detriment of Plaintiff.

40.     Although, mechanisms for effective discovery are essential to the fairness of any litigation, the state trial court has deprived Plaintiff of the use of such established adjudicatory procedures, such as discovery. This deprivation did not occur through the normal course of an objec-

---

[8] *See* para. 11 – 14 of **Appendix D** for allegations concerning complaint letter docketed Sept. 15th 2004.

tion by the opposing party and protective orders granted in response to such an application (as required by the Colorado Rules of Civil Procedure).

**41.**     The state trial court has failed to adjudicate claims that were properly presented by Plaintiff, thereby depriving him of any means to defend substantial liberty interests, redeem his property interests and rights and confront his accusers. For example, Plaintiff has no state forum or remedy to enforce telephone visitation with his daughter, enforce tax exemption allocations that were ordered or enforce child support arrearages, because the trial court has refused to adjudicate pending contempt motions (three have been pending for over one year); declined to adjudicate motions filed by the County Attorney (in Plaintiff's favor); and, further,  has divested itself of any power to act by refusing to decide a pending recusal motion (now over one year pending).

**42.**     The Colorado trial and appellate courts have issued decisions (in unpublished opinions), which have effectively created a rebuttable presumption that persons with a psychiatric diagnosis are an imminent danger to a minor child, which presumption does not exist in the Colorado statutes. While the aforementioned decisions, themselves, cannot be "reviewed" here in contravention of *Rooker-Feldman*, they are indicative of underlying policies of discriminatory animus and lack of training that the ADA was enacted to resolve and, thereby evidence that this aspect, too, of the state judicial system is not in compliance with the ADA mandate.

**43.**     When due process does not obligate the State to establish an avenue of judicial redress, such as an appeal, once the State does so, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts. The State's appellate court has disregarded specific and pivotal issues raised on appeal by Plaintiff, without so much as acknowledging that Plaintiff-Appellant had presented them or even disposing of them under some legal theory (such as failure to preserve issue on review, mootness, lack of legal merit, *etc.*).

**44.**     Plaintiff properly filed intelligible, articulate and meritorious motions with the appellate court as far back as July of 2004 but, which were not disposed of until March of 2005 (eight months later) and only after Plaintiff's appellate counsel entered her appearance. Plaintiff believes and therefore alleges that the real purpose for this delay was to withhold justice and deny meaningful access in an attempt to coerce Plaintiff to retain counsel, in violation of his right to participate fully in the proceedings (a right of constitutional magnitude) and, which was a discriminatory practice based on an invidious discriminatory animus.

**45.**     A litigant's ability to vindicate legal rights in a court of proper jurisdiction is guaranteed in Article II, § 6 of the Colorado Constitution ("[c]ourts of justice shall be open to every person, and a **speedy remedy** afforded for every injury to person, property or character") [emphasis added].  In contravention of this guarantee of a speedy remedy, Plaintiff has been subjected to a double-standard by the Colorado judiciary, including the appellate court. For example, although, a state court cannot refuse to enforce an otherwise valid contract, the Colorado judiciary has deprived Plaintiff of *any and every means* to enforce any contract over the past five years. For example, Plaintiff's Motion[s] for contempt citation remained undecided for eight (8) months (June through November of 2004), and there are three pending as of the time of this filing. The County Attorney's motion (seeking relief on behalf of Plaintiff) has been "held in abey-

ance" since May of 2004 (over one year ago). Conversely, Defendant Ryan has enjoyed this speedy remedy (relief granted within one or two days) every time she has sought it against Plaintiff; Defendant Fyfe (a <u>non-party</u> in the state case) has enjoyed an *ex parte* speedy remedy every time that he has sought it against Plaintiff; Defendant Wilson has also enjoyed this speedy remedy every time that she has sought it against Plaintiff.

**46.**    As a matter of practice (and not any specific order or judgment), Plaintiff has been relegated by the state judiciary to an outside spectator to the litigation to which he is a party, (other than being subject to the state court's orders (on the courts own motion or the motion of his opponents)). In addition to being denied the opportunity to conduct routine discovery, Plaintiff has been denied the opportunity to have adequate notice of hearings (*e.g.*, more than 9 waking hours of notice) sufficient to prepare witnesses, exhibits and retain counsel; denied the full and fair opportunity to present exhibits; denied the opportunity to fully participate on those proceedings against him, either commensurate with the latitude and time allocated to his opponents or simply being permitted to attend; denied the opportunity to object to opposing counsel's preparation of orders, which adjudicate away his rights; and denied the opportunity to submit applications for relief that are received, read, contemplated and decided fairly by a judicial officer.

**47.**    The Executive Director of the Colorado Psychologist Examiners Board, who will be called by Plaintiff as a witness, expressed his views to Plaintiff, which included that, *"There's no question that people with a mental illness are treated differently in court by judges* [in Colorado]. *That's just the reality. Whether it's fair or not, is another question."* He further stated that there is substantial evidence "in the literature," and by his own observation of disparate treatment of the mentally ill *"and the vulnerable, including children"* in the Colorado courts.

**48.**    A memorandum from the Colorado **Division of Mental Health** (DMH) recently written to Plaintiff states:

> **Following a review of your submitted material, DMH does agree that you have raised concerns related to the Mental Health System in Colorado. . . .It is the assessment of DMH that your information should be provided to the Legal Center for People with Disabilities for their increased awareness regarding your concerns and to CMHIFL per your request for a peer review.**

During a follow-up phone call with Lori Banks of the Division of Mental Health, she stated, "I agree, Mr. Harrington –No one should ever have to go through what you've gone through during your commitment process . . .but, although I agree that change is needed, what we're talking about requires major institutional and legislative reform . . . "

**49.**    The foregoing admissions, combined with the set of facts set forth herein, illustrate that Plaintiff, similarly situated to other *pro se* or mentally ill litigants, has been subjected, as a class of one, to a continuing pattern of disparate treatment that has no rational basis in a legitimate state interest.

10

**50.**    The present situation in Colorado is such that any party to litigation may gain a tactical advantage and severely prejudice his opponent simply by informing the court of his unfounded "concerns," that an opponent is mentally ill or allegedly not taking antipsychotic medication. Such unfounded allegations, when stripped of formality, are nothing more than fears, discomforts and misguided perceptions of mental illness, upon which the state court has (and will continue to) forthwith deprive persons (including Plaintiff) of procedural due process, liberties, property and right to familial association. This strategy has been effectively utilized consistently and <u>repeatedly</u> over the past five years by Defendants Ryan and Wilson against Plaintiff. Their "weapon" of choice has been the Colorado judicial system.

**51.**    The ongoing discriminatory practices and underlying invidious animi of the state judicial system have trammeled the rights of the disabled (and those perceived as disabled), including Plaintiff.  As examples:

- Individuals who are civilly committed to Colorado acute-care psychiatric state-run institutions may have process served upon them with civil restraining orders and other civil matters, without regard for their mental condition, level of confinement or competency.[9] Service for these collateral proceedings is often made on behalf of the same individuals who petitioned to have them committed. Subsequently, these "mental patients" are <u>intentionally</u> denied (by the state court system) the opportunity to participate in the collateral proceedings in, which significant liberty interests are at stake, in violation of both the Fifth and Fourteenth Amendment to the Constitution. The procedural background of *Scott v. Hern*, 216 F.3d 897 (10th Cir 2000) is identical to Plaintiff's, in this respect, `though the Tenth Circuit was not presented with an Access-to-the-Court issue and, therefore, did not reach it.[10]  (*See also* excerpts from Scott's Verified Motion at **Appendix G,** incorporated by reference, herein). It is clear that this problem with the Colorado judiciary is <u>not</u> moot and continues to evade review.  Even after *Tennessee v. Lane* and as recently as **May 15th 2005,** the Gilpin County Court obliquely characterized Scott's absence from the 1996 hearing (which was <u>solely</u> the result of State action) as Mr. Scott's "failure."[11]

- Individuals (including Plaintiff) have been confined and segregated primarily or solely upon a lay-person's accusations that they have a psychiatric diagnosis[12] without a scintilla of

---

[9] Plaintiff possesses a written admission by the State's Attorney General's Office acknowledging this.

[10] ("Finally, we reject Scott's claim that [defendants] violated his constitutional rights by preventing him from participating in the permanent restraining order hearing. This claim fails because Scott's inability to participate in those proceedings was the result of his commitment.") *Id* In *Scott*, the claims were abuse of process, false imprisonment and the balance were in the nature of a SLAPP suit. Mr.  Scott tried to sue private parties under 42 U.S. §1983 and did not allege an access-to-the-court violation under the ADA, Title II..

[11] "After a hearing on January 2, 1996 at which neither Defendant nor his counsel appeared, this permanent restraining order was entered by the Court. On March 15, 1996, the Trial Court denied Defendant's Verified Motion for Relief from Judgment" May 15th 2005 Order on Motion for Relief on [sic] Restraining Order *Id.* at ¶ 2.

[12] In Plaintiff's case, the diagnostic information was manufactured by his ex-spouse (Defendant Ryan), which she provided to her supervisor (the Director of the Jefferson Center for Mental Health, Tom Ol-

evidence of probable dangerousness and often in response to odd, but harmless, misunderstood and non-criminal behavior.. Although, these particular lay-persons had some plainly ulterior motive (such as malice, vindictiveness, intolerance, prejudice or jealousy), their allegations were regarded by State decision makers with the same deference as any other petitioner, which is an irresponsible discharge of the state's *parens patriae* power and, which is tantamount to **deliberate indifference**.

- Individuals (including Plaintiff) in Colorado courts have been required to provide evidence of psychiatric medicating and/or to barter their right to refuse said medication in exchange for some other fundamental right (such as raising or associating with their child[ren]) –on nothing more than the court's knowledge that the person may have an Axis I or II psychiatric diagnosis and a lay person's expression of "concerns" that one is not taking medication (even if that lay-person lives 900 miles away). These decisions have been made without *any* expert witness testimony (a <u>basic</u> procedural due process protection) or any present evaluation of the individual's psychiatric condition or any showing that the individual's alleged diagnosis has some demonstrable impact on parenting skills.[13]

- Individuals who are regarded as having a mental or psychiatric disability do not enjoy equal and **meaningful** access to the court and are treated in these proceedings as *persona non standi in judicio,* thereby relegated to outside spectators of their own litigation.

**52.**    The State defendants, including the state trial courts, had been properly informed of the ongoing improper interference with Plaintiff's civil commitment, but disregarded the claims (`though the disregard was not embodied in any judgment that this suit could be construed as attempting to reverse). The State collectively shirked its *parens patriae* responsibility when it codified this misconduct through permissive action and inaction, which was tantamount to **deliberate indifference**, which, alone, is a violation of the ADA.

**53.**    For all of the reasons more fully set forth, hereinabove, persons with psychiatric disabilities have no protections in the Colorado courts, the system that purportedly exists to equitably decide the rights of the parties, and, in fact, have been made vulnerable by that system to predation by those who seek to monopolize on their illness to gain a tactical advantage.

**54.**    Plaintiff complied with the notice provisions of the Colorado Governmental Immunity Act (*see generally,* C.R.S. § 24-10-109 *et. seq.*) by sending, via Certified Mail, a claim notice regarding the Colorado Judicial systems on August 16th 2003.  Plaintiff renewed and expanded his sect. 24-10-109 Notice on May 27th 2004 regarding specific ADA allegations.

---

brich), who in turn, disguised it as an official medical referral to the State hospital in support of their request for a high security confinement.  In Ken Scott's case, the diagnostic information was provided by Scott's political adversary, Warren Hern, which (by admission of Hern's own affidavit) was based on the unauthorized receipt of medical records given to him by anonymous "law enforcement" personnel.

[13] Such disability-based discrimination, is often disguised under a specious best-interests standard and the exercise of states' rights in domestic matters.

55.     Plaintiff believes that, based upon the record of acts of retaliation [against this Plaintiff]
as complained of herein, the Colorado judiciary will retaliate against him in any and all pending
or future cases involving Plaintiff, because of this suit.  Plaintiff is in possession of admissions
that will prove that the State district court judiciary clearly believes that its wisdom is beyond
that of the federal judiciary and that state court litigants have no business seek redress therefrom.

### ALLEGATIONS CONCERNING DEFENDANT ARCILISE

56.     Because claims of civil conspiracy and retaliatory motive are subject to a heightened
pleading standard pursuant to Tenth Circuit precedents, the evidentiary factual allegations con-
cerning Defendant Arcilise are contained in **Appendix D** to the within Complaint and are incor-
porated herein by reference.

57.     Plaintiff complied with the notice provisions of the Colorado Governmental Immunity
Act (*see generally,* C.R.S. § 24-10-109 *et. seq.*) by sending, via Certified Mail, a claim notice re-
garding Arcilise and the denial of access to the court claim on Oct. 7th 2004 (the point at, which
Arcilise's pattern of conduct, a combination of events which culminated to reach a level of out-
rageous conduct, had risen to the level of a triable cause of action).

### ALLEGATIONS CONCERNING DEFENDANT RYAN AND WILSON'S CONSPIRACY TO CONCEAL

58.     Because conclusory allegations of conspiracies are insufficient and **a well-pleaded com-
plaint must set forth detailed factual allegations** in support of such claims. Therefore, the evi-
dentiary factual allegations concerning Defendant Ryan and Wilson's Conspiracy to Conceal are
contained in **Appendix E** to the within Complaint and are incorporated herein by reference.

### ALLEGATIONS CONCERNING DEFENDANT FYFE

61.     Because conclusory allegations of conspiracies are insufficient, the evidentiary factual
allegations concerning Defendant Fyfe's conspiracy to extort fees, *inter alia,* are contained in
**Appendix F** to the within Complaint, which is incorporated herein by reference.

62.     Anticipating that Dr. Fyfe might seek immunity under the Colorado Governmental Im-
munity Act (*see generally,* C.R.S. §§ 24-10-101 through 109) for his role as a state actor, Plaintiff
sent, via Certified Mail, a claim notice regarding Defendant Fyfe on August 25th 2004.

63.     Plaintiff complied with Mass.G.L. 93(A) § 9 (3) by mailing a 30-day demand letter to Dr.
Fyfe on August 25th 2004.

64.     Although, the instant case may not require expert testimony to establish any of Plaintiff's
*prima facie* claims, Plaintiff has complied with Colorado's Negligence Statute, section 13-20-

602(1), and a Certificate of Review by Dana Cogan, M.D., is supplied hereto in **Appendix G** and incorporated by reference, herein.

### ALLEGATIONS CONCERNING DEFENDANT PRYOR AND THE COLORADO CIVIL RIGHTS DIVISION

**116.**    In August of 2004, Plaintiff wrote a "Statement of Discrimination" letter to the Colorado Civil Rights Division (hereinafter, "the Division").

**117.**    The Division responded, stating that they can may only, "conduct investigations in the areas of Employment, Housing, and **Public Accommodations**." [emphasis added], and for this reason, did "not have jurisdiction over the issues," concerning court (judicial) buildings and processes that Plaintiff complained of.

**118.**    Plaintiff and the Division exchanged several letters and phone calls and, in written response to Plaintiff's specific question, Pryor cited Colorado Revised Statutes §§ 24-34-501 ~ 510 (discrimination in housing); § 24-34-601 (discrimination in advertising); and §§ 24-34-701 ~ 707 (discrimination in employment), none of which support the assertion that the Division does not have jurisdiction over court buildings or processes contains any language that language that exempts court buildings, processes, policies or practices from the meaning of public accommodations, services or facilities as set forth in section 24-34-601(1).

**119.**    The Division's website at http://www.dora.state.co.us/civil-rights/complaint_process.htm states that:

> If the Director of the Colorado Civil Rights Division issues a finding of no probable cause for your case, you have the right to appeal the determination within ten days after the date of the notice. New or additional information not previously considered during the investigative process may be considered as part of the appeal process. **Instructions on the appeal process are provided to all persons whose cases are dismissed.** [emphasis added]

**120.**    No instructions on the appeal process were provided to Plaintiff.

**121.**    On or about August 23rd 2004, when the disability discrimination complained of, herein, had sufficiently accrued to become actionable, Plaintiff filed a discrimination claim pursuant to C.R.S. §§ 24-34-306 & 24-34-604.

**122.**    Plaintiff complied with the notice provisions of the Colorado Governmental Immunity Act (*see generally*, C.R.S. § 24-10-109 *et. seq.*) by sending, via Certified Mail, a claim notice regarding Defendant Pryor on March 4th 2005.

**123.**    Plaintiff's standing to sue Defendant Pryor under *Ex Parte Young* derives not only from an injury-in-fact, but also from a procedural injury, because Defendant has violated procedures that are designed to protect a concrete substantive interest.

14

**ALLEGATIONS CONCERNING DEFENDANT GLEASON AND THE OFFICE OF ATTORNEY REGULATION COUNSEL**

**124.**    The Attorney Regulation Counsel ("ARC") is the same *State* agency that even the federal magistrate, who may make dispositive rulings over the case at bar is directly accountable to.[14]

**125.**    Because claims of civil conspiracy and retaliatory motive are subject to a heightened pleading standard pursuant to Tenth Circuit precedents, the detailed evidentiary allegations concerning Defendants Gleason, Culberson-Smith and the ARC are contained in **Appendix H**, which is incorporated by reference, hereto.

**126.**    Plaintiff complied with the notice provisions of the Colorado Governmental Immunity Act (C.R.S. § 24-10-109 *et. seq.*) by sending, via Certified Mail, a claim notice regarding the ARC on March 4th 2005. Plaintiff filed a clarification of the notice on July 25, 2005.

**127.**    Plaintiff's standing to sue Gleason under *Ex Parte Young* derives not only from an injury-in-fact, but also from a procedural injury, because Defendant has violated procedures that are designed to protect a concrete substantive interest.


## IV. CLAIMS FOR RELIEF

▶ First Claim for Relief (Against Wilson and Ryan) for Reckless and Intentional Infliction of Emotional Distress

**128.**    Plaintiff realleges Paragraphs 1 through 127, hereinabove, as if set forth in full herein.

**129.**    Section 46 of the Restatement (Second) of Torts provides:

> **Outrageous Conduct Causing Severe Emotional Distress:** "(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

**130.**    Defendants Ryan and Wilson have robbed Plaintiff of his relationship with his daughter, Shelby Harrington, through an established pattern of behavior designed to erode the bonds of

---

[14] *See* May 10th 2005 article by Chad Abraham appearing in the Glenwood Springs Post Independent Valley News: " *'They're not any different than any other lawyer,'* said John Gleason, the Supreme Court's regulation counsel. The court's Officer of Attorney Regulation governs the state's judges and district attorneys, along with other lawyers . . . *'This is an office of the Supreme Court. We can do anything we need to,'* he said."

love and affection between Plaintiff and his child. This has been accomplished through planned abuse-of-process, fraud, collusion, evasion and concealment.

131.    Defendants willfully, maliciously, intentionally, and outrageously inflicted extreme mental suffering and distress on Plaintiff rendering it impossible for any personal contact or other communication to occur between Plaintiff, Sean Harrington, and his daughter, Shelby.

132.    Defendants knew that that their actions would likely result in extreme emotional grief and suffering. It has been one of their tactical strategies during the last five years to inflict emotional injury and then capitalize on Plaintiff's resulting grief to justify further injunctive "relief."

133.    In keeping the location and condition, both physical and mental, of Plaintiff's child concealed from Plaintiff, Defendants acted intentionally, maliciously and outrageously, with the intended purpose and result of causing Plaintiff humiliation, mental anguish, emotional and physical distress, extreme and severe mental suffering, all to Plaintiff's damage and injury in an amount within the jurisdiction of the above entitled court.

134.    Defendant Wilson's involvement in the commission of this tort occurred, not only in violation of a court order, but also through her direct contact with Plaintiff (specifically her refusal to provide minor child's contact information during such time that she was in the possession or control of the information sought and while she acted as Ryan's intermediary).[15]

135.    Defendants have consciously attempted to not only conceal the child, but also evade accountability and avoid process on this account.

136.    Although the public policy served by the Absolute Privilege may immunize Wilson from libel and slander actions for damages, the Privilege does not protect against her unethical conduct. The within claim is neither a libel nor slander action.

137.    Plaintiff misses the affection and company of his daughter and has been worried about her physical and emotional condition. His concern for his daughter and her well-being is injuring his mental and physical health. Plaintiff suffers stomach problems, headaches, chest pain and, occasionally, breathing problems. Plaintiff has become extremely depressed and has experienced increasingly greater difficulty in keeping his emotions from adversely effecting daily life. He has reported these symptoms to medical staff, including a doctor of psychiatric medicine. Plaintiff has sought, but failed to obtain remedy for these injuries. Since the abduction and concealment, Plaintiff cannot concentrate on anything but his daughter. Plaintiff has felt compelled to leave work, social gatherings and other functions because of his physical and mental injuries and deep depressions. He has nightmares, nightly, and loses valuable sleep, which has taken a toll on his health and productivity. His symptoms worsen around Fathers' Day, his daughter's birthday, "Bring-Your-Daughter-to-Work Day," and the holidays. Plaintiff's symptoms worsen when around other parents who are enjoying their child[ren]'s company, which includes most public and family places. Plaintiff has found it necessary to avoid movies and television programs fea-

---

[15] Ryan & Wilson clearly indicated, both expressly and impliedly, that all contact with Ryan should be directed to and through Wilson solely in the form of written correspondence.

turing family themes, which aggravate his symptoms. Plaintiff has removed photographs and reminders of his daughter from his home and work areas because they aggravate his symptoms.

**138.** Plaintiff has suffered severe emotional distress as a direct and proximate result of the action of Defendants Ryan and Wilson, which injuries include, but are not limited to: the complete alienation and/or loss of affection of his natural child; the complete destruction of the emotional bonding existing between himself, his paternals and the minor child; nervousness, humiliation, emotional distress, pain and suffering, fright, shock, tension, anxiety, loss of sleep; denial of social pleasures and companionship of his child; medical expenses, both past and future; reduced productivity; loss of earnings and earning capacity; a higher cost for life insurance premiums; and the loss of ordinary enjoyment of life and the pursuit of happiness.

**139.** The Colorado trial judiciary (both the trial court and appellate courts) has done nothing to remedy —or even acknowledge— Plaintiff's claims of parental alienation. In fact, the trial court has expressly declined to address that issue and has entered no findings or conclusions of law, despite repeated attempts by Plaintiff to raise the issue.

**140.** The acts alleged herein were done oppressively, with actual malice and in contravention of the public policy of encouraging contact between a child an both parents (*see generally* C.R.S. §§ 14-10-104.5 & 124) thereby justifying an award of punitive damages to Plaintiff according to proof, and believed to exceed $900,000.00

**WHEREFORE,** Plaintiff prays at the conclusion, hereof.


► **SECOND CLAIM FOR RELIEF (AGAINST WILSON AND RYAN) FOR CIVIL CONSPIRACY TO CONCEAL THE MINOR CHILD**


**141.** Plaintiff realleges Paragraphs 1 through 140, hereinabove, inclusive of the within Complaint, as if set forth in full herein.

**142.** The *Uniform Custody Child Jurisdiction Act,* prefatory note provides, in pertinent part:

> There is a growing public concern over the fact that thousands of children are shifted from state to state . . . while their parents or other persons battle. . . this "game" may continue for years, with the child thrown back and forth from state to state, never coming to rest in one single home and in one community.
>
> * * *
>
> The harm done to children by these experiences can hardly be overestimated. It does not require an expert in the behavioral sciences to know that a child, especially during his early years and the years of growth, needs security and stability of environment and a continuity of affection. A child who has never been given the chance to develop a sense of belonging and whose personal attachments

17

when beginning to form are cruelly disrupted, may well be crippled for life, to his own lasting detriment and the detriment of society.

**143.**    The July 2nd 2003 Order to return the parties' minor child to Defendant Ryan, was secured with deception and fraud. 'Though the order was characterized by the state trial judge as temporary and interlocutory, Defendants intentionally misapplied the order (without leave from any court) in violation of C.R.S. §§ 14-10-123.8 & 14-10-124, as if it was a permanent no-contact restraining order. They further exploited appellate pendency using dilatory and obstructive means to avoid compliance with discovery (in violation of the Rules of Civil Procedure).

**144.**    Defendants' ulterior purpose for petitioning for the July 2nd 2003 order was to fulfill their scheme conceived in December 1999 to eliminate Plaintiff from his daughter's life.

**145.**    The Defendants, and each of them, wrongfully and intentionally withheld access to information pertaining to the minor child, including but not limited to medical, dental and school records, without leave from any court and in violation of Colo. Rev. Stat. § 14-10-123.8.

**146.**    Defendants knowingly and willfully conspired and agreed amongst themselves to conceal the whereabouts of Shelby from Plaintiff and to deny Plaintiff his right to this information, as well as the availability of contact with his daughter that could have flown therefrom.

**147.**    As a proximate result of the foregoing, Plaintiff has been directly injured and damaged in a sum within the jurisdiction of the above entitled court.

**148.**    The acts alleged herein were done willfully, wantonly, maliciously and oppressively, thereby justifying an award of punitive damages to Plaintiff based upon each Defendant's ability to pay, but believed to exceed $900,000.00

**WHEREFORE,** Plaintiff prays at the conclusion, hereof.

### ► THIRD CLAIM FOR RELIEF (AGAINST RYAN & WILSON) FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**149.**    Plaintiff realleges Paragraphs 1 through 148, hereinabove, inclusive of the within Complaint, as if set forth in full herein.

**150.**    That Defendant Ryan had the duty not to negatively influence the mind of the minor child, Shelby, against their natural father or to allow others, including Wesley Sisk, church members or other family to do the same.

**151.**    That Defendant Ryan did not prevent disparaging, outrageous, severe, emotionally destructive and abusive commentary from being uttered to [and in the presence of] the minor child, which caused permanent emotional injury not only to the child, but also to Plaintiff and to his relationship with his child, which injury could not be adequately remedied through the prospective injunctive relief then issued by Magistrate Norton of the state trial court.

**152.** That <u>both</u> Defendants Ryan <u>and</u> Wilson, as named individual parties to a contract, owed a contractual duty to Plaintiff to move to dismiss their respective permanent restraining orders pursuant to a valid court order (stipulated agreement ordered by the State trial court Nov. 6th 2001).

**153.** Neither Defendants Ryan nor Wilson performed their contractual duties under the Nov. 6th 2001 [ordered] Agreement within the time required, resulting in voluminous hours expended by Plaintiff to pursue resolution, voluminous billable hours by Plaintiff's attorney exceeding $5,000 in pursuit of said performance, humiliation and obstruction of parenting time,[16] emotional pain and suffering and other injuries to be proven at the trial of this matter.

**154.** The Colorado Court of Appeals opined, in their opinion announced on December 30th 2004 that, "[W]e do not approve of [Ms. Wilson]'s apparent manipulation of the notice provisions and the rules of civil procedure."

**155.** Defendant Wilson had a statutory duty [to the court and opposing party] to *not* manipulate the notice provision and the rules of civil procedure, to comply with the rules governing discovery; and that their petitioning activities have a rational basis in both fact and law.

**156.** Defendants Ryan & Wilson did manipulate the notice provisions, discovery rules and Rules of Civil Procedure and their petitioning activities had no rational basis in either fact or law.

**157.** Defendant Wilson had a legal and ethical duty to refuse to submit any affidavit to any governmental agency consisting of fraud or containing a reckless disregard to the truth or falsity of information or, which containing primarily hearsay or conjecture, under the pretext of personal knowledge, irrespective of whether the original intent was to invoke government action.

**158.** Defendants Wilson did submit affidavits, petitions and pleadings to governmental agencies and/or tribunals on behalf of her client or on her own behalf that she knew or reasonably should have known consisted of fraud; a reckless disregard to the truth or falsity of information; substantial hearsay and substantial conjecture.

**159.** The standard of care as to Defendant Wilson is predicated, in part, on the ABA Model Rules of Professional Conduct, the Colorado Rules of Professional Conduct (*see* the allegations contained in **Appendix H**), 7 <u>Moore's Federal Practice and Procedure</u> § 60.33, § 552 of the Restatement (Second) of Torts and under a theory of common law liability for fraud notwithstanding privity because the acts complained of consist of fraud, collusion or both.

---

[16] *E.g.,* Ryan's fraudulent statement to Federal Heights Police officers Dax Nance and Brian Lippa that, "Everyone I know has a restraining order against him," referring to the only two restraining orders that have ever existed against Plaintiff (Ryan and Wilson's), and which were supposed to have been dismissed by them 6 and 12 months earlier, respectively).

160.    Defendant Wilson has a duty to the court, Plaintiff and the legal profession to take reme-
dial action to redact or correct information that she was responsible for submitting to the tribunal
that was false, unsubstantiated or later established to be false (*see* Colo.R.P.C. § 3.3).

161.    Defendant Wilson refused, even when asked, to take remedial action to redact or correct
information that she was responsible for placing before a tribunal that was false or unsubstanti-
ated or later established to be false.[17]

162.    Wilson had the legal and ethical duty to the court and to Plaintiff to abstain from a dual-
role as an unsworn witness and from interjecting personal knowledge about the facts of a case.

163.    Wilson, at all times material hereto, was joined as a party to her client's divorce case and,
thus, a complaining, unsworn witness, able to assert personal knowledge of facts at issue; assert
personal opinion as to the justness of a cause and initiate *ex parte* communications with the tri-
bunal under the guise of a co-victim protected by a duty-to-warn.

164.    Defendant Wilson had a duty [to the court, to opposing party and to the legal profession]
to not employ dilatory practices that bring the administration of justice into disrepute or for the
purpose of frustrating Plaintiff's right to obtain rightful redress or purpose, irrespective of
whether such conduct is or has been tolerated by the bench and bar.

165.    Defendant Wilson, notwithstanding her duty to zealously represent her client, had a duty
to Plaintiff, pursuant to state law (and in equity), to disclose information concerning the where-
abouts, welfare and contact information of Plaintiff's child to Plaintiff.

166.    Wilson has employed dilatory and obstructive practices that have brought the administra-
tion of justice into disrepute, prejudiced Plaintiff and violated his civil rights.

167.    Defendant Wilson, as an officer of the court, notwithstanding her duty of zealous advoca-
cy, has a duty to the legal system, opposing party, and the court, to abstain from aiding and abet-
ting tortious conduct, violating the civil rights of others and defrauding the court.

168.    Defendant Wilson's relationship to Plaintiff (as opposing counsel in the domestic rela-
tions case) became improperly transmogrified because of her affirmative personal interjection
into Plaintiff's mental health care, which fell outside the scope of her fiduciary duty to her client.

169.    The conduct of the defendants, and each of them, was an outrageous, malicious and intol-
erable breach of defendants' duties. Further, such actions were taken in a reckless and negligent
disregard of the possible and probable outcome of the same. That Defendants' negligent conduct
has been consistent and ongoing and constitutes a serial and systemic pattern of misconduct and
outrageous behavior, evidencing reckless indifference to Plaintiff.

---

[17] *E.g.*, Plaintiff's email to Defendant Wilson dated 17 February 2004 and letter dated 27 May 2004.

20

170.    Plaintiff has suffered severe emotional distress as a direct and proximate result of the action of the Defendants, which injuries include, but are not limited to:  the complete alienation and loss of affection of his natural child; the complete destruction of the emotional bonding existing between himself, his paternals and the minor child; nervousness, humiliation, emotional distress, pain and suffering, fright, shock, tension, anxiety and loss of sleep; denial of social pleasures and companionship of his child; medical expenses, both past and future; loss of earnings and earning capacity; and denial of unfettered and meaningful access to the courts.

**WHEREFORE,** Plaintiff prays at the conclusion, hereof.

▶ **FOURTH CLAIM FOR RELIEF (AGAINST WILSON, RYAN AND ARCILISE) FOR CIVIL CONSPIRACY TO DENY ACCESS TO THE COURTS**

171.    Plaintiff realleges Paragraphs 1 through 170, hereinabove, inclusive of the within Complaint, as if set forth in full herein.

172.    Meaningful access to the courts is, not only a fundamental right of the highest order in an orderly government, but also one of the highest and most essential privileges of citizenship, which has been granted by and is protected by both the state and federal constitutions.

173.    Defendant Wilson, a licensed attorney in Colorado, does not intend for this right meaningful access to be available to Plaintiff.[18]

174.    Plaintiff is informed and believes and thereon alleges that Wilson's request for leave to no longer answer Plaintiff's pleadings (*see* footnote 18) has been *sub silentio* granted.

175.    Plaintiff is informed and believes, and thereon alleges that, at various times known to Defendant Arcilise, that she and Judge Tidball agreed and conspired with each other to *sub silentio* deny Plaintiff, and only Plaintiff, access to the court in a manner that could not be subjected to appellate review, and that whatever papers filed by him would axiomatically be detrimentally delayed, ignored, rubber-stamp denied (without neither consideration nor findings) or denied on the basis of knowingly erroneous, fabricated or narrow technicalities.

---

[18] For example, when Plaintiff was hospitalized in the spring of 2000, she asked the Judge to hold the permanent [marital dissolution] orders hearing without Plaintiff present. In another example, in Wilson's August 2nd 2000 "Response to . . . Motion for Rehearing," she argued against a rehearing and for affirmation of the court's decision to hold a permanent restraining order hearing despite that Plaintiff was unable to appear because of the civil commitment (that she was instrumental in orchestrating). She further argued for, "an Order striking all future pleadings filed by Defendant in this matter." In another responsive pleading, dated January 31, 2005, Wilson requested the trial court to, "issue a ruling preventing the father from filing further pro se pleadings in this matter." In yet another response dated October 1st 2001, she requested, "that [Mr. Harrington] be barred from filing further pleadings in this case **and that [Ms. Wilson] not be required to answer any further pleadings**." [emphasis added].

**176.** Plaintiff is informed and believes, and thereon alleges that, at various times known to Defendants Wilson and Arcilise, the conspiracy described in the preceding paragraph was communicated by Arcilise to Wilson, who was informed that she no longer needed to file responsive pleadings. Upon information and belief, Wilson shared this with her client, Ryan.

**177.** The Defendants, and each of them, thus, did agree amongst themselves to conspire against Plaintiff. Further, Defendants, and each of them, conspired with the specific intent to directly injure Plaintiff, to accomplish the common, but unlawful, objective of stifling Plaintiff's meaningful access to the courts, equal protection of the laws and procedural due process, all of which had the effect of rendering hollow his right to seek redress.

**178.** In addition to this "backwards-looking," prejudice, the effect of Defendants' actions has also created a "forward looking" prejudice. Because these defendants remain unaccountable until and unless the relief sought by Plaintiff has been granted by this Honorable Court, Plaintiff's right of meaningful access to the courts is effectively chilled, as he cannot seek redress, therefrom (if for no other reason than because the law never requires a futile act).

**179.** Defendants have accomplished their objective through the following:

- Advertisement and exploitation of Plaintiff's mental illness (proscribed by C.R.P.C. § 1.2 (f)), which was accomplished through fraud, *ex parte* communications based on misrepresentations, omissions and the provision of highly prejudicial and otherwise inadmissible information to a presiding judicial officer;

- The use of dilatory tactics, deliberately intended to frustrate Plaintiff's right to redress or repose and resulting in the unavailability of established adjudicatory procedures (*e.g.*, contempt authority, perfunctory discovery, motions practice, *etc.*);

- Ryan and Wilson's exploitation of the courts' disfavor of *pro se* litigants; and

- A meeting of the minds that any and all pleadings filed by Plaintiff would and shall be axiomatically denied or disregarded, such that Defendants Ryan & Wilson had knowledge of the same and have been "relieved" of the obligation to answer pleadings. The visible manifestation of this agreement was, not only the inexplicable disposition (or lack of disposition) of said pleadings, but that Defendants Ryan and Wilson did not answer them,[19] no matter how meritorious the pleading or if supported by affidavit, exhibits, or legal authority.

**180.** Defendants Ryan and Wilson acquiesced to the aforesaid plan and also encouraged it, solicited it, facilitated it and were willing participants in the scheme.

**181.** Defendant Arcilise, as a clerk for Judge Tidball for several years, knew that her contumacious conduct in refusing case information, providing obstructive or misleading information and discouraging callers from contacting the division on behalf of Plaintiff would prejudice Plaintiff

---

[19] The failure to deny constituted their admission of all allegations contained in said pleadings.

directly, because a reasonable person in her position should know that litigants (or agents acting on behalf of the litigant (family, spouses or persons identifying themselves as gathering information for the litigant)) enjoy a constitutionally protected interest in unfettered access to the court and equal protection from disparate treatment of persons similarly situated absent a rational basis in a legitimate state interest. It is inferred that Defendant Arcilise should have known this and did know this, because:

    **a.** certain "div   isional procedure" questions cannot be answered by other staff of the court unfamiliar with a division's unique procedures;

    **b.** on occasion, certain information needs to be obtained directly from the division clerk promptly in order to ascertain a course of action in pending litigation;

    **c.** her job-specific training[20] included matters such as ADA-compliance, anti-discrimination practices, policies regarding prohibition dispensation of legal advice, expected public employee behavior (including dealing with *pro se* parties), diffusing conflict and dispute resolution; *inter alia;*

    **d.** her years of experience in proximity to matters of jurisprudence familiarized her with clearly established legal principles, such as access to the courts, equal protection of the laws and first amendment petitioning activities; and

    **e.** her knowledge that her principal job responsibilities include case management and providing procedural information to members of the public, without regard for their race, gender, disability or her personal caprice.

**182.**    Defendant Arcilise also knew or reasonably should have known that any scheme, which involved the **axiomatic** disregard and/or rubber-stamp denial of Plaintiff's applications for relief was, not only not a "standard procedure," but also constituted an improper denial of access to the courts, and that her participation and/or communication of this policy with or to non-judicial persons facilitated this unlawful end.

**183.**    Defendant Arcilise's conduct was willfull and wanton: She intended to frustrate Plaintiff's clearly established right of equal protection and access to the court. Her mental state, which may be inferred from the affidavits of parties and non-parties to the litigation, exhibited malicious intent to treat Plaintiff and those associated with him disparately from others similarly situated and without any rational basis in a legitimate state interest.

---

[20] *See, e.g.,* Colorado Supreme Court Chief Justice Directive 97-05, all judicial branch employees are required to take training programs including, "Code of Conduct," and, "Business of the Courts." *See also* Chief Justice Directive 94-02 (judicial branch employees are required to, "Serve the public with respect, concern, courtesy and responsiveness . . . without favoritism . . . Behave in a manner that promotes public confidence in the integrity and impartiality of the judicial system . . . avoid[ing] impropriety or any activity that give the appearance of impropriety").

184.    Defendant Arcilise, not only had knowledge of the deprivation, but also communicated Judge Tidball's intent, partook in the deprivation and, further, was, herself, an essential tool of the deprivation through **undirected** conduct. Her conduct was conditioned, patterned conduct reflecting both her intent and a policy.

185.    To the extent that Arcilise's conduct was *sua sponte,* such conduct was neither intertwined with the judicial process, nor undertaken in connection with a discretionary implementation a judicial decision, as part of a valid court order or at the direction of a Judge, as opposed to a purely ministerial discharge of her duties direction.

186.    To the extent that Arcilise's conduct included the passive or affirmative communication of or execution of Judge Tidball's plan to oppress Plaintiff's right of access, such communication or execution was not a judicial act, in that it was not an adjudication of rights between parties to the litigation, nor did it arise from either party's approach to Judge Tidball in her judicial capacity, nor was it a function performed to the expectation of the parties.

187.    Defendant Arcilise's conduct was not part of duties carried out as she believed were correct and consistent with good public policy, as it both violated Plaintiff's clearly established rights, as well as the standard of care set forth in the code of conduct (*see* Colorado's Chief Justice Directive 94-02).

188.    In Paragraphs ___ through ___, Plaintiff established the non-frivolous and arguable underlying claims that he would have brought had it not been for the denial of access to the courts. Paragraphs __ through __ described the official acts that denied access. Plaintiff prays for such relief at the conclusion, hereof, which constitutes a unique remedy for the within denial-of-access claim, and which is not available under any other cause of action.

189.    That, as a direct and proximate result of the actions of Defendants, Ryan and Wilson, in collusion with Defendant Arcilise and Judge Tidball, both state employees, Plaintiff has suffered the loss of meaningful access to the courts and equal protection of similarly situated persons, including, but not limited to:  **(a)** The ability to designate persons to obtain time-sensitive information free of unwarranted hostility and as incidental to adequate, effective and meaningful opportunities to vindicate rights and pursue claims or to comply with court rules in the pursuit of said claims; **(b)** The use of established adjudicatory procedures; **(c)** The ability to redeem rights vested by federal and state constitution,[21] statute, court orders and stipulated agreements, through adequate, effective and meaningful opportunities; **(d)** The availability of an impartial tribunal for the determination of justiciable controversies; and **(e)** The availability of procedural due process protections, including those conferred by constitution or  statute, *indicia*-of-reliability of hearsay requirement, pre and post-deprivation hearings, adequate preparation time for trial, opportunity to develop the record during trial, *etc.* and those duties imposed on Defendants Ryan and Wilson

---

[21] Colorado Constitution Article II, Section 6 guarantees that the "[c]ourts of justice shall be open to every person, and a speedy remedy afforded for every injury to person, property or character ....' and Article II, Section 24 states that "[t]he people have the right ... to apply to those invested with the powers of government for redress of grievances, by petition or remonstrance."

by statute or rule (*e.g.,* C.R.C.P. § 16.2(g) notice provision, C.R.C.P. § 121 duty to confer, C.R.P.C. § 3.4 compliance with discovery, *etc.*).

**WHEREFORE,** Plaintiff further prays at the conclusion, hereof.

► <u>**Fifth Claim for Relief (Against Wilson, Ryan and Arcilise) for Extreme and Outrageous Conduct**</u>

**190.**   Plaintiff realleges Paragraphs 1 through 189, hereinabove, inclusive of the within Complaint, as if set forth in full herein.

**191.**   Defendants, and each of them, have acted intentionally, negligently and maliciously in their behavior toward Plaintiff. The behavior of Defendant Wilson is clearly proscribed by the unambiguous language of the Rules of Professional Conduct,[22] the behavior of Defendant Arcilise is clearly proscribed by the Colorado court staff Code of Conduct, and the conduct of all defendants has far exceeded beyond all human decency and beyond mere insult, indignity, threat, annoyance, petty oppression or other triviality.

**192.**   The injuries caused by defendants is far beyond the measure of emotional discomfort or mental anguish normally associated with or inherent in post-decree domestic relations turmoil.

**193.**   [Regarding defendants Ryan & Wilson,] the alienation of the affections of one family member for another is often a gradual process —it cannot be said to have occurred until some overt act takes place, which demonstrates a want of affection. Consequently, an action for alienation of affection accrues when the loss of affection is sustained. Plaintiff herein alleges a cumulative and continuing series of acts on the part of defendants with the intent to cause and ultimately causing the alienation of affection as complained of herein.

**194.**   To the extent that conduct committed by Defendant Wilson does not implicate mere aiding-and-abetting (but rather her own original actions), such conduct occurred either in the context of direct contact with Plaintiff and/or conduct that fell outside the role of advocate.

**195.**   The actions of the defendants have caused Plaintiff severe mental anguish and suffering, the extent of which no reasonable person should endure. As a direct and proximate result of the outrageous conduct of the Defendant, Plaintiff has suffered: the complete alienation and loss of affection of his natural child; the complete destruction of the emotional bonding existing be-

---

[22] For example, Rule 1.2. (Scope and Objectives of Representation) (f) provides that, "In representing a client, a lawyer shall not engage in conduct that exhibits or is intended to appeal to or engender bias against a person on account of that person's . . . disability . . ., whether that conduct is directed to other counsel, court personnel, witnesses, parties, judges, judicial officers, or any persons involved in the legal process." Wilson's primary litigation strategy has been to inflame and capitalize on the stigma surrounding mental illness. Rule 1.2(f) contains no exception for disability-based tortious conduct if it is, instead, called "zealous advocacy."

tween himself, his paternals and the minor child; nervousness, humiliation, emotional distress, pain and suffering, fright, shock, tension, anxiety and loss of sleep; denial of social pleasures and companionship of his child; medical expenses, both past and future; loss of earnings and earning capacity; denial of unfettered and meaningful access to the courts.

**WHEREFORE,** Plaintiff prays at the conclusion, hereof.

### ► SIXTH CLAIM FOR RELIEF (AGAINST RYAN AND WILSON) FOR BREACH OF CONTRACT

**196.**    Plaintiff realleges Paragraphs 1 through 195, hereinabove, inclusive of the within Complaint, as if set forth in full herein.

**197.**    The Three Stipulated Agreements signed by Plaintiff and Defendants Ryan & Wilson and ordered by the state trial court (on November 6th 2001 and May 7th 2003, respectively) constitute binding and enforceable contracts for valuable considerations between Defendants and Plaintiff.

**198.**    Under Paragraph 6 of the May 6th 2003 contract, Defendant Ryan agreed to relinquish the tax exemption for tax year 2003 and, pursuant to Colo.Rev.Stat. § 14-10-115 (14.5), alternating (7 out of 10) for all years thereafter.

**199.**    Defendant Ryan breached the May 6th 2003 contract by refusing to surrender the tax exemption (made available solely through IRS form 8332) for either 2003 or 2004 tax years.

**200.**    Plaintiff performed under the May 6th 2003 contract, and has been in compliance with Colo.Rev.Stat. § 14-10-115 (14.5), because he has been current in his child support payments due and accruable for the calendar years of 2003 & 2004.[23]

**201.**    Defendant's Ryan's willful and wanton breach resulted in economic injuries to Plaintiff, including: the loss of the tax exemptions, tax credits and interest thereon; substantial filing delays (including delay of refund for 2003) while pursuing defendant's compliance; voluminous expense of time and effort seeking compliance (in the nature of *quantum meruit*); voluminous expense of attorneys' fees and costs in seeking compliance; emotional pain and suffering and other injuries to be proven a the trial in this matter.

**202.**    Defendants Ryan **and** Wilson were named as individual parties to the Nov. 6th 2001 contract, each with their own respective and various obligations thereunder. For example, under subsection 3 of the Nov. 6th 2001 contract, defendants Ryan and Wilson agreed to dismiss their permanent restraining orders after six months and immediately, respectively. Under subsections 5.1 & 5.3), Defendant Ryan agreed to execute a standard confidentiality agreement.

---

[23] *See* Aff. of Karin Dyer (Director of the Jefferson County Child Support Enforcement Division), attached hereto and made part hereof by reference as, **"Appendix G."** *And see* the Colo. Family Support Registry official payment records, both of which shall be introduced prior to trial.

26

**203.**    Ryan and Wilson breached the contract because neither defendants dismissed their respective restraining orders under the Agreement within the time required, resulting in voluminous hours expended by Plaintiff to exhort performance, voluminous billable hours by Plaintiff's attorney exceeding $5,000 in pursuit of performance, humiliation, obstruction of parenting time,[24] emotional pain and suffering and other injuries to be proven at trial.

**204.**    Defendant Ryan breached the Contract because she did not execute the confidentiality agreement that was provided to her and as she agreed.

**205.**    Plaintiff fully performed under the Nov. 6th 2001 contract, until he became aware of the Defendants' breach. By that time, Plaintiff had already substantially performed all or most of his obligations under the contract.

**206.**    Defendant Ryan and Wilson breached the contracts not because of inadvertence, mistake or excusable neglect, but through intentional dilatoriness, cool deliberation and defiance. For the foregoing reasons, Ryan's breach of contract was willful and wanton.

**207.**    The economic injuries, exclusive of pre and post-judgment interest, caused by defendants' breach of contract is: $3,387.00 of tax liability of tax years 2003 & 2004; $2,000 for the "child tax credit" for both years; an indeterminate amount of hours in attorney Karen Renne's fees expended on the matter, and an indeterminate amount in hours of Attorney Mitch Geller's fees in attempts to compel performance under the November 6th 2001 stipulated order.

**208.**    The non-economic injuries as a direct and proximate result of the defendants' willful and wanton breach of contract include hundreds of hours expended by Plaintiff relating to this claim, emotional pain and suffering, distress, nervousness, humiliation, pain, suffering and anxiety.

**WHEREFORE,** Plaintiff prays at the conclusion, hereof.

▶ **SEVENTH CLAIM FOR RELIEF (AGAINST RYAN AND WILSON) FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

**209.**    Plaintiff realleges Paragraphs 1 through 208, hereinabove, inclusive of the within Complaint, as if set forth in full herein.

**210.**    Under Colorado law, every contract contains an implied covenant of good faith and fair dealing. The covenant is invoked only to give effect to the intentions of the parties or to honor their reasonable expectations in entering into the contract and may not contradict terms or conditions for which a party has bargained.

---

[24] Specifically and especially Ryan's fraudulent statement to Federal Heights Police officers Dax Nance and Brian Lippa that, "Everyone I know has a restraining order against him," referring to the only two restraining orders that have ever existed against Plaintiff (Ryan and Wilson's), and which were supposed to have been dismissed by them 6 and 12 months earlier, respectively).

211.    Defendants have substantively and repeatedly rejected their obligations under numerous written and spoken contracts and quasi contracts, participating only to the extent that they have reaped fruit for their own enrichment. Plaintiff's performance under these contracts was conditioned upon the Defendant's timely reciprocation (as more fully set forth, hereinabove).

212.    As an example, Wilson wrote to Plaintiff by facsimile dated December 1st 2004:

> I have spoken with Christy. She tells me she is prepared to sign the exemption form for 2004 on January 1, 2005, so long as your child support (as per statute) is paid through December 31, 2004. Please fax the form [8332] to my office and I will forward it to her. I will fax it to you once I have received her signature.

Although, Plaintiff twice sent Wilson a courtesy copy of the IRS Form 8332 (also available to the public online from www.irs.gov), Plaintiff has never received the executed form. Plaintiff has been current on his child support obligations for 2003, 2004 and 2005, yet had received not the requisite executed form 8332 for any year, in direct contravention of the court order, the contract, C.R.S. 14-10-115 (14.5) and Wilson's own [mis]representation.

213.    In good faith, Plaintiff relied upon the defendants' representations, including contracts, quasi-contracts, verbal agreements and other promises.

214.    As a direct and proximate result of the Defendant's misrepresentations and willful failure to perform, Plaintiff has suffered mental anguish and suffering; lost time, planning and resources; lost substantial monies in attorney fees pursuing compliance by the Defendants; suffered financial hardships; and other consequential damages to be proven at the time of trial.

**WHEREFORE,** Plaintiff prays at the conclusion, hereof.


### ► EIGHTH CLAIM FOR RELIEF (AGAINST WILSON AND RYAN) FOR ABUSE OF PROCESS

215.    Plaintiff realleges Paragraphs 1 through 214, hereinabove, inclusive of the within Complaint, as if set forth in full herein.

216.    Section 682 of the Restatement (Second) of Torts provides:

> "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed is subject to liability to the other for harm caused by the abuse of process."

217.    Plaintiff has no criminal record and **none** of Ryan's and Wilson's scores of false or misrepresentative allegations over the past five years have been decided by a judgments on the merits (defined as determined the rights and liabilities of the parties in issue upon ultimate facts as disclosed by the pleadings or judgments) or determined and necessary to any prior judgments. These outrageous claims over these past five years and, which have consisted solely of hearsay,

28

conjecture or speculative notions of future harm and have been directed at courts, police officers, Colorado state psychiatrists [having custody of Plaintiff], the Postal Inspector's Office and private citizens). A **non-exhaustive** list of such unsubstantiated claims include that Plaintiff:

- smeared feces and blood on the walls of his home;
- threatened to kill a State court district judge Jane Tidball;
- threatened to kill both Ryan's co-workers and Plaintiff's co-worker[s];
- possessed and hid a cache of weapons;
- has a record of "numerous weapons charges;" has an "interest in weapons;"
- had "detailed plans to kill" Defendant Ryan;
- used or uses illegal drugs;
- had or has an alcohol problem;
- brandished a gun at someone at a carwash;
- engaged in sexually inappropriate behavior in front of his daughter;
- is (or was) schizophrenic;
- called and screamed at and harassed Defendant Ryan's family;
- operated a motor vehicle recklessly while Defendant Ryan and the minor child were in the vehicle with him;
- violated [a] restraining order[s];
- took his daughter "storm chasing" into the gaping yaw of tornadoes;
- becomes [became] "potentially homicidal" when he does [did] not take anti-psychotic medication;
- attempted to assault Defendant Wilson in the courtroom and had to be restrained as a result of the alleged attempted assault;
- had/has a warrant issued for his arrest for his alleged violation of a restraining order against him by Defendant Wilson;
- refused voluntary psychiatric treatment;
- had become volatile and dangerous;
- was on a killing spree;
- threatened to kill Defendant Wilson's child[ren];
- threatened economic harm to Defendant Wilson; and
- stalked Defendant Wilson's receptionist.

**218.**   While the State has a legitimate interest in providing care to the mentally ill and in protecting the community from the dangerous tendencies of some who are mentally ill, courts have long recognized that these interests must yield to the substantial rights of those individuals who face involuntary commitment.

**219.**   Plaintiff has a legitimate interest in being free from unfounded or illegitimate applications of the power of the state through Defendants Ryan and Wilson's misuse of the courts.

**220.**   Plaintiff's peace-of-mind is intimately associated with his daughter's well being, by reason of their close bond of love and affection. Thus, Plaintiff has a concrete interest in assuraning

29

that his daughter be free from the significant and threatening instability, dislocation and mental injury that results when one parent uses the law as a means to escalate intrafamily warfare.

**221.**    Defendants Ryan and Wilson's sham litigation has been consistently and *repetitively* based on intentional falsehoods, omissions and distortions or on knowingly frivolous claims: Defendants Ryan and Wilson, and each of them, both individually and collectively, have solicited the intervention of the State, through a pattern of baseless repetitive claims and fraudulent inducement, with ulterior motives (unrelated to the legitimate purpose of soliciting state intervention) of: **(a)** stifling Plaintiff's First Amendment petitioning and information gathering endeavors; **(b)** cutting off all contact between Plaintiff and his daughter; and **(c)** adversely affecting Plaintiff's legal interests, including (but not limited to) the maintenance of a parental relationship with his daughter, meaningful right of access to the courts and Plaintiff's economic resources.

**222.**    Defendant Ryan, a former mental health clinic worker (now a R.N.) and Defendant Wilson (a "family law" attorney) both understand the misperceptions and stigma of mental illness in society and the court-system.

**223.**    Defendants Ryan and Wilson's sham litigation is intended to monopolize on society's misguided fears of the mentally ill and, which is proscribed by C.R.P.C. § 1.2 (f). They have pursued this practice through intentionally embellished, fraudulent and repetitive claims *years* after any acute psychiatric crisis on the part of Plaintiff might have appeared to exist. Their ulterior purpose was to create and solidify a lasting mischaracterization of Plaintiff, thereby placing him at a perpetual tactical disadvantage and chill his ability to oppose their sham litigation. This "ulterior purpose" is far beyond incidental motives of spite, greed or harassment.

**224.**    The defendants' serial, continuing opportunistic violations, as complained of herein, were not in response to exigent circumstances, but rather, were preemptive and indicative of a an intent and plan, which was intended to mislead the tribunal.

**225.**    Wilson's fraudulent misrepresentation of an alleged arrest warrant and her surreptitious request for the duty-to-warn were both employed to gain a tactical advantage in collateral proceedings. Because she intended to influence the perceptions and actions of Plaintiff and the judge by making material misrepresentations to third parties, she is liable to Plaintiff under §533 of the Restatement (Second) of Torts, 1976.

**226.**    Plaintiff is informed, and believes, thereon, that Wilson intended to alarm and frighten the judge against Plaintiff by requesting a "duty-to-warn" of the mental hospital; asking for the judge to be placed on that list and then informing the Judge *ex parte*. Wilson had *ex parte* communications with Judge Tidball's clerk (Defendant Arcilise) regarding the Duty-to-Warn that was requested by Wilson.[25]

---

[25] The certified CMHIFL records contain entries, such as the August 3rd 2000 notation by State psychiatrist, Alan Levy: "Duty to Warn - I talked to Judge Tidball's clerk who had already been informed by Ms. Wilson, but she wanted to be advised again at time of discharge." [emphasis in the original]

**227.** The comment for Colo.R.P.C § 4.5 provides, in pertinent part:

> Threatening to use, or using the criminal . . .process to coerce adjustment of private civil matters is a subversion of that process; further, the person against whom the criminal . . . process so misused may be deterred from asserting valid legal rights and thus the usefulness of the civil process in settling private disputes is impaired. As in all cases of abuse of judicial process, the improper use of criminal, administrative or disciplinary process tends to diminish public confidence in our legal system . . . Threats to file such charges are prohibited if a purpose is to obtain <u>any</u> advantage in a civil matter . . . if the <u>sole</u> purpose for presenting the charges is to obtain an advantage in a civil matter. . . [T]he abuse of the judicial process is at its greatest when a threat of filing charges is used as a lever to obtain an advantage in a collateral, civil proceeding. [emphasis in the original]

**228.** Wilson intended that the false information of an arrest warrant, "force-fed" directly to Plaintiff (who had no way to verify the information) through a one-way communication channel (his treatment staff), might deter Plaintiff from continuing to pursue the collateral civil action that he had filed against Wilson.[26]

**229.** The comment for Colo.R.P.C. § 4.5 also provides, in pertinent part:

> While it may be difficult in certain circumstances to distinguish between a notification and a threat, public policy is served by allowing a lawyer to notify another person of a perceived violation without subjecting the notifying lawyer to discipline [because m]any minor violations can be eliminated, rectified or minimized if there is frank dialogue among participants to a dispute.

**230.** The intentional misrepresentation that an arrest warrant had been issued does not fall under any cognizable form of "notification," as contemplated in the § 4.5 comment.

**231.** Ryan also falsely reported Plaintiff's Rule 5 service of legal documents (upon her) as a restraining order violation.[27] She asked the officer to pass on a [one-way] message to Plaintiff (also through the mental hospital staff) to desist from sending "letters" in her attempt to intimidate him from further seeking redress in a court of proper jurisdiction.

**232.** The Defendants' continuing and serial abuses of process, not only are systemically derived from a conspiratorial policy, but also have accrued cumulatively in their prejudice to Plaintiff and threat to the dignity of the judicial process.

---

[26] *Arguendo, e*ven if a warrant had issued as a result of a report that Wilson alleged to have filed, such a report, itself, was an abuse of process (Wilson's claim has always been that Plaintiff allegedly violated the restraining order by mailing her copies of pleadings (as required by Colo.R.Civ.P. § 5), whilst (at the same time), she was complaining to the court that she had not been "properly served," in that case (even 'though the restraining order had a written-in specific provision for such service)). This leads one to the clear conclusion that the <u>sole</u> purpose for Wilson's filing of such a report (if it actually occurred) was to, "obtain an advantage in a civil matter." (*See* cmt. Colo.R.P.C. § 4.5)

[27] Apparently, Ryan misled the Arvada police officer by misrepresenting that she had been in receipt of "letters," (rather than legal pleadings).

**233.**    The actions of the Defendants, and each of them, constitute both objective bad faith and subjective bad faith.  The defendants' abuse of process (such as the surprise July 2nd 2003 hearing, characterized by the Court of Appeals as the, "mother's attorney's apparent manipu- lation of the notice provisions and the rules of civil procedure." Dec. 30, 2004 opinion, *In Re Marriage of Harrington,* Case No. 03CA0825), which continue to the present, were orchestrated by Defendants for the purpose of gaining a tactical advantage. As an example, nearly all of the allegations contained in the defendants' June 30th 2003 motion were intention- ally false or misrepresentative and were intended to defraud the state trial court and facilitate the permanent severance of a relationship between Plaintiff and his daughter, consonant with their plan conceived in December, 1999.[28]

**234.**    Defendants Ryan and Wilson have continue to advance to the State trial court these same arguments (as contained in their June 30, 2003 application for relief) recently as January 2005 in an effort to codify or obtain judicial approval of their ongoing alienation and concealment of the minor child.  The "approval" was never obtained because the State trial court was divested of jurisdiction. Nevertheless, they have realleged them as recently as June 6, 2005 in a string of ap- pellate pleadings, even when such allegations (*e.g.,* regarding Plaintiff's mental health) were not relevant to the issue before the Court of Appeals. The ulterior purpose for advancing these scurri- lous and immaterial arguments was to discredit Plaintiff, engender bias on the basis of his per- ceived disability (in violation of R.P.C. § 1.2(f)) and to obtain a tactical advantage.

**235.**    Defendants' purpose in filing both the July 6th 2000 *ex parte* domestic-relations motion and the July 7th 2000 *ex parte* petition for mental health hold (both in the Jefferson County Dis- trict Court) was to cause hardship to Plaintiff and to put him out of a home and out of their sight & mind for some indefinite period of time. Defendants conduct continues to the present and they continue to allege that Plaintiff is mentally impaired.[29]

**236.**    Wilson's ulterior purpose for filing for a civil restraining order and falsely alleging threats to her life (as she did in 2000) in July ~ September of 2005, was to stifle this Plaintiff's First Amendment petitioning and pre-filing discovery (information gathering) for the instant suit and occurred only and immediately after she learned that Plaintiff has embarked on an informa- tion-gathering campaign about her.[30]

---

[28] Plaintiff's claims of fraud and offers-of-proof have never been heard or adjudicated by any court.

[29] Plaintiff's claims of fraud and offers-of-proof regarding the civil commitment case have never seen the light of day of a courtroom, as of the date of this filing.  *E.g.,* July 27th 2000 order: "[W]hile Respondent states that he believes Petitioner is responsible for one or more of his several incarcerations (hospitaliza- tions), the relief, if any is requested, is beyond the scope of this divorce proceeding."  Plaintiff's motions for an evidentiary hearing to the county court (handling Wilson's contemporaneous civil restraining or- der) and to the District Court handling the mental health case were denied (without comment).

[30] "As required by Fed.R.Civ.P. § 11, discovery begins with a reasonable investigation of the facts before [a plaintiff] drafts the complaint." Federal Practice Manual for Legal Aid Attorneys, (© 2004, Sargent Shriver National Center on Poverty Law)

237.    Although Ryan has had no contact of any form with, by or from Plaintiff since July of 2003, and although Plaintiff has not lived in the same state as Ryan in five years, she stated (as recently as January 2005), by and through her attorney (Wilson), that, if she could have Plaintiff's residential address, she would again file for a restraining order. (*See* para. 76 of **Appendix B**). If not enjoined or deterred by this court, Ryan & Wilson will, by their own admission, continue to engage in abuses of process.

238.    As a direct and proximate result of defendants' abuses of process, including the false reporting of death threats in the years 2000 & 2005, Plaintiff has suffered the complete and continuing alienation and loss of affection of his natural child; denial of social pleasures and companionship of his child; nervousness; humiliation; emotional distress, pain and suffering; fright; shock; anxiety; loss of sleep; hyper-vigilance; aggravation of a preexisting mental illness (which was known to defendants); medical expenses, both past and future; loss of earnings and earning capacity; denial of unfettered and meaningful access to the courts; loss of reputation; pecuniary losses associated with defendants' material misrepresentations of child support arrearages; and loss of the ordinary enjoyment of life and the pursuit of happiness.

**WHEREFORE,** Plaintiff further prays at the conclusion, hereof.

### ▶ NINTH CLAIM FOR RELIEF (AGAINST WILSON) FOR MALICIOUS PROSECUTION

239.    Plaintiff realleges Paragraphs 1 through 238, hereinabove, inclusive of the within Complaint, as if set forth in full herein.

240.    Defendant Wilson's attempt to obtain permanent restraining orders in Jefferson County (Case Nº 00CO2389 - February 17th 2000) and Denver County (Case Nº 05WCO1018 - September 8th 2005) were both **denied** after hearing.

241.    In July of 2005, Wilson supplied a false report to the U.S. Postal Inspector's offices in Worcester, MA and St. Paul, MN, accusing Plaintiff of issuing a death threat to herself and children and requesting that the agency take action to enjoin this Plaintiff from any further pre-filing discovery (information gathering) via mail. The same report was made to municipal law enforcement agencies in Massachusetts, Colorado and Minnesota. All of the agencies, including the Postal Inspector's Office, declined to further pursue Wilson's claims.

242.    Wilson acted with malice in her attempt to fraudulently obtain any and all permanent restraining orders applied for and in an attempt to induce federal, county, state and municipal agencies to prosecute Plaintiff in advance of this suit.

243.    The lack of probable cause of Wilson's attempts to obtain permanent restraining orders and induce criminal prosecution are so obvious that an inference of malice is warranted.

244.    Plaintiff and his family have been emotionally injured by Wilson's malicious prosecution. Moreover, Plaintiff has expended financial resources on attorneys' fees and evasive maneuvers to establish and maintain his anonymity in an effort to protect his family and self from Wilson's frequent and duplicative malicious prosecution. Plaintiff has suffered nervousness, humiliation, emotional distress, pain and suffering, fright, shock, tension, anxiety and loss of sleep; hyper-vigilance; aggravation of a preexisting mental illness (known to defendants); medical expenses, both past and future; loss of reputation; pecuniary losses; and loss of the ordinary enjoyment of life and the pursuit of happiness.

**WHEREFORE,** Plaintiff prays at the conclusion, hereof.

### ▶ TENTH CLAIM FOR RELIEF (AGAINST WILSON) FOR AIDING AND ABETTING

245.    Plaintiff realleges Paragraphs 1 through 244, hereinabove, inclusive of the within Complaint, as if set forth in full herein.

246.    Section 876 of the Restatement (Second) of Torts (1979) provides:

> "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he "(a) does a tortious act in concert with the other or pursuant to a common design with him, or; "(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or; "(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."

247.    Aider and abettor tort liability, for various underlying torts, has been uniformly recognized, including in Colorado state courts.

248.    An existence of a duty existed between Ryan & Wilson and Plaintiff. Defendant Ryan owed Plaintiff duties under two valid settlement agreements, statute and common law, including, but not limited to, information regarding Plaintiff's daughter, the execution of a Confidentiality Agreement, a tax dependency allocation and reimbursement of certain expenses, and compliance with the Rules governing discovery, *inter alia.*

249.    Defendant Wilson did more than provide counsel and advice to her client (Ryan). Wilson encouraged and substantially Ryan in breaching her duty to Plaintiff and committing tortious acts. Wilson's conduct exceeded the bounds of legitimate advocacy and surpassed mere transgressive participation in her client's unlawful and tortious conduct. Plaintiff is informed and believes and, thereon, alleges that Wilson has been the instigator of many of the conspiratorial and tortious endeavors complained of, herein.

250.    Wilson knowingly provided substantial encouragement or assistance or directly facilitated the following (which is, by no means, an exhaustive list):

- Defendant Ryan's flight from the State of Colorado with Plaintiff's daughter, Shelby;

- The deliberate concealment of Defendant Ryan and Plaintiff's daughter, Shelby;

- The violation of the telephonic and other communication provisions contained in the Nov. 6th 2001 ordered stipulated agreement;

- The evasion and avoidance of Ryan's performance of other duties under two court ordered stipulated agreements;

- Abuse of process, including the intentional manipulation of the Rules of Civil Procedure, Plaintiff's mental illness and the State courts' disfavor of *pro se* litigants;

- Violation of the Rules governing discovery by refusing to cooperate with valid discovery requests which sought, *inter alia,* contact information, health information and the whereabouts of the minor child;

- That manufacture and dissemination of material falsehoods regarding Plaintiff's mental illness to third parties who were not connected to the proceedings.

**251.**    Defendant Wilson, as a licensed attorney, knew or reasonably should have known  that the conduct she was aiding and abetting was tortious: Defendant Wilson recognized that Ryan's tortious conduct would and had already caused injury to Plaintiff; she recognized that Ryan's conduct constituted a breach of duty; and, she substantially assisted, enabled and encouraged Ryan's tortious commissions. Defendant Wilson's knowledge of the tortious nature of the conduct alleged herein is substantially inferred from the circumstances.

**252.**    Wilson's conduct, both intrinsic and extrinsic to proceedings in which was counsel, amounted to fraud, collusion and malicious and tortious conduct towards Plaintiff.

**253.**    Attorney Wilson's conduct, to the extent that any such conduct occurred in the context of any proceeding involving Plaintiff, including those in which she, herself, was a party (not represented by counsel), involved disguising her tortious activity under the veil of the certain trust that the courts place in the integrity of their officers, and caused or was intended to cause a situation in which the  judicial machinery could not perform in the usual manner of its impartial task of deciding cases presented for adjudication.

**254.**    As a direct and proximate result of Wilson's aiding and abetting tortuous conduct, Plaintiff has been injured.  Plaintiff injuries include, but are not limited to:  the complete alienation and loss of affection of his natural child; the complete destruction of the emotional bonding existing between himself, his paternals and the minor child; nervousness, humiliation, emotional distress, pain and suffering, fright, shock, tension, anxiety and loss of sleep; denial of social pleasures and companionship of his child; medical expenses, both past and future; loss of earnings and earning capacity; denial of unfettered and meaningful access to the courts; loss of repu-

35

**EXHIBIT B**



# HARVARD

Office of the Vice Provost for Advances in Learning

Certifies that

# Mark Tracey Lanterman

successfully completed all requirements in

## Cybersecurity: Managing Risk in the Information Age

*Through Harvard's Office of the Vice Provost for Advances in Learning in association with*



April 2018 - July 2018
Issued on: 26 July 2018

Robert A. Lue
Faculty Director, HarvardX

Vice Prov— — — —es in Learning

**EXHIBIT C**

STATE OF MINNESOTA                         DISTRICT COURT

COUNTY OF HENNEPIN                    FOURTH JUDICIAL DISTRICT

---

Computer Forensic Services,                          Case Type: Contract
                                                    Judge Susan N. Burke
        Plaintiff,

                     **ORDER FOR JUDGMENT**

v.

Michael Roman Afremov,                        Court File No. 27-CV-12-22089

        Defendant.

---

    The above-entitled matter was tried to a jury before the Honorable Susan N. Burke from October 21, 2019 to October 23, 2019. Chris Madel, Esq. and Cassandra Merrick Esq. appeared for Plaintiff Computer Forensic Services. Barbara Berens Esq., Erin Lisle Esq. and Carrie Zochert Esq. appeared for Defendant Michael Roman Afremov. Mr. Afremov also appeared.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. The jury returned its verdict on October 23, 2019.

2. The jury found that $807,587.33 will fairly and adequately compensate Computer Forensic Services for the damages caused by Michael Afremov's breach of contract.

3. The jury found that $628,737.33 of the amount is related to the June 15, 2007 invoice.

4. The jury found that $178,850.00 of the amount is related to the May 7, 2008 invoice.

5. The jury's findings are supported by the evidence and adopted by the Court.

## ORDER FOR JUDGMENT

Accordingly, **IT IS HEREBY ORDERED** that:

1. Computer Forensic Services is entitled to judgment against Michael Roman

    Afremov in the amount of $807,587.33 and costs and disbursements.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

Dated: October 23, 2019

**SUSAN N. BURKE**
District Court Judge

2

*This opinion will be unpublished and*
*may not be cited except as provided by*
*Minn. Stat. § 480A.08, subd. 3 (2014).*

## STATE OF MINNESOTA
## IN COURT OF APPEALS
## A15-0729

Mark Lanterman, et al.,
Appellants,

vs.

Michael Roman Afremov,
Respondent.

**Filed April 18, 2016**
**Reversed and remanded**
**Kirk, Judge**

Hennepin County District Court
File No. 27-CV-12-22089

Eric J. Magnuson, Christopher W. Madel, Benjamin D. Steinberg, Robins Kaplan LLP, Minneapolis, Minnesota; and

K. Jon Breyer, Christopher D. Pham, Lindquist & Vennum LLP, Minneapolis, Minnesota (for appellants)

William R. Skolnick, Andrew H. Bardwell, Skolnick & Joyce, P.A., Minneapolis, Minnesota (for respondent)

Considered and decided by Peterson, Presiding Judge; Kirk, Judge; and Jesson, Judge.

# U N P U B L I S H E D   O P I N I O N

**KIRK**, Judge

Appellants Mark Lanterman and Computer Forensic Services, Inc. (CFS) sought

payment from respondent and cross-appellant Michael Roman Afremov for costs incurred

in analyzing AGA Medical Corporation data in preparation for Afremov's criminal lawsuit. Following separate jury and bench trials, Lanterman and CFS argue that the district court erred by: (1) granting Afremov judgment as a matter of law (JMOL) on their breach-of-contract claim; (2) providing the jury erroneous instructions on the breach-of-contract claim; and (3) limiting its recovery of unjust-enrichment damages. Afremov argues that the district court erred in awarding any damages to CFS for unjust enrichment. Because the record contains sufficient evidence to support the jury's finding of a contract and the district court erred in defining "costs" in the jury instructions and during deliberations, we reverse and remand to the district court for proceedings consistent with this opinion.

## FACTS

Lanterman, a computer forensic analyst, is the founder and CEO of CFS. In 2002, Afremov initiated a shareholder lawsuit against AGA Medical Corporation. The district court appointed a receiver for AGA. The receiver hired Lanterman and Espiria Computer Consulting to collect, search, and deliver electronic files stored on various platforms and to retain custody of AGA's electronic data. Lanterman worked on the case as an employee of Espiria. Lanterman later left Espiria and found his own firm, CFS, and transferred the AGA job to CFS. Lanterman produced the requested electronic documents and submitted billing invoices to the receiver reflecting standard business rates. The district court reviewed and approved CFS's billing invoices, which were paid in full by AGA.

In the fall of 2005, AGA and Afremov settled the shareholder lawsuit. In October, the district court entered an order discharging the receiver and outlining how the parties could continue to access the AGA data.

2

> Bassford, Remele ([AGA] litigation counsel) shall
> retain and store [AGA's] litigation files relating to this action
> for a period of six years, allowing [AGA] and Mr. Afremov
> access to such files . . . . The costs resulting from the Bassford,
> Remele custody and administration of the files and the access
> process, are properly payable by Plaintiff Afremov, except that
> [AGA] should pay all costs associated with identification and
> segregation of the Protected Items and the costs associated with
> its own access to such files.

In June 2006, Afremov was indicted in federal court on criminal charges. In April 2007, Frank Berman, Afremov's local attorney, contacted Lanterman and told him that he wanted to review the AGA documents. On April 18, Joseph Petrosinelli, one of Afremov's attorneys based in Washington D.C., sent a letter to Lanterman informing him that Afremov would be subpoenaing documents from the 2005 shareholder lawsuit in advance of his criminal trial, which was slated to begin in September 2007. In the letter, Petrosinelli wrote:

> We represent Michael Afremov in connection with the
> above-captioned criminal case [*United States v. Afremov*], now
> pending in federal court in Minneapolis. We understand that
> some time ago, in your capacity as an expert consultant to the
> [r]eceiver of AGA Medical Corporation, you and/or your
> company took custody of certain AGA documents, including
> electronic files. We believe those documents contain
> information that is relevant to our defense of Mr. Afremov in
> the criminal case, and at the appropriate time we intend to serve
> subpoenas on you and your company calling for production of
> the documents to us. Thus, we request that you preserve such
> documents in your possession, and that you conduct whatever
> compilation and review of the documents that you believe is
> necessary in advance of production to us. For your
> information, the trial is currently scheduled for September 10,
> 2007, and we intend to serve our subpoenas well in advance of
> that date.

> We note that on October 24, 2005 the trial court in [the shareholder lawsuit] entered an [o]rder concerning discharge of the [r]eceiver, Mr. Afremov's right to continued access to AGA's litigation files, and other matters. *Pursuant to that [o]rder, Mr. Afremov will pay any costs, including reasonable attorney's fees, that you incur in connection with responding to this request and the forthcoming subpoenas.* Please send all bills for such costs to my attention at the above address. If you have any questions, please feel free to contact me at the above number.

(Emphasis added.) Lanterman testified that, upon receiving the letter, he believed Afremov was offering to hire him to perform computer-forensic analysis of the AGA data. The following day, Afremov served Lanterman the subpoena, commanding him to appear in federal district court on September 10, 2007, and to bring with him:

1. All documents, including all electronic files or data, obtained from AGA Medical Corporation or any of AGA's officers, directors, owners, employees, attorneys, or receivers.

2. All documents, including all electronic files or data, that refer, relate, or pertain to Franck Gougeon, Kurt Amplatz, Michael Afremov, AGA Medical Corporation, Frederick Fischer, or Foremost Machining Company.

3. All electronic mail created or received by Franck Gougeon, Kurt Amplatz, Michael Afremov, or any officer, director, or employee of AGA Medical Corporation.

CFS hired Scott Harris, an attorney employed at Leonard, Street, & Deinard, P.A., to review and segregate AGA's privileged documents. A short time after receiving the letter and subpoena, Lanterman, Berman, and Harris worked together to create a list of search terms for production of AGA documents. Lanterman and CFS immediately began compiling and reviewing the documents, which they sent to Harris for the privilege review.

After Harris completed the privilege review, the documents were provided to Afremov's criminal defense team. On June 15, CFS issued its first billing invoice to Afremov totaling $674,861.08, which was composed of $628,737.33 for CFS's computer-forensic services, and $46,123.75 in attorney fees. Afremov paid the attorney fees, but refused to pay the remaining balance. Shortly after CFS issued the first billing invoice, Berman directed CFS to immediately stop working on the project.

In October 2007, Petrosinelli sent Harris a letter, stating that Afremov viewed Lanterman as a fact witness, not as an expert computer-forensic consultant, and offered to pay the "actual, reasonable, out-of-pocket costs" that CFS incurred for the work. Lanterman declined this offer.

In May 2008, CFS sent a second billing invoice to Afremov totaling $178,850.00 for data searches allegedly performed, but not billed before it received the work-stop order. Afremov never received the work product reflected in the second billing invoice, and he refused to pay the invoice.

Afremov pleaded guilty to three tax charges and one conspiracy charge. Lanterman and CFS sought compensation for their unpaid billing invoices in federal court. Although Lanterman and CFS did not provide additional discovery to document their fees, the federal district court ordered Afremov to pay the first billing invoice, but not the second billing invoice. *United States v. Afremov*, No. 06-196(1) (JRT/SRN), 2009 WL 3164739, at *6-8 (D. Minn. Sept. 28, 2009), *vacated*, 611 F.3d 970 (8th Cir. 2010). The federal district court's order was later vacated by the Eighth Circuit Court of Appeals for lack of jurisdiction. *See United States v. Afremov*, 611 F.3d at 978.

5

In October 2012, Lanterman and CFS sued Afremov in state court, asserting claims of breach of contract, promissory estoppel, and unjust enrichment. In February 2014, the district court held a six-day jury trial. At trial, Lanterman testified extensively and was cross-examined about the methods CFS employed to compile and review the AGA data. He also testified about his fees, which included computer-analyst time, flat-rate fees, and computer run-time. Lanterman explained that he charged the computer run-time fee when a computer was used to generate a searchable index of an electronic dataset. During that time, the computer could not be used for other work projects.

At the close of Lanterman and CFS's presentation of their case, Afremov moved for JMOL, arguing in part that CFS failed to prove its breach-of-contract claim. The district court denied the motion, stating that it would rehear the issue at the close of the case.

When both sides had rested, the district court provided the jury with detailed instructions defining a contract. Another section, entitled "Damages," stated the following:

> In answering special verdict question 4, you are to determine the amount of money that will fairly and adequately compensate Computer Forensic Services for damages caused by the breach of contract.
>
> The damages award, if any, should put Computer Forensic Services in the position it would have been in, if the contract had not been breached by Michael Afremov.
>
> Specifically, in this case, to the extent that you find that paragraph 5 of pages 8-9 of the Discharge Order (Exhibit 3) covers Computer Forensic Services, *the word "costs" means a reasonable hourly rate for the people who did any work that Plaintiff has proven was performed*. A party seeking damages must prove the nature and extent of their damages.

6

> You must not decide damages based on speculation or guess.

(Emphasis added.)  The district court limited "costs" to the reasonable hourly rate of CFS employees against the wishes of both parties.

The district court provided the jury with a special verdict form directing it to determine whether a contract existed between CFS and Afremov.  During deliberations, the jury sent the district court the following question:

> Re: Question pertaining to Judge's Instruction (p. 8: Damages: ¶ 3)
>
> Do damages of the plaintiff as described in costs include <u>only</u> the "reasonable hourly rate for the people" or can it include flat rate fees and computer run time?

The district court responded:

> The word "cost" as described in the jury instruction in question does not include any flat rate fees and computer run time.
>
> Nov. 11, 2014 12:10 p.m.

As deliberations continued, the jury posed another question to the district court:

> The jury is in agreement that the discharge order (pp8-9:¶5) does cover CFS.
>
> In order for the jury to [] put [CFS] in the position it would have been, if the contract had not been breached, the jury believes that the damages include all line items in the invoice (6/15/2007) minus legal fees of $46,123.75.
>
> Is the jury's position [in] violation of your instructions (p8¶3) and your initial clarification (Question 2@12:10?)

The district court responded, "Yes, it would violate the instructions."  The jury returned a special verdict finding that there was a contract between Afremov and CFS, that Afremov

breached the contract, and that the breach directly caused damage to CFS.  It awarded CFS $104,568.75 in damages.

In March, the district court granted Afremov's motion for JMOL on the breach-of-contract claim, concluding that there was no agreement between the parties concerning the scope and nature of the work to be performed and the terms of compensation.  Following a bench trial on Lanterman and CFS's promissory estoppel and unjust-enrichment claims, the district court concluded that they failed to prove promissory estoppel because they provided no evidence of the costs incurred in working on the Afremov project.

The district court awarded CFS $103,012.33 on its unjust-enrichment claim related to the first billing invoice because Afremov "obtained some benefit from CFS's production of AGA's documents."  The district court found that this balance "best reflect[ed] the value of the services that were provided."

Lanterman and CFS moved for a new trial and both parties moved for amended findings.  While the motions were pending, the parties filed a joint motion for dismissal and vacatur on the ground that they had reached an agreement that disposed of the issues raised in the litigation.  But the district court denied all of the parties' posttrial motions, including the motion for dismissal and vacatur.

The parties appeal.

# D E C I S I O N

## I.    The district court erred in granting JMOL on CFS's breach-of-contract claim.

We review a district court's decision to grant JMOL de novo.  *See Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn. 2009).

> [JMOL] should be granted: only in those unequivocal cases where (1) in the light of the evidence as a whole, it would clearly be the duty of the [district] court to set aside a contrary verdict as being manifestly against the entire evidence, or where (2) it would be contrary to the law applicable to the case.

*Jerry's Enters., Inc., v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816 (Minn. 2006) (quotation omitted). "Courts must view the evidence in the light most favorable to the nonmoving party." *Longbehn v. Schoenrock*, 727 N.W.2d 153, 159 (Minn. App. 2007) (quotation omitted). "JMOL is appropriate when a jury verdict has no reasonable support in fact or is contrary to law." *Id.* In deciding a motion for JMOL, the district court must not "weigh the evidence or judge the credibility of the witnesses." *Lamb v. Jordan*, 333 N.W.2d 852, 855 (Minn. 1983).

CFS argues that the district court improperly granted JMOL because there was substantial evidence in the record supporting the jury's finding of a contract between the parties. We agree.

To prove a breach-of-contract claim, a plaintiff must establish: "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (quotation omitted). The formation of a contract requires mutual assent of the parties involved in the transaction. *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 864 (Minn. 2011). "Whether mutual assent exists is tested under an objective standard." *Id.*; *see also Cederstrand v. Lutheran Bhd.*, 263 Minn. 520, 532, 117 N.W.2d

213, 221 (1962) (explaining that "[e]xpressions of mutual assent, by words or conduct, must be judged objectively, not subjectively.").

 "Generally, the existence of a contract, as well as the terms of that contract, are questions of fact to be determined by the fact-finder." *TNT Props., Ltd. v. Tri-Star Developers LLC*, 677 N.W.2d 94, 101 (Minn. App. 2004). After reviewing the evidence in the light most favorable to CFS, we conclude that there is sufficient evidence to support the jury's finding of a contract. The April 18, 2007 letter from Petrosinelli to Lanterman requested that Lanterman use his discretion in "compil[ing] and review[ing]" AGA documents in preparation for Afremov's criminal trial, and specifically referenced his role "as an expert consultant" to the receiver of AGA medical corporation during Afremov's 2005 shareholder lawsuit. Berman testified that he was aware of the computer-forensic analysis that Lanterman and CFS had performed during the 2005 shareholder lawsuit. Berman also testified that he knew the scope of the AGA data encompassed as many as a million documents.

According to Lanterman, shortly after receiving the letter from Petrosinelli and the subpoena, he discussed the AGA data with Berman and Harris. Berman told him to work quickly in reviewing the AGA documents, and "to leave no stone unturned." Berman also suggested some search terms to narrow the scope of production. These facts demonstrate that there was a "meeting of the minds" between the parties concerning the scope of the work to be performed. A meeting of the minds "may be based on objective manifestations whereby one party by his words or by his conduct, or by both, leads the other party reasonably to assume that he assents to and accepts the terms of the other's offer."

10

*W. Insulation Servs., Inc., v. Cent. Nat'l Ins. Co. of Omaha*, 460 N.W.2d 355, 358 (Minn. App. 1990) (quotation omitted).  While the parties never formalized their agreement in a written contract, the evidence demonstrates that Afremov, through his attorneys' words and conduct, hired Lanterman to perform computer-forensic services in anticipation of Afremov's criminal trial.

The district court reasoned that there was no meeting of the minds concerning the scope of the project because the parties did not know that the AGA data was not in a searchable format and would have to be recreated at great cost.  The district court cited Lanterman's testimony that he initially thought that the data was readily searchable because it was on the production server, but was surprised to learn, after engaging with Berman and Petrosinelli, that it had been removed.  Upon learning this fact, Lanterman never advised Afremov or his counsel that the AGA data needed to be regenerated into a searchable format at a cost of over $500,000.

But the record evidence shows it was Afremov who initially requested Lanterman and CFS's expert assistance in analyzing the data.  Afremov's counsel never inquired about the format of the AGA data or the requisite steps needed to compile and review the data. Instead, they requested immediate production of documents.  These facts demonstrate that the parties understood the scope of the work to be performed.

The district court also determined that there was no meeting of the minds on the terms of compensation to be paid to CFS.  It cited trial testimony that Afremov's counsel understood "costs . . . incur[red]" in the April 18, 2007 letter to mean out-of-pocket costs, but Lanterman and CFS understood the terms to reflect CFS's normal, customary rates.

11

Viewing the evidence in the light most favorable to CFS, we conclude that the evidence supports a finding that CFS was to be paid its normal, customary rates. Neither the discharge order nor the April 18, 2007 letter defined the types of "costs" Afremov would pay for accessing, compiling, or reviewing the AGA data. The 2005 discharge order stated that Afremov would pay costs associated with the "access process" to the AGA data. The April 18, 2007 letter stated that Afremov would pay Lanterman "any costs, including reasonable attorney's fees" that he incurred "compil[ing] and review[ing]" the AGA data for Afremov's upcoming trial and the forthcoming subpoena. In particular, the phrase "any costs" used in the April 18, 2007 letter is both broad and ambiguous and does not support the district court's reasoning that the term was necessarily restricted to out-of-pocket costs. Moreover, any ambiguity concerning the terms of payment must be construed against Afremov, the drafter. *Hilligoss v. Cargill, Inc*., 649 N.W.2d 142, 148 (Minn. 2002).

Lanterman testified and was extensively cross-examined about the fees that CFS charged in the billing invoices. Berman testified that he knew that Lanterman had been paid its normal rates for his computer-forensic services in the 2005 shareholder dispute, which totaled approximately $2,000,000. The managing director of FTI Consulting, a company that provides computer-forensics services, reviewed CFS's billing invoices to Afremov and testified that FTI would have charged considerably more to complete the work. We conclude that the jury's finding that the discharge order covered CFS's first billing invoice has reasonable support in fact based on the broad language used to define costs in the discharge order, the April 18, 2007 letter, and witness testimony.

Afremov argues that he only agreed to pay out-of-pocket costs incurred by Lanterman as a fact witness and custodian of the AGA documents, and that he had hired another computer-forensic expert for his criminal defense. But the evidence demonstrates that Berman and Petrosinelli clearly asked Lanterman to perform computer-forensic services in compiling and reviewing documents. Had Afremov only subpoenaed Lanterman as a fact witness, Lanterman would have only been required to ensure that the data was available on the first day of trial. To the contrary, the parties' testimony demonstrates that Berman and Petrosinelli wanted Lanterman's expert computer-forensic assistance in reviewing and producing relevant documents in preparation for Afremov's defense five months before trial.

Because the jury's breach-of-contract finding has reasonable support in the record, the district court should have denied Afremov's JMOL motion and allowed the jury's verdict to stand. *Jerry's Enters.*, 711 N.W.2d at 816. We reverse the district court's grant of JMOL on the breach-of-contract claim.

## II. The district court's jury instructions were erroneous.

"The district court has broad discretion in determining jury instructions and [an appellate court] will not reverse in the absence of abuse of discretion." *Hilligoss*, 649 N.W.2d at 147. The district court is not authorized to give a jury instruction that "give[s] prominence to and emphasize[s] particular facts disclosed by the evidence" in such a way that "singl[es] out elements or views upon the controversy which were proper for argument and discussion by counsel." *Domagala v. Rolland*, 787 N.W.2d 662, 669 (Minn. App. 2010), *aff'd*, 805 N.W.2d 14 (Minn. 2011).

13

Both parties argue that the district court erred in its jury instruction defining "costs" in the discharge order for the breach-of-contract claim. But Afremov contends that Lanterman and CFS are not entitled to a new trial because the error was harmless, as they failed to prove that a contract existed in the first place.

The district court stated on the record that it would define the word "costs" to refer to the discharge order, but did not explain its reasoning for excluding flat-rate fees or computer run-time. The discharge order stated that "[t]he costs resulting from the Bassford, Remele custody and administration of the files and the access process, are properly payable by Plaintiff Afremov." As noted earlier in this opinion, this language does not explicitly define costs, let alone that costs should be restricted to employee hours.

Here, the jury instructions emphasized only one form of contract damages, lost revenue from employee hours. But the measure of contract damages is generally "based on recovery of the expectancy or benefit of the bargain." *See, e.g.*, *Lesmeister v. Dilly*, 330 N.W.2d 95, 101 (Minn. 1983). Lanterman's testimony established that CFS's damages from Afremov's breach of contract included lost payments for computer run-time and flat-rate fees as well as analyst time.

The district court's error was not harmless. "An error is prejudicial if there is a reasonable likelihood that the giving of the instruction in question would have had a significant effect on the verdict of the jury." *Youngquist v. W. Nat'l Mut. Ins. Co.*, 716 N.W.2d 383, 386 (Minn. App. 2006) (quotation omitted). In answering the special verdict questions, the jury was tasked with finding the amount of damages Afremov owed CFS for breaching the contract. Special verdicts allow "the jury to make findings of ultimate facts

14

. . . without regard to the effect of their answers upon the ultimate outcome of the case."
*McCourtie v. U.S. Steel Corp.*, 253 Minn. 501, 516, 93 N.W.2d 552, 562 (1958).  Here, we
conclude that the jury's proposed finding of damages in favor of CFS totaling $628,737.33
was entirely reconcilable with the record evidence.  *See Dunn v. Nat'l Beverage Corp.*, 745
N.W.2d 549, 555 (Minn. 2008) (stating that "[i]f the answers to special verdict questions
can be reconciled on *any* theory, the verdict will not be disturbed." (quotation omitted)).

Under Minn. R. Civ. P. 49.01(a), a jury returns a special verdict in the form of a
special written finding upon each issue of fact, and the district court cannot "inform the
jury of the effect of its answers on the outcome of the case."  Here, the district court violated
rule 49.01(a) when it informed the jury that an award of $628,737.33 in damages to
Lanterman and CFS would violate its instructions.  This comment was equivalent to telling
the jury the conditions under which Lanterman and CFS could recover damages.
*McCourtie*, 253 Minn. at 516, 93 N.W.2d at 562.   And the district court's response to the
jury's question substantially prejudiced Lanterman and CFS because the jury returned a
significantly lower damages award of $104,568.75.  We conclude that the erroneous jury
instruction, coupled with the district court's reply instructing the jury on how CFS could
recover on its breach-of-contract claim, resulted in substantial prejudice warranting a new
trial on damages arising from CFS's first billing invoice.  *Domagala*, 787 N.W.2d at 669,
675.

Both sides appeal the district court's award of unjust-enrichment damages to
Lanterman and CFS.  An unjust-enrichment claim is not available when there is an
enforceable contract.  *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838

15

(Minn. 2012).  Here, there is no basis for equitable relief in light of the jury's finding of a

contract.  For this reason, we reverse the district court's unjust-enrichment award.

**Reversed and remanded.**