# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF FLORIDA
 2                  PENSACOLA DIVISION
    ------------------------------------------------
 3  ALLIANCE LAUNDRY SYSTEMS LLC,
          Plaintiff,
 4  vs.                    File No. 23-CV-22130 (MCR)
    TRUDY ADAMS, JOHN "CLAY" WILLIAMS
 5  and AUTARKIC HOLDINGS, INC. D/B/A
    LAUNDRYLUX,
 6        Defendants.
    ------------------------------------------------
 7  TRUDY ADAMS, JOHN "CLAY" WILLIAMS,
            Defendants/Counterclaim Plaintiffs,
 8  vs.
    ALLIANCE LAUNDRY SYSTEMS LLC,
 9  GREG REESE, MIKE HAND, and SAMANTHA
    BAKER,
10        Plaintiff/Counterclaim Defendants/
          Third-Party Defendants.
11  ------------------------------------------------
12           REMOTE VIDEO ZOOM DEPOSITION OF
13                  MARK LANTERMAN
14
15  DATE:  February 11, 2025
16  TIME:  10:00 a.m. CT
17  PLACE:  Videoconference
18
19
20
21
22
23
24  REPORTED BY:  NANCY G. GISCH, RMR, CRR, CLR, CRC
25                (Via videoconference)
```

Page 1

```
1              The videoconference deposition via
2    Zoom of MARK LANTERMAN, taken on February 11,
3    2025, commencing at approximately 10:00 a.m. CT,
4    before Nancy G. Gisch, Registered Merit Reporter,
5    Certified Realtime Reporter, Certified LiveNote
6    Reporter, Certified Realtime Captioner, a notary
7    public in and for the State of Wisconsin.
8
9                A P P E A R A N C E S
10          (All appearances via videoconference)
11
12   On behalf of the Plaintiff and Witness:
13          MELINDA GIFTOS, ESQ.
14          mindi.giftos@huschblackwell.com
15          Husch Blackwell, LLP
16          33 East Main Street
17          Suite 300
18          Madison, Wisconsin 53703
19
20
21
22   (Appearances continued on next page.)
23
24
25
```

Page 2

1    On Behalf of Defendant Laundrylux:

2          DAVID WATNICK, ESQ.

3          dwatnick@perkinscoie.com

4          ADRIAN ALMAGUER, ESQ.

5          aalmaguer@perkinscoie.com

6          Perkins Coie LLP

7          1120 Northwest Couch Street

8          10th Floor

9          Portland, Oregon 97209

10

11   On behalf of Trudy Adams and Clay Williams:

12          JURA ZIBAS, ESQ.

13          jura.zibas@wilsonelser.com

14          WILSON ELSER MOSKOWITZ

15             EDELMAN & DICKER, LLP

16          150 E 42nd Street, 23rd Floor

17         New York, New York 10017

18

19

20

21   Also Present:

22          MATT SCHROEDER, Consultant

23          BRIAN CICCONE, Videographer

24

25

Page 3

```
 1                    I N D E X

 2   WITNESS:  MARK LANTERMAN                         PAGE

 3

 4   EXAMINATION BY MR. WATNICK...................     7

 5

 6   EXHIBITS MARKED AND REFERRED TO:

 7   EXHIBIT 1...................................    26

 8          Amended Expert Declaration of

 9          Mark Lanterman

10   EXHIBIT 2...................................    34

11          Upsala Transcripts

12   EXHIBIT 3...................................    36

13          1/16/25 email to D. Watnick

14          from C. Horan

15   EXHIBIT 4...................................    53

16          Plaintiff's Responses to Defendant

17          Laundrylux's Fifth Set of Document

18          Requests

19   EXHIBIT 5...................................    88

20          Reddit "Ask Me Anything" thread

21   EXHIBIT 6...................................   113

22          Affidavit of Mark Lanterman

23   EXHIBIT 7...................................   123

24          Bench & Bar of Minnesota

25   (Exhibits continued on next page.)
```

Page 4

1    EXHIBIT 8.................................... 161

2            Deposition transcript, rough draft

3    EXHIBIT 9.................................... 174

4            Adams laptop -- Axiom date filter.png

5    EXHIBIT 10................................... 177

6            Screenshot from Axiom

7

8

9    (Original exhibits attached to original

10   transcript; copies to counsel.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
Calendar-PNW@veritext.com 503.245.4552

1    consultant for PRG.

2                MS. GIFTOS:  Mindi Giftos of Husch

3    Blackwell, representing Alliance Laundry Systems

4    LLC, the third-party -- I'm sorry -- the

5    third-party counter-defendants, and the witness,

6    Mark Lanterman.

7                MS. ZIBAS:  Jura Zibas of Wilson

8    Elser, representing Trudy Adams and Clay

9    Williams.

10               VIDEOGRAPHER:  Thank you.

11           Will the court reporter please swear in

12   the witness.

13                    MARK LANTERMAN,

14   duly sworn, was examined and testified as follows:

15               VIDEOGRAPHER:  You -- you may

16   proceed.

17                    EXAMINATION

18   BY MR. WATNICK:

19       Q.  Mr. Lanterman, can you please state your

20   full name for the record.

21       A.  Mark Lanterman, L-A-N-T-E-R-M-A-N.

22       Q.  Do you have a middle name?

23       A.  Oh, I'm sorry.  Yes.  Tracey, T-R-A-C-E-Y.

24       Q.  And have you ever used any other names?

25       A.  No.

Veritext Legal Solutions
Calendar-PNW@veritext.com 503.245.4552

```
1              Does that make sense?
2        A.   Yes.
3        Q.   You can take a break whenever you need,
4    but if there's a question pending, you must
5    answer the question before the break is called
6    for.
7              Do you understand?
8        A.   Yes.
9        Q.   And you understand today that you're
10   testifying under oath?
11       A.   Yes.
12       Q.   Is there any reason that you're not able
13   to testify accurately today?
14       A.   No.
15       Q.   Are you under the influence of any drugs,
16   alcohol, or any other substance that affects your
17   ability to testify?
18       A.   No.
19       Q.   Okay.  Where are you joining us from
20   today?
21       A.   Medina, Minnesota.  Just outside of
22   Minneapolis.
23       Q.   Is that where you reside?
24       A.   Yes.
25       Q.   And are you coming to us from your home
```

Page 9

1   today?

2        A.   Yes.

3        Q.   Is there anybody else in the room with

4   you?

5        A.   No.

6        Q.   Do you have any documents in the room with

7   you?

8        A.   Yes.

9        Q.   What documents are those?

10       A.   I have a -- I have an iPad with a copy of

11  my report, but the iPad is off -- or excuse me,

12  it's -- it's locked.

13            And I have a manila folder that has two

14  documents.  These are our chain of custody

15  documents.  And I include -- or I wanted to have

16  them handy in case you asked when certain devices

17  arrived at my offices.

18       Q.   Were --

19       A.   Other than that, I -- oh, I'm sorry.

20            Other than that, I -- I've no additional

21  documents here.

22       Q.   Are those chain of custody documents

23  documents that were previously provided to

24  counsel for Alliance?

25       A.   I don't know.  My office may have provided

Page 10

```
1        A.   No.
2        Q.   Are there any mistakes included in this
3   resumé that you are aware of.
4        A.   Not that I am aware of.
5             I think that there's something missing,
6   though.
7        Q.   What is that?
8        A.   In -- I think it was in December the
9   Arizona Supreme Court appointed me to the Court's
10  AI steering committee.
11       Q.   I think that is reflected right here.
12       A.   Oh, is it?
13            Oh, okay.  Thank you.  I -- I missed that.
14  Yep.
15       Q.   Nothing on here that needs correction, as
16  far as you can tell?
17       A.   No.
18       Q.   So you say here you have a -- a bachelor's
19  of science -- a bachelor -- a -- I'll start over.
20            You say you have a BS in computer science
21  and an MS in computer science, both from Upsala
22  College.
23            Is that right?
24       A.   Yes.
25       Q.   What year did you earn each of those
```

Page 28

```
 1   degrees?
 2        A.   1987 and 1989, I believe.
 3        Q.   Where is Upsala College located?
 4        A.   Well, it was located in East Orange,
 5   New Jersey.
 6        Q.   It is no longer located there?
 7        A.   Correct.
 8        Q.   The college is no longer in existence.  Is
 9   that right?
10        A.   That's correct.  My understanding is the
11   state of New Jersey shut down the school.
12        Q.   Do you know when that occurred?
13        A.   I believe it was in the early 1990s, but
14   I -- I -- didn't really follow it.
15        Q.   Shortly after your attendance?
16        A.   Yes.
17        Q.   What year did you start attending Upsala
18   College?
19        A.   I believe that would have been September
20   or -- yeah, September of 1983.
21        Q.   Were you -- had -- had you ever attended
22   any other college before that?
23        A.   I took a distance learning class once.
24        Q.   During high school, after high school?
25        A.   In the -- in the -- I want to say it was
```

Page 29

```
 1    the summer after high school.
 2         Q.  And you began attending Upsala College in
 3    September 1983.  Had you just graduated from high
 4    school the prior spring?
 5         A.  Yes.
 6         Q.  And did you live in East Orange,
 7    New Jersey?
 8         A.  No.
 9         Q.  Where did you live?
10         A.  Morristown, New Jersey.
11         Q.  Morristown?
12         A.  I -- Morris, with an M.  I lived with my
13    grandparents.
14         Q.  And did you live there for the entirety of
15    your attendance at Upsala College?
16         A.  Yes.
17         Q.  Did you begin working on your master's
18    upon finishing your bachelor's degree?
19         A.  Yes.
20         Q.  Were you a student there six years
21    consecutively?
22         A.  Yes.
23         Q.  Were you a full-time student for that
24    entire time?
25         A.  I believe so, yes.  I think it depends on
```

Page 30

```
 1    the number of credits I had.  I -- I sometimes
 2    couldn't afford as many credits as I would have
 3    preferred to have taken, but I believe,
 4    technically, yes, I was a full-time student.
 5        Q.  Do you remember your grade point average
 6    when you completed your bachelor's degree?
 7        A.  No.
 8        Q.  Any guess?
 9        A.  No.
10        Q.  Do you recall your master's degree
11    grade-point average?
12        A.  No.
13        Q.  No guess?
14        A.  No.
15        Q.  We talked about how Upsala College has
16    since closed.  Do you know who maintains the
17    records of Upsala College?
18        A.  No.
19        Q.  Have you ever sought to procure any of the
20    records relating to your attendance at Upsala
21    College?
22        A.  I did once, yes.
23        Q.  When?
24        A.  Probably a year or two years ago.
25        Q.  And what were the circumstances of that
```

Page 31

1        Q.   And what did you do after that?

2        A.   I attempted to get the transcript.   And I

3   was unable to.

4        Q.   How did you attempt to get the transcript?

5        A.   I think I googled, trying to find out how

6   to do that -- or, you know, how to track down

7   the -- the records.

8             And I forget who the custodian of the

9   records were, but I sent a -- an email.  I never

10  heard back.  So I sent a letter, requesting a

11  copy of my transcript.  And I never heard back.

12       Q.   Did you do anything other than that?

13       A.   No.

14       Q.   Do you have copies of diplomas that you

15  earned from Upsala College?

16       A.   No.

17       Q.   Did you ever have copies of diplomas?

18       A.   Yes.

19       Q.   When?

20       A.   I think the last time I saw them would

21  have been in the early 1990s.

22       Q.   What happened to them?

23       A.   I -- well, I would have to speculate, but

24  I had them at my grandparents' apartment.  And my

25  grandfather was very proud of that.

Veritext Legal Solutions
Calendar-PNW@veritext.com 503.245.4552

1          And I believe that when my grandparents

2    passed away -- I believe that their belongings

3    were thrown away.

4        Q.  So the -- to the best of your

5    understanding, your diplomas would have been

6    thrown away?

7        A.  I -- I don't know what would have happened

8    to them.  I'm -- I'm -- I'm guessing.

9          The -- the last time I saw my diplomas

10   they were at my grandparents' apartment in

11   Morristown.

12       Q.  Were they framed and hanging on a wall?

13       A.  They were framed.  I don't know if they

14   were hanging or not.

15       Q.  But you don't know what happened to them

16   after that?

17       A.  No.

18       Q.  I'm going to introduce Exhibit No. 2.

19          (Deposition Exhibit No. 2 introduced.)

20       Q.  (By Mr. Watnick, continuing)

21   Mr. Lanterman, can you see this document?

22       A.  Yes.

23       Q.  This is a -- a web page that I accessed

24   and printed from Felician University of

25   New Jersey.  You can see the URL down here.

Page 34

1           "After multiple attempts to find this

2     file, we have not been able to locate this

3     student's transcript.

4           "I apologize for the inconvenience."

5           Do you see that?

6      A.   I see that, yes.

7      Q.   Do you have any idea why your transcripts

8     would not be available in the Upsala College

9     records?

10     A.   No.  Other than bad recordkeeping, which

11    is, I believe, the reason why the school was shut

12    down, to begin with.  But I don't know why they

13    would not have my transcript.

14     Q.   The school was shut down because of bad

15    recordkeeping?

16     A.   My understanding is that there was bad

17    rec- -- recordkeeping.  And I think there were

18    allegations of financial fraud, having to do with

19    student loans.

20          But I -- once I was -- you know, once I

21    was done with school, I didn't really follow --

22    follow Upsala College much.

23     Q.   Do you have any documentary evidence

24    confirming your attendance at Upsala College?

25     A.   I don't know.  Not that I know of.

Page 39

1    you're being asked to investigate that?

2                MS. GIFTOS:   Object to form.

3        A.   (Continuing) Well, typ- -- typically my

4    cases involve the analysis of data, yes.

5        Q.   Would you -- if you wanted to understand

6    what somebody did on a computer, would you rather

7    ask that person what they did or look at the data

8    on the computer?

9        A.   I usually would want to look at the data.

10       Q.   Well, I -- I would analogize that to our

11   situation, which -- my question for you is, why

12   should anybody in our case be satisfied with your

13   claims of attendance at Upsala College if you are

14   not able to provide any written evidence of that?

15       A.   Yeah.   I -- I don't know how you would

16   expect me to answer that.

17       Q.   I -- that's why I'm asking the question.

18   I don't -- I -- I don't know what your answer

19   would be.

20           I mean, do you think that the parties in

21   this case should just rely on your statement that

22   you've attended Upsala College?

23       A.   Well, it's the truth.

24       Q.   And so we should just take that -- we

25   should just take your word for it?

Veritext Legal Solutions
Calendar-PNW@veritext.com 503.245.4552

```
 1              MS. GIFTOS:  Objection; asked and
 2    answered, argumentative.
 3         A.  (Continuing) That would be your decision.
 4         Q.  So reasonable to conclude, if we don't
 5    believe you, that you didn't attend Upsala
 6    College?
 7              That's a --
 8         A.  I --
 9         Q.  -- decision we could make?
10         A.  Again, I can't -- I can't help you come to
11    your determination.  I told you that I've -- that
12    I attended a -- Upsala College; I graduated from
13    Upsala College.
14              I had a long career in law enforcement, in
15    which I was subjected to multiple background
16    checks.
17              If you don't want to believe me, I
18    don't -- I don't know how, you know -- how I can
19    change your mind.
20              But I'm telling you that if -- if I -- if
21    I was going to fabricate a degree, I would have
22    chosen a better school; not one that was shut
23    down by the state of New Jersey for bad
24    recordkeeping practices and financial fraud.
25         Q.  You wouldn't choose a school that doesn't
```

Page 42

```
 1        A.  No, it's not a concern for -- for me.  I
 2   know -- I know what schooling I attended.  I know
 3   what degrees I earned.  And my -- I don't know
 4   what else you want me to say, other than that.
 5        Q.  I think, if it were me, I would perhaps go
 6   to greater lengths to try and recover these
 7   missing transcripts.  I am surprised that there's
 8   only been one email and one letter.
 9             You've done nothing else to try and get
10   them?
11             MS. GIFTOS:  Objection --
12        A.  (Continuing) No.
13             MS. GIFTOS:  -- moment of counsel
14   testifying.
15        Q.  (By Mr. Watnick, continuing) Your answer
16   was no?
17        A.  My answer is no.
18        Q.  So you know where you went to college.
19   Right?
20        A.  Yes.
21        Q.  And how are we supposed to know?
22        A.  Well, because I told you.
23        Q.  And that's everything?
24        A.  That's everything.
25        Q.  Okay.  I want to look back at your resumé
```

Page 47

```
 1          Do you see that?
 2              MS. GIFTOS:  I'm going to object to
 3     the extent it re- -- it misstates the text being
 4     read.
 5              MR. WATNICK:  If I misstated it, I
 6     apologize.  I mean, I think we can agree that the
 7     document speaks for itself.
 8          Q.  (By Mr. Watnick, continuing) But you can
 9     read it.  Right, Mr. Lanterman?
10          A.  I can see it, yes.
11          Q.  Did Alliance communicate this request to
12     you?
13              MS. GIFTOS:  I'm going to object to
14     the extent it's calling for attorney-client
15     privileged information.
16              MR. WATNICK:  Mr. Lanterman is not
17     your client, is he?
18              MS. GIFTOS:  Sorry.  Excuse me.
19          Yes, you can proceed.
20          A.  (Continuing) Could you ask me the question
21     again.
22          Q.  Did Alliance communicate to you this
23     request?
24          A.  I believe that they communicated it to my
25     office, yes.
```

Page 54

```
 1        Q.  And did it reach you?

 2        A.  I was asked about this, yes.

 3        Q.  Did you give a response?

 4        A.  I did give a response.

 5        Q.  And what was your response?

 6        A.  That it was not readily available.

 7        Q.  Did you offer to look for it further?

 8        A.  I don't know if I did or not.

 9        Q.  Were there any other discussions with

10   Alliance about this request?

11        A.  Not with me, no.

12        Q.  Request No. 2 is the same question, just

13   with respect to the MS in computer science from

14   Upsala College.

15            And, again, it says, "Alliance has

16   communicated Defendants' Request" -- this is

17   "No. 1."  I believe it meant to say -- "No. 2" --

18   "to Mark Lanterman."

19            Is there any distinction between the --

20   I'll start over.

21            Is -- is your answer the same for the MS

22   degree?

23        A.  Yes.

24        Q.  Okay.  And then Request No. 3 says,

25   "Documents sufficient to show that Plaintiff's
```

Page 55

```
 1        A.   I don't know.

 2        Q.   Do you want more --

 3        A.   I may --

 4        Q.   -- time to think about it?

 5        A.   No, I don't need -- I don't need more time

 6   to think about it.  I attempted to in the past

 7   and I was unsuccessful.

 8        Q.   And you're not going to try any other

 9   avenue to recover them?

10        A.   What other avenue?

11        Q.   They are not my transcripts.  I -- I'm not

12   sure what -- what efforts you might undertake.

13   I -- I think if they were, I would probably do

14   more, but I would probably get on the phone with

15   somebody at Felician.  I -- if it were me, I

16   would probably do a lot, but it -- it -- if

17   you're not intending to make any further efforts,

18   I just want that to be clear in your testimony.

19        A.   Yeah, I don't know what additional efforts

20   I'll take.

21        Q.   Do you intend to make a renewed effort to

22   recover those transcripts in -- in time for trial

23   in this matter?

24        A.   I don't know.

25        Q.   What will it depend on?
```

Page 64

```
 1      A.  Well, it -- I'm going to think about it.

 2  And if I think I should, then I will.

 3      Q.  Do you think it would be wise for your

 4  business if that -- you had them?

 5      A.  I don't know.

 6      Q.  Do you recall whether the program you

 7  completed at Harvard was called "Cybersecurity;

 8  the Intersection of Policy & Technology"?

 9      A.  I don't know.

10          MR. WATNICK:  Okay.  I'd like to take

11  a break now, if that works for everybody else.

12          MS. GIFTOS:  Sure.

13          VIDEOGRAPHER:  Time is approximately

14  11:21 a.m.  We are going off the video record.

15      (Recess from 11:21 a.m. to 11:33 a.m.)

16          VIDEOGRAPHER:  Stand by, please.

17      Time is approximately 11:33 a.m.  We are

18  back on the video record.

19      Go ahead.

20          MR. WATNICK:  Thank you.

21      A.  (Continuing)  David, if I could, you know,

22  during break I -- I thought about it.  I -- I've

23  never had this come up in 30-some odd years.  I

24  understand how important it is.  I will reach out

25  to Upsala or the other school.  I will make
```

Page 65

```
 1    Minnesota.  Is that right?
 2         A.  Yes.
 3         Q.  Maybe let me start there.  How long were
 4    you a detective in Hopkins, Minnesota?
 5         A.  Well, I believe it would have been
 6    from '92 to 2003.  I was technically an employee
 7    with the Hopkins Police Department, but I was
 8    assigned to the U.S. Secret Service Electronic
 9    Crimes Task Force and sworn in as a U.S. Marshal.
10         Q.  I want go back to Hopkins for a minute.
11    You were a detective there beginning in 1992?
12         A.  I believe so, yes.
13         Q.  Is Hopkins in the Twin Cities area?
14         A.  Yes.
15         Q.  And what did you do before you were a
16    detective in Hopkins?
17         A.  I was a police officer with the
18    Springfield Township Police Department in
19    Montgomery County, Pennsylvania.
20         Q.  Where is Montgomery County, Pennsylvania?
21    What part of the state?
22         A.  Southeast.
23         Q.  Near Philadelphia?
24         A.  It borders Philadelphia.
25         Q.  And -- I'm sorry.  What jurisdiction did
```

Page 70

```
 1    you say you were a police officer in?
 2         A.   Springfield Township.
 3         Q.   Springfield Township.
 4              How long were you a police officer there?
 5         A.   I believe two years, maybe three years,
 6    before moving to Minnesota.
 7         Q.   Was that your first job after your
 8    university studies?
 9         A.   Yes and no.  My -- my -- technically, my
10    first job was -- I was self-employed.  I would
11    help companies build computers.
12         Q.   Your first external employment was as a
13    police officer?
14         A.   Yes.
15         Q.   Did you need to attend a police academy?
16         A.   Yes.
17         Q.   Where did you attend the police academy?
18         A.   In -- I believe it was in Conshohocken.
19         Q.   Is that in Pennsylvania?
20         A.   Yes.
21         Q.   And were you -- how long were you in the
22    academy?
23         A.   I don't recall how long that lasted.  It
24    was either six or nine months.
25         Q.   Was it a full-time academy?
```

Page 71

```
 1        A.   Yes.
 2        Q.   And then, upon graduating, you took a job
 3   as a police officer?
 4        A.   Well, I was hired before going to the
 5   police academy, so I was -- I was paid full-time
 6   wages while I went through training.
 7        Q.   And when you finished, the -- the --
 8   the -- the job was waiting for you --
 9        A.   Yeah.
10        Q.   -- within the department?
11             Okay.
12        A.   Yes.
13        Q.   Did you investigate computer crimes while
14   you were a police officer?
15        A.   Yes.
16        Q.   Can you describe the -- the types of cases
17   that you saw?
18        A.   I'm sorry.  The types of...?
19        Q.   Cases that you investigated as a police
20   officer.  And I'm just talking about Springfield
21   Township right now.
22        A.   Oh, just Springfield Township?
23             You know, I think I only had -- I think I
24   only had one case at Springfield, as far as a --
25   computer crimes go.
```

Page 72

```
 1        A.   I don't know.  Wasn't what I was asked to
 2   do.
 3        Q.   You attempted to form an opinion about
 4   email activity conducted through those email
 5   accounts.
 6             Correct?
 7        A.   Correct.
 8        Q.   And would it be relevant if individuals
 9   were continuing to access those accounts after
10   Ms. Adams or Mr. Williams left the company?
11        A.   I don't know.
12        Q.   You would need to explore further to
13   determine that?
14        A.   Yes.
15        Q.   But you didn't do that?
16        A.   No.
17        Q.   Mr. Lanterman, can you give me the name of
18   any students you attended Upsala College with?
19        A.   Well, I lived with my grandparents.  I
20   wasn't close to many people.  No.
21        Q.   What were the names of your grandparents?
22        A.   Why?
23        Q.   Your -- you've told us that's who you
24   lived with during college.  Can you give me their
25   names?
```

Page 269

```
1        A.   No.  I'm not --

2        Q.   You're --

3        A.   -- giving you my -- the names of my

4   grandparents.

5        Q.   Will you tell us the address that you

6   lived at during college?

7        A.   No.

8        Q.   You're refusing?

9        A.   Yes.

10       Q.   And you're refusing to tell us who you

11  lived with?

12       A.   No.  I told you who I lived with.  I lived

13  with my grandparents.

14       Q.   But you won't give me their names?

15       A.   No.

16       Q.   And you can't tell me the name of any

17  other student you attended school with?

18       A.   No.  I didn't have a lot of friends.  I

19  lived with my grandparents.

20       Q.   Whose names you refuse to share?

21            MS. GIFTOS:  David, what is the

22  relevance of his grandparents' names to his

23  expert analysis in this case?

24            MR. WATNICK:  We intend to use this

25  information to try and determine whether the
```

Page 270

```
 1                    REPORTER'S CERTIFICATE
 2                    STATE OF WISCONSIN
 3
            I hereby certify that I reported the
 4  videoconference deposition of MARK LANTERMAN, who
    appeared remotely before me on February 11, 2025,
 5  and that the witness was by me first duly sworn
    to tell the whole truth;
 6
            That the testimony was transcribed by me
 7  to the best of my ability and is a true record of
    the testimony of the witness; that the right to
 8  read and sign was not reserved.
 9          That the cost of the original has been
    charged to the party who noticed the deposition,
10  and that all parties who ordered copies have been
    charged at the same rate for such copies;
11
            That I am not a relative or employee or
12  attorney or counsel of any of the parties, or
    relative or employee of such attorney or counsel;
13
            That I am not financially interested in
14  the action and have no contract with the parties,
    attorneys, or persons with an interest in the
15  action that affects or has a substantial tendency
    to affect my impartiality.
16
17          WITNESS MY HAND AND SEAL THIS 13th of
    February, 2025.
18
19
20
21          Nancy G. Gisch
22
23          Nancy G. Gisch, RMR, CRR, CLR, CRC
            Notary Public, State of Wisconsin
24          My commission expires on 11/13/28
25
```

Page 274

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.