<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| VISION INDUSTRIES GROUP, INC., | Civil Action No. 18-6296 |
| *Plaintiff*, | |
| v. | **TRIAL OPINION** |
| ACU PLASMOLD, INC., | April 3, 2026 |
| *Defendant*. | |

**SEMPER**, District Judge.

This Court held a bench trial for four days in this matter regarding Vision Industries Group Inc.'s ("Vision") claims for breach of contract and breach of the covenant of good faith and fair dealing against Defendant ACU Plasmold, Inc.'s ("ACU"). Pursuant to 28 U.S.C. §§ 1332 and 1391, this Court has jurisdiction over the matter and venue is proper. Based on the testimony and evidence presented at trial, this Trial Opinion constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure ("Rule") 52(a). For the reasons stated below, this Court finds that ACU is liable for breach of contract and is not liable for breach of the covenant of good faith and fair dealing.

## I. <u>PROCEDURAL HISTORY</u>

Plaintiff filed its Complaint on April 12, 2018. (ECF 1.) Plaintiff brought claims for breach of contract and breach of the implied covenant of good faith and fair dealing. (*Id.*) Defendant filed an initial Answer on May 31, 2018. (ECF 7.) On August 29, 2018, Defendant filed a motion to amend its answer (ECF 16), which the Court granted on October 11, 2018. (ECF 20.) Defendant filed an Amended Answer and Counterclaims (the "Answer") on October 12, 2018. (ECF 22.) In

its Answer, Defendant asserted counterclaims for (1) declaratory judgment that the Agreement is terminated; (2) declaratory judgment that the Agreement is rescinded based on mistake; and (3) declaratory judgment that ACU may treat the Agreement as terminated as a result of Plaintiff's anticipatory breach, *i.e.*, its failure to purchase goods. (Answer ¶¶ 59-88.)

On November 8, 2024, the Court denied Defendant's request to file a motion for summary judgment. (ECF 288.) On March 21, 2025, Vision filed a memorandum requesting a decision from the Court that its Requests for Admissions ("RFAs"), which ACU had not responded to, be considered admitted. (ECF 328.) On the same day, ACU moved to withdraw its admissions (ECF 333.) The Court heard oral argument on the motions and reserved its ruling. (ECF 358 at 29:17-33:9.) On December 30, 2025, the Court issued an opinion and order granting in part and denying in part ACU's motion to withdraw its admissions (ECF 333). (ECF 371, "RFA Opinion and Order.") The Court denied ACU's motion to withdraw its admissions to RFAs 1-53 and granted its motion to withdraw its admissions to RFAs 54 and 55. (RFA Opinion and Order at 6.)

The Court held a four-day bench trial from May 5, 2025 to May 8, 2025. (ECF 358-361.) Following the bench trial, the parties submitted proposed findings of fact and conclusions of law. (ECF 362-1, "Def. Proposed Findings of Fact and Conclusions of Law"; ECF 363, "Pl. Proposed Findings of Fact and Conclusions of Law.") The parties also submitted reply briefs to the respective proposed findings of fact and conclusions of law. (ECF 365, "Pl. Reply"; ECF 364, "Def. Reply.")

## II.    FINDINGS OF FACT[1]

The Court has considered the testimony and assessed the credibility of all the witnesses who testified, the documentary evidence presented at trial, and those facts stipulated to ("Stipulated Fact" or "SF") in the Final Pretrial Order (ECF 246) and finds as follows.

### A.    The Parties

Vision is a distributor and producer of window and door hardware based in Somerset, New Jersey.[2] (Liang, T1, 56:16-21; SF 2.) Vision supplies window hardware parts and accessories for installation on windows.[3] (Liang, T1, 57:16-17, 65:8-19; SF 3.) This hardware includes the components that are mounted on windows. (Liang, T1, 57:16-21.) Vision employs approximately 50 to 60 people (*Id.* 59:15-18), and has approximately 482 customers in its database. (Paesano, T2, 253:1-2.) Vision is one of the largest vendors of window and door hardware in the United States. (SF 6.) Luke Liang is the founder and Chief Executive Officer of Vision. (Liang, T1, 56:3-8; SF 7.)

Vision fulfills orders as follows: once Vision and a customer agree that Vision will supply the hardware for a customer's particular window, the customer provides Vision with a manufacturing forecast and estimate of its needs. (Liang, T1, 62:9-63:23.) Vision then stocks the

---

[1] References to trial exhibits are to Plaintiff's Exhibits and Defendant's Exhibits. References to trial transcripts (ECF 358-361) identify the witness, volume (e.g., "T1"), and page: line.

T1 = Trial Transcript dated May 5, 2025. (ECF 358.)
T2 = Trial Transcript dated May 6, 2025. (ECF 359.)
T3 = Trial Transcript dated May 7, 2025. (ECF 360.)
T4 = Trial Transcript dated May 8, 2025. (ECF 361.)
PX = Plaintiff's Exhibit.
DX = Defendant's Exhibit.

[2] At the time the Complaint was filed, Vision was located in South Plainfield, New Jersey. (SF 1.)
[3] A hung or "sash" window is a window that has a frame and two window panels called sashes. (Liang, T1, 58:7-14; SF 13.) Sash windows open vertically. (SF 14.) Casement windows are built with one large window within an outer frame, and are hinged and generally open outwards, like a door. (SF 15.) Most windows sold in the United States are sash windows. (SF 12.)

parts in one of its warehouses based on the customer's anticipated needs. (*Id.* at 63:24-65:6.) Vision considers this business model (the "Stocking Program") a competitive advantage because, once a customer provides usage projections and Vision stocks the parts in its warehouse, Vision will not run out of parts for that customer. (Paesano, T2, 253:8-24; Prignano, T2, 238:3-239:8; Liang, T1, 59:24-60:12.)

Defendant ACU is a Canadian company owned and controlled by Alvin Zhuo, its CEO. (Zhuo, T2, 400:11-12; Zhuo, T3, 521:8-19; SF 9.) Zhuo also controls ACU Hardware USA Inc. ("ACU Hardware USA"), a U.S.-based company, and Jiangmen Plasmold Hardware Company Ltd., a Chinese company located in Jiangmen, a city in the Guandong province. (Zhuo, T3, 521:8-522:19; SF 10-11.) ACU sells casement and window hardware, which it makes at its factory in China. (Zhuo, T2, 400:24-401:5.) Zhou's factory employs less than 60 people. (*Id.* 401:6-8.) Before Zhuo and Liang met, Zhuo had previously made efforts to expand into the U.S. market by forming ACU Hardware USA, which operated only in California and grossed $200,000 to $300,000 a year; only one customer purchased casement parts from ACU Hardware USA. (Zhuo, T3, 429:5-430:14, 431:9-18; Quach, T3, 607:15-608-4.)

## B.      Vision's Efforts to Develop a Casement Line

Around 2015, Vision decided to start selling casement hardware. (Liang, T1, 65:8- 66:2; SF 18-19.) To do so, Vision needed to find a supplier. (Liang, T1, 66:3-10.) Vision was unable to work with its main vendor, who did not have the capabilities to produce casement hardware. (*Id.* at 67:3-19.) After speaking with a different potential manufacturer, Liang was introduced to Zhuo through a mutual friend and contacted Zhuo by phone. (*Id.* at 68:24-71:13; Zhuo, T3, 423:11-424:5.) On that call, the two spoke about the possibility of ACU supplying casement parts to Vision for sale in the United States. (Liang, T1, 70:15-71:13; Zhuo, T3, 423:11-16, 424:1-5.)

Following the call, Zhuo visited Vision's headquarters in New Jersey; Liang showed Zhuo Vision's warehouse and the two continued business discussions over dinner at a restaurant. (Liang, T1, 71:14-72:5; Zhuo, T3, 424:1-425:25.) At dinner, Liang and Zhuo discussed agreement terms, including an exclusivity provision, along with anticipated profits of several million dollars. (Liang, T1, 72:3-73:2; Zhuo, T3, 519:24-520:4, 526:9-21, 568:14-20.) The pair also discussed Vision's anticipated investment of resources into the sale of casement parts. (Liang, T1, 72:8-73:2; Zhuo, T3, 540:16-542:6.) Specifically, Liang detailed Vision's process of entering the casement market and selling casement parts, including advertising in trade magazines, displaying products in trade shows, providing its salespeople with samples and promotional materials, and building sample windows for customers with casement hardware attached. (Liang, T1, 73:9-22, 76:23-77:2, 85:23-87:10.)

After his visit to New Jersey, although he knew Vision would take time to start making sales, Zhuo was left with the impression that it would be easy for Vision to sell casement parts to its existing customer base and to grow the business in the next year or two. (Zhuo, T3, 425:2-5, 425:16-20, 428:2-429:2.)

###    C.    The Exclusive Distribution Agreement

On November 3, 2015 and November 10, 2015, Zhuo and Liang respectively executed a contract titled "Distribution Agreement" on behalf of Vision and ACU (the "Exclusive Distribution Agreement" or "Agreement"). (PX-1; SF 26.) Liang drafted the Exclusive Distribution Agreement by working off a template. (Liang, T1, 78:11-14.) Zhuo signed Liang's draft contract without any edits or changes. (SF 22.) The Exclusive Distribution Agreement states

5

that "Distributor [Vision] wishes to obtain, and Supplier [ACU] is willing to grant Distributor, an exclusive right to distribute the Products (as hereinafter defined[4]) in the Territory.[5] (PX-1 at 1.)

The relevant terms of the Exclusive Distribution Agreement are as follows. Under the Agreement, ACU granted Vision "an irrevocable, exclusive right and license to distribute the Products in the Territory for the Term of the Agreement." (PX-1 ¶ 2.1). The Term of the Agreement was five years and gave Vision "the option to extend for another five years under the same terms." (*Id.* ¶ 1.5; *see also id.* ¶ 10.1.)

Vision was required to distribute the Products only in the Territory. (*Id.* ¶ 3.1.) Under Section 4, "Order Procedure," the Agreement states in relevant part: "All orders for Product [sic] placed by [Vision] shall be in writing with Supplier's [ACU's] Factory in Jiangmen, Guangdong, China or its offices in Canada or if placed orally, shall be confirmed in writing within five (5) business days after such oral order." (*Id.* ¶ 4.1.) Per the Agreement, orders could also be placed through "Vision's associated factory (Vision Enterprises; Ltd.) in Nanhai, Foshan, China." (*Id.* ¶ 4.2.) All orders for Products placed by Vision were "subject to acceptance by the Factory and shall not be binding until written confirmation of the order." (*Id.* ¶ 4.2.)

Under Section 5, "Prices, Discounts, and Payment," the Agreement states that the "price payable by Distributor [Vision] for each Product shall be no greater than the best price Supplier's Factory provides its largest customers." (*Id.* ¶ 5.1.) The Agreement also states that ACU "has no right to market, distribute, and support the Products in the Territory." (*Id.* ¶ 8.2.) The Distribution Agreement did not impose a minimum purchase requirement upon Vision. (SF 24; Liang, T1, 155:14-16; Zhuo, T3, 530:5-531:6.) Vision was also free to purchase casement parts from a

---

[4] "Products" is defined as "[t]he products which are the subject of this Agreement are Window (primarily Casement) Hardware and Door Hardware, and other materials provided by Supplier for distribution and use in combination with such door and window (primarily casement) hardware." (PX-1 ¶ 1.3.)

[5] The "Territory" is defined as "The United States (excluding customer IWC in California)." (PX-1 ¶ 1.4.)

different supplier or to manufacture its own casement parts. (SF 25; Liang, T1, 155:17-22.) However, both parties understood that Vision had a responsibility under the Agreement to use its best efforts to promote the sale of the casement hardware it anticipated purchasing from ACU. (Liang, T1, 153:25-154:2, 162:7-11, 198:5-12; Zhuo, T3, 541:5-18-542:6.)

Section 11.1 of the Agreement, "Modifications, Amendments, and Waivers" states in relevant part: "This Agreement may not be modified or amended, including by custom, usage of trade, or course of dealing, except by an instrument in writing signed by duly authorized officers of both of the parties hereto…." (PX-1 ¶ 11.1.) The Agreement also includes an integration clause, which states:

> This Agreement constitutes the entire understanding and contract between the parties and supersedes any and all prior and contemporaneous, oral or written representations, communications, understandings, and agreements between the parties with respect to the subject matter hereof. The parties acknowledge and agree that neither of the parties is entering into this Agreement on the basis of any representations or promises not expressly contained herein. (PX-1 ¶ 11.8.)

The Agreement includes further terms not at issue, including an agreement that ACU provide training to Vision "for Products for the duration of this Agreement, upon Supplier's reasonable request" (*id.* ¶ 3.2); a provision covering shipment, risk of loss, and delivery (*id.* ¶ 6.1); and warranty (*id.* ¶¶ 7.1-7.3), among others.

### D.    The Breakdown of the Exclusive Distribution Agreement

Although Vision started its casement program in 2015, Vision's sales effort was "very detailed." (Prignano, T2, 234:3-14.) Vision's sales process for casement windows included educating sales people on the casement products, obtaining sample windows from customers, sending the samples to Vision's factory in China, applying the parts to the window, returning the samples to the United States for review by Vision's engineers, and providing the samples to the sales force to bring to the customer, a process that was sometimes repeated multiple times until

7

final approval. (Liang, T1, 86:15-88:7, 109:20-110:1; Blackwell, T1, 213:13-214:24, 215:5-216:5; Prignano, T2, 234:2-25; Paesano, T2, 256:2-20; *see also* PX-83-PX-89 (casement hardware lists).) Vision also advertised in trade magazines, e-mail blasts, and placed casement products in its booth at trade shows. (Liang, T1, 88:8-23; Paesano, T2, 256:21-257:5.) Zhou understood that Vision's sales process included providing samples to customers. (Zhou, T3, 439:24-440:21; *see also* Quach, T2, 296:11-18.)

Liang and Vision senior account manager Denise Prignano testified that twenty of Vision's customers were at the final stage of the sales cycle for purchasing casement hardware from Vision and seven had committed to buying. (Prignano, T2, 231:20-22, 236:4-15; *see also* Liang, T1, 92:15-94:7, 96:18-22, 98:22-99:11; PX-199 (list of seven customers Liang prepared).) These seven customers were longstanding Vision customers. (Liang, T1, 100:6-22, 115:22-116:5; Prignano, T2, 236:4-15.) Vision issued quotes to these seven customers (Liang, T1, 112:13-18; PX-90-PX-101 (quotes)) but did not issue purchase orders for these customers. (Liang, T1, 64:13-65:3, 104:7-20, 113:18-114:5; Prignano, T2, 236:16-237:17.) As Liang and Prignano testified, due to Vision's Stocking Program, Vision customers, including the seven that received quotes, do not formally place orders until after Vision has stocked its warehouse with product. (Liang, T1, 63:24-65:3, 104:7-20, 113:18-114:5; Prignano, T2, 236:16-237:17.)

During the first two years of the Agreement, Vision placed orders for casement parts under the Agreement that ACU filled. (Liang, T1, 117:23-118:4; Zhou, T3, 512:8-9, 543:2-7.) These orders, mostly for sample windows for Vision's salespeople to leave with customers, were small. (Liang, T1, 118:22-119:11; Zhuo, T3, 444:17-25.) From August 2017 until January 2018, Vision made no orders at all. (Zhuo, T3, 444:21-25.) During the course of the Agreement, ACU also sold

window products to other customers in the United States. (Tr., T3, 535:18-536:2; Zhou, T3, 595:3-11.)

The relationship between the parties began to break down in mid-2017. On June 29, 2017, Liang emailed Zhuo, informing him that Vision had put resources and efforts into selling the casement line and had twenty "sample windows from customers who showed interests [sic] in purchasing casement parts from us, and more are on the way." (PX-203 at VISION0000469.) Liang further stated, "[y]our incomplete and fragmented line also created big issues for us---we have yet to find a customer who we can supply a complete window components [sic] from your offerings." (*Id.*) He also noted that "we are getting ready to deliver these sample windows installed with our hardware back to customers, with hopes of getting orders…any disruptions of supply or 'retractions' from previous agreements…will irreparably harm all efforts that Vision had committed so far." (*Id.*)

In response, in a July 7, 2017 email, Zhuo expressed frustration that there was a "no transaction situation" under the agreement and contended that Vision improperly sold and promoted its own casement hardware, assertions that Liang disputed in a response on the same day. (PX-2; Liang, Tr. 120:1-122:5, 122:20-123:7.)

On August 18, 2017, Vision employee Dan Huang emailed Zhuo advising of Vision's preparation for a trade show in September and Vision's need for hardware sample parts to support the exhibition of window samples at the trade show. (SF 29; PX-167 at VISION0000481-VISION0000482). On August 19, 2017, Zhuo responded to Huang and advised that Vision's orders were required to be full cartons. (PX-167; *see also* DX-3.) Zhuo further stated that the order would be accepted when there was enough stock in ACU's China or Canada locations, and that ACU would not run a new production only for a sample order. (PX-167 at VISION0000480-

9

VISION0000481.). ACU ultimately filled the order referred to in Vision's August 18, 2017 email. (Zhuo, T3, 422:10-23.)

Zhuo was, however, frustrated that the Agreement had not yet led to larger sales. (*See* Zhuo, T3, 446:14-22, 543:8-544:19.) On December 12, 2017, ACU emailed its 2018 price list to Vision. (DX-2 at ACU 000233.) The price list reflected an increase on 22 out of 51 casement parts listed; the average increase of the entire inventory was 7.38% above the 2017 price list but was a 6 to 8% decrease from the 2016 price list. (Zhou, T3, 470:25-471:19, 472:2-473:15, 571:11-574:21, 582:23-583:22.) The increase in the 2018 price list was "20 to 30 percent" for certain products (Zhuo, T3, 571:11-574:21); according to Liang, "no supplier" would send such a "crazy" increase. (Liang, T1, 184:22-185:4, 204:4-17, 205:16-24.)

Zhuo testified that the prices on certain items increased due to an increase in zinc prices (Zhuo, T2, 402:1-17), an explanation that the Court does not find entirely credible.[6] The Court does find credible, however, ACU's testimony that it provided different prices for different customers, but the increase across customers was within one percent more or less per customer (Zhuo, T2, 407:15-408:19), and that ACU Factory's largest customer, called Ayunn, always paid a higher price than ACU charged Vision. (Zhuo, T2, 409:12-20; *see also* Zhou, T3, 461:1-462:10.) By way of non-response to Vision's Requests for Admission, ACU also admitted that it offered other customers better prices than it offered Vision. (*See* PX-256; *see also* RFA Opinion and Order.)

---

[6] The Court's credibility determinations for all of the trial witnesses were based, not only on a witness's response to a particular question, but also the witness's physical reaction (*i.e.* body language, facial expressions, shifting, squirming, folding of their arms, *etc.*). *See* Third Circuit Model Civil Jury Instructions § 1.7 (noting a jury should consider several factors in determining the credibility of a witness including "(1) the opportunity and ability of the witness to see or hear or know the things the witness testifies to; (2) the quality of the witness's understanding and memory; (3) the witness's manner while testifying; (4) whether the witness has an interest in the outcome of the case or any motive, bias or prejudice; (5) whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence; (6) how reasonable the witness's testimony is when considered in the light of other evidence that you believe; and (7) any other factors that bear on believability.").

On December 13, 2017, an employee from Vision's China factory, Dan Huang, sent Zhuo an email questioning the price increase and asking if Vision could receive the same prices that it received in 2017. (DX-2 at ACU 00134-136.) On December 15, 2017, Huang wrote again, informing Zhuo that an increase in zinc alloy material alone could not explain the increase in prices on all of the products on the new price list. (*Id.* at ACU 00135-136.) On December 15, 2017 Zhuo responded with a two-sentence email which he copied to Liang: "You do realize that it's not just zinc alloys that have gone up in price, right? Didn't the boss give you a raise in the last two years?" (DX-2 at ACU 00134.) Despite this response, Zhuo viewed the 2018 price list as a starting point from which he expected to negotiate with Liang. (Zhou, T3, 578:18-24.)

On January 10, 2018, following a small order Vision placed on January 3, 2018, an ACU employee emailed a Vision employee stating that the order from Vision would not be accepted because the order quantity was less than the "MOQ [minimum order quantity] request"; and there was "no production plan for these products in [upcoming] months." (PX-106 at VISION0000485; *see also* DX-5.[7])

On January 19, 2018, Vision placed another small order with ACU's factory. (SF 31-34; PX-169[8]; ECF 334-1.) ACU rejected the January 19, 2018 order on the same day, stating in part that the order was too small. (SF 31-34; PX-169; ECF 334-1.) ACU's email rejecting the order specifically stated, "please do not place these individual orders, loose parts and samples with our company in the future" and "we won't supply any hardware for you." (PX-169 at VISION0000488; ECF 334-1 at 5.) ACU also asked Vision to stop sending non-full-carton orders;

---

[7] Although the parties represented that only the translation of PX-169 was in dispute (*See* ECF 334), ACU submitted into evidence a number of exhibits identical to Vision's previously-admitted exhibits but with a slightly different English translation. (*See* Tr., T1, 134:7-24.) For duplicate exhibits, the Court relies on the certified translation of the first-admitted exhibit. However, considering all the evidence and for the avoidance of doubt, the Court also notes that its findings of fact and conclusions of law remain the same regardless of which translation is used.

[8] Pursuant to Vision's letter at ECF 334, the Court relies on the certified translation at ECF 334-1 for the exhibit PX-169.

orders less than the minimum order quantity; and sample orders. (PX-169 at VISION0000488; ECF 334-1 at 5.) The email further stated, "[i]n 2015, our company and your company signed a cooperation agreement, which is mainly for promoting casement window (casement) series of hardware (whole set of hardware). In view of the order situation of your company in the past two years, our company has decided not to accept those individual orders and loose parts etc. mentioned above." (*Id.* at VISION0000489; ECF 334-1 at 5.) Finally, the email requested that Vision contact headquarters for discussion regarding Vision's future orders. (*Id.*)

On February 7, 2018, Zhuo received an email from Liang captioned: "Pending lawsuit." (DX-9.) In the email, Liang stated that ACU's refusal to take Vision's order of "1,500 hinges without any explanation" and "HUGE" price increase are "blatant infringements of the contract." (*Id.* at ACU 00141.) Liang further stated: "As for now, the matter is in our lawyer's hands. Unless you rectify these problems within ten business days, we will file a lawsuit of which we are very confident that we will prevail." (*Id.*) On February 14, 2018, Zhuo responded that ACU "didn't refuse [Vision's] orders." (*Id.* at ACU 00140.) Zhuo continued, "But what I asked are: 1) The price need to be [sic] the price we offered in year 2018. We have offered new price list long time ago but we have never got feed-back. 2) Our deal is of selling Acu [sic] casement line of products, not just the isolated item like the hinges your [sic] side-ordered." (*Id.*) The same day, Liang replied, "I will see you in court." (*Id.*)

Vision filed this lawsuit on April 12, 2018. (ECF 1.) Vision was unable to secure casement parts from its main supplier or an alternative supplier and ultimately did not sell casement parts to any of the seven customers who it alleged had committed to its casement business. (Liang, T1, 101:6-11, 136:3-137:17; Paesano, T2, 263:12-22.)

12

### E.    **Damages**

In support of its damages from ACU's alleged breach, Plaintiff introduced an expert report and expert testimony of Rebecca Fitzhugh, a forensic accountant. (See Fitzhugh, T2, 302:16-21.) ACU conceded to Fitzhugh's qualifications as an expert and the Court allowed her testimony in forensic accounting. (Tr., T3, 306:25-307:1, 307:8-10.)

Fitzhugh opines on three types of economic damages Vision incurred as a result of ACU's alleged breach of contract, plus additional prejudgment interest: (1) expenses Vision incurred to create a market for ACU's casement hardware totaling $251,000.00 (PX-210 ¶¶ 25-33); (2) lost profits from unconsummated sales of casement hardware to seven of Vision's existing customers totaling $3,654,000 (*id.* ¶¶ 34-59); and (3) damages due to the alleged violation of the Exclusivity Provision of the Agreement totaling $247,000 (*id.* ¶¶ 61-71).

## III.    **CONCLUSIONS OF LAW**

Vision alleges in its Complaint that (1) ACU breached the Exclusive Distribution Agreement and (2) violated the implied covenant of good faith and fair dealing. (ECF 1, "Compl.") The Court has considered the evidence presented and trial and its Findings of Facts in making the following conclusions of law.

### A.    **Enforceability of the Exclusive Distribution Agreement**

Under New Jersey law[9], to prevail on a breach of contract claim, a plaintiff must prove four elements: (1) "the parties entered into a contract containing certain terms"; (2) "plaintiffs did what the contract required them to do"; (3) "defendants did not do what the contract required them to do, defined as a breach of the contract"; (4) "defendants' breach, or failure to do what

---

[9] The Distribution Agreement is governed by the laws of New Jersey. (PX-1 ¶ 11.4.)

the contract required, caused a loss to the plaintiffs." *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (citation and internal quotation marks omitted).

While Vision argues that the parties entered into a valid contract, ACU argues that Vision has not proven that a legally enforceable contract existed between the parties; the Agreement, ACU argues, is illusory. (Pl. Proposed Findings of Fact and Conclusions of Law at 18-21; Def. Proposed Findings of Fact and Conclusions of Law at 15-20.) The Court first addresses whether Vision has met its burden of proving by a preponderance of the evidence that a contract existed and will then address Vision's theories of breach of contract. *See L&T Fashion, Inc. v. Best Items Int'l, Inc.*, No. 15-4039, 2019 WL 692949, at *1–3 (D.N.J. Feb. 15, 2019).

To establish a valid contract, a party must prove "(1) a "[m]eeting of the minds…"; (2) "[o]ffer and acceptance…"; (3) "[c]onsideration [, that is,] each party gave or promised something of value to the other"; and (4) "[c]ertainty [, that is,] the terms of the agreement were reasonably certain." *Big M, Inc. v. Dryden Advisory Grp.*, No. 08-3567, 2009 WL 1905106, at *13 (D.N.J. June 30, 2009) (quoting N.J. Jury Instr. Civ. 4.10 C); *see also TBI Unlimited, LLC v. Clearcut Lawn Decisions, LLC*, 12-3355, 2013 WL 1223643, at *3 (D.N.J. Mar. 25, 2013) ("No valid contract exists unless a party alleges four elements: 1) a meeting of the minds; 2) an offer and acceptance; 3) consideration; 4) reasonably certain contract terms."). "An enforceable contract may occur where [one] party communicates an offer and another party demonstrates acceptance." *Gordon v. Dailey*, No. 14-7495, 2018 WL 1509080, at *8 (D.N.J. Mar. 27, 2018).

Here, ACU specifically disputes that there was consideration sufficient to create a contract. (Def. Proposed Findings of Fact and Conclusions of Law at 16 ("the contract is void because it lacks the essential element of consideration flowing from Vision to ACU.").) "Under New Jersey law, '[c]onsideration may take many forms and may be based upon either a detriment incurred by

14

the promisee or a benefit received by the promisor.'" *Comprehensive Spine Care v. Oxford Health Ins.*, No. 18-10036, 2019 WL 928421, at *4 (D.N.J. Feb. 26, 2019) (quoting *Seaview Orthopaedics ex rel. Fleming v. Nat'l Healthcare Res., Inc.*, 841 A.2d 917, 921 (N.J. App. Div. 2004)). ACU argues that Vision did not provide any consideration, and labels Vision's obligations under the Agreement as illusory because "[t]he contract is totally free of any obligation upon [P]laintiff." (Def. Proposed Findings of Fact and Conclusions of Law at 17.) An illusory promise is defined as a "promise which by [its] terms make[s] performance entirely optional with the promisor whatever may happen, or whatever course of conduct in other respects he may pursue." *Del Sontro v. Cendant Corp.,* 223 F. Supp. 2d 563, 577–78 (D.N.J. 2002) (quoting Restatement (Second) of Conts. § 2, cmt. e (ALI 1979)); *see also Bryant v. City of Atlantic City,* 707 A.2d 1072, 1085 (N.J. Super. Ct. App. Div. 1998). "Generally, courts . . . seek to enforce contracts and avoid deeming them illusory." *Del Sontro,* 223 F. Supp. 2d at 578 (citations omitted).

The Court agrees with Plaintiff that consideration is present here and, as such, an enforceable contract exists. As an initial matter, the contract here is for the sale of goods.[10] (*See* PX-1.) Therefore, it is governed by New Jersey's Uniform Commercial Code ("UCC"). *See* N.J. Stat. Ann. § 12A:2-102; *see also Jo-Ann, Inc. v. Alfin Fragrances, Inc.*, 731 F. Supp. 149, 153–55 (D.N.J. 1989) (holding that the New Jersey UCC applies to questions concerning exclusive distribution agreements). Defendant does not dispute that the UCC applies. (*See* Def. Proposed Findings of Fact and Conclusions of Law at 29 ("As Plaintiff agreed in summation, the contract is one for the sale of goods….").)

---

[10] Although Section 3.2 of the Agreement requires ACU to provide Vision training for the Products, upon reviewing the contract, the Court finds that the goods portion of the agreement predominates and therefore the UCC applies. *See Talon Indus., LLC v. Rolled Metal Prods., Inc.*, No. 15-4103, 2022 WL 3754800, at *5 (D.N.J. Aug. 30, 2022).

Pursuant to the New Jersey UCC, because the parties entered into an exclusive distribution agreement, Plaintiff was obligated to use its best efforts to distribute the products. *See* N.J. Stat. Ann. § 12A:2-306 ("A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."). As the New Jersey Supreme Court has recognized, "[t]he grant of the exclusive franchise is a consideration for the grantee's obligation to establish and develop a market for the sale and distribution of the product in the area covered by the monopoly. The character of the contractual arrangement is such as to preclude explicitness as to quantity and prices." *Mantell v. Int'l Plastic Harmonica Corp.*, 55 A.2d 250, 256 (N.J. 1947).

Moreover, Section 12A:2–204(1) provides that "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Further, a contract will not fail for indefiniteness if the parties have intended a contract. *Id.* § 12A:2–204(3). To determine if the parties have intended a contractual relationship, the court will look to the "objective intent of the parties as manifested through their conduct, and not . . . at the subjective intent of one of the parties." *First Valley Leasing, Inc. v. Goushy*, 795 F. Supp. 693, 696–97 (D.N.J. 1992) (citing *Air Master Sales Co. v. Northbridge Park Co-op., Inc.*, 748 F. Supp. 1110, 1115 (D.N.J. 1990)).

The parties agree that the Agreement did not impose any specific purchase obligations upon Vision. (Liang, T1, 155:14-156:1; Zhuo, T3, 530:5-531:3, 555:1-3.) However, both parties also testified at trial that they understood that Vision had a responsibility under the contract to use its best efforts to promote the sale of the casement hardware it anticipated purchasing from ACU. (Liang, T1, 153:25-154:2, 162:7-11, 198:5-12; Zhuo, T3, 541:5-542:6.) Vision employees testified

16

that they undertook such efforts in the first couple years of the contract. (Paesano, T2, 263:1-11; Blackwell, T1, 217:12-25.) The Court finds credible the testimony from both parties in concluding that Vision was required to use its best efforts in promoting the ACU products, which is sufficient consideration in an exclusive distribution agreement for the sale of goods. *See Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 500–01 (S.D.N.Y. 2022) (applying analogous provisions of the New York UCC). Finally, the Court finds that the parties' conduct, including ACU's fulfillment of Vision's orders from 2015 to 2017, demonstrates their recognition that a valid contract existed. (Liang, T1, 117:23-118:4; Zhuo, T3, 420:23-421:10, 543:2-4.)

ACU's citations to *G. Loewus & Co. v. Vischis*, 65 A.2d 604 (N.J. 1949) and *Mid-American Salt, LLC v. Morris County Cooperative Pricing*, 964 F.3d 218 (3rd Cir. 2020), do not require a different result. (*See* Def. Proposed Findings of Fact and Conclusions of Law at 18-19.) As ACU recognizes, these cases involved requirements contracts, which lacked the exclusivity provision present here. Despite Defendant's counsel's legal arguments that the Exclusive Distribution Agreement was illusory, Zhuo testified that he understood an agreement existed (*see, e.g.*, Zhuo, T3, 432:5-433:13) and that Vision was responsible for promoting the products under the agreement.[11] (Zhuo, T3, 541:5-18.) For these reasons, the Exclusive Distribution Agreement is a legally enforceable contract.

## B. **Breach of Contract**

Vision advances three theories for breach of contract: (1) ACU breached the Agreement by refusing to fill its orders on January 10, 2018 and January 19, 2018 and refusing to accept small orders going forward; (2) ACU breached the exclusivity provision of the Agreement; and (3) ACU

---

[11] Because the Court has found an enforceable contract exists, it does not address Vision's alternative argument that ACU previously admitted an enforceable contract existed and waived its right to contest contract formation. (Pl. Proposed Findings of Fact and Conclusions of Law at 18-19.)

17

breached the price provision of the Agreement. (*See* Compl.; Pl. Proposed Findings of Fact and Conclusions of Law at 21-24.) The Court addresses each theory in turn.

### 1.    ACU's Refusal to Fill Orders

The parties dispute whether ACU's non-acceptance of the two orders on January 10, 2018 and January 19, 2018, and its representation that it would no longer provide Vision with small orders, were material breaches of the Agreement. (*See* Pl. Proposed Findings of Fact and Conclusions of Law at 23-24; Def. Proposed Findings of Fact and Conclusions of Law at 21-24.) The Exclusive Distribution Agreement states: "All orders for Products by Distributor shall be subject to acceptance by the Factory and shall not be binding until written confirmation of the order. Orders may also be placed through Vision's associated factory (Vision Enterprises, Ltd.) In Nanhai, Foshan, China." (PX-1 ¶ 4.2.) ACU maintains that it reserved the right under the Agreement to reject Vision's orders for good reason. (*See* Def. Proposed Findings of Fact and Conclusions of Law at 21-24.) Zhuo testified that the Distribution Agreement allowed ACU to reject orders as long as it had good cause to do so. (Zhuo, T3, 585:14-586:1.) Liang, meanwhile, maintains that under the Agreement, ACU had to supply Vision orders of any size. (Liang, T1, 171:15-172:15.)

### a)    Legal Standard

"The paramount goal of contract interpretation is to determine the intent of the parties." *Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R.*, 870 F.3d 244, 253 (3d Cir. 2017) (quoting *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011)); *see also Boyle v. Huff*, 314 A.3d 793, 798 (N.J. 2024). In determining intent, it is "not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior" that matters. *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009). "The strongest

objective manifestation of intent is the language of the contract," and "[t]he words of the contract clearly manifest the parties' intent if they are capable of only one objectively reasonable interpretation." *Baldwin*, 636 F.3d at 76; *see also Quinn v. Quinn*, 137 A.3d 423, 429 (N.J. 2016) ("[W]hen the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written"). "Courts will permit extrinsic evidence to interpret ambiguous contractual terms, but such evidence cannot be used to modify or contradict clear, unambiguous provisions." *Passano v. Martin-DeLoach*, No. 0257-23, 2025 WL 2938210, at *4 (N.J. Super. Ct. App. Div. Oct. 16, 2025) (citing *Garden State Plaza Corp. v. S.S. Kresge Co.*, 189 A.2d 448, 454 (N.J. Super. Ct. App. Div. 1963)). Moreover, if the terms of a contract are ambiguous, courts "consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation." *Barila v. Bd. of Educ. of Cliffside Park*, 230 A.3d 243, 255–56 (N.J. 2020) (quoting *Cnty. of Atl.*, 166 A.3d 1112, 1122 (N.J. 2017). An ambiguity exists when a contract term is "susceptible to at least two reasonable alternative interpretations." *Chubb Customs Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008) (citing *Nester v. O'Donnell,* 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997)).

Additionally, where, as here, a contract includes an integration clause,[12] the terms of the contract may not be "contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented . . . by course of dealing or usage of trade or by course of performance . . . ." N.J. Stat. Ann. § 12A:2-202 (internal citations omitted). Section 12A:2-208(1) states that "[w]here the contract for sale involves repeated occasions for

---

[12] The Agreement's integration clause states: "This Agreement constitutes the entire understanding and contract between the parties and supersedes any and all prior and contemporaneous, oral or written representations, communications, understandings, and agreements between the parties with respect to the subject matter hereof. The parties acknowledge and agree that neither of the parties is entering into this Agreement on the basis of any representations or promises not expressly contained herein." (PX-1 ¶ 11.8.)

performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." *Id.* § 12A:2-208(1).[13]

### b)       ACU's Obligation to Fill Orders of All Sizes

The Court agrees with Plaintiff that ACU was obligated to fill orders of all sizes under the Agreement.

As an initial matter, Section 4.2 of the Agreement is ambiguous. *See Taylor v. Cont'l Grp. Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir. 1991) ("A term is ambiguous if it is subject to reasonable alternative interpretations."). This clause can be read under the interpretation that Vision proffers, *i.e.*, that orders were not considered formally submitted until written confirmation was received from ACU's factory. (*See* Pl. Reply at 9-10.) However, the language of this clause can also be read under the interpretation that ACU proffers, *i.e.*, ACU could reject orders for good reason. (*See* Def. Proposed Findings of Fact and Conclusions of Law at 4-5.)

Considering the extrinsic evidence offered by the parties, the Court concludes that Plaintiff's interpretation aligns with both the parties' intent and their course of performance. Most importantly, ACU filled Vision's small orders for the first two years the Exclusive Distribution Agreement was in effect. (Liang, T1, 117:23-118:4; Zhuo, T3, 512:8-9.) Moreover, Zhuo testified that he understood that Vision's sales process included providing samples to customers before larger sales were made, and he provided Vision with those samples. (Zhuo, T3, 439:19-440:21.) Liang also testified that before the contract was signed, he explained the sales process to Zhuo.

---

[13] The Agreement states that it may not be modified or amended "including by custom usage of trade, or course of dealing, except in writing signed by duly authorized officers of both of the parties hereto." (PX-1 ¶ 11.1.) However, as the UCC allows, the Court can refer to course of dealing, usage of trade, or course of performance to interpret the Agreement's ambiguous language; the Court does not refer to this evidence to modify the Agreement.

20

(Liang, T1, 197:11-198:1.) Zhuo even testified that there was no minimum order quantity specified in the Distribution Agreement. (Zhuo, T3, 530:5-531:6.) Considering both this testimony and ACU's performance under the Exclusive Distribution Agreement for two years, the Court cannot credit Zhuo's testimony that he believed ACU had the right to reject any orders that would have caused it to lose money. (*See id.* 587:17-588:6.) *See* N.J. Stat. Ann. § 12A:2-208(1).

ACU suggests that it did not breach the contract because Vision did not apply updated 2018 prices when placing its orders on January 10, 2018 and January 19, 2018, and thus it had a valid reason to reject the orders. (*See* Def. Proposed Findings of Fact and Conclusions of Law at 14, 22; DX-9.) The Court finds this argument unpersuasive for three reasons. First, ACU personnel who rejected the orders cited the size of the orders as the reason ACU declined to fill them, not the price listed on the order forms. (*See* PX-106; PX-169; DX-7.) Second, ACU made clear to Vision that, in addition to the two rejected orders on January 10, 2018 and January 19, 2018, it would no longer fill any of Vision's orders for individual orders and loose parts. (*See* PX-169; DX-8; DX-9 (February 14, 2018 email from Zhuo to Liang stating that ACU "didn't refuse your orders" but that "our deal is of selling Acu's [sic] casement line of products, not just the isolated item like the hinges your [sic] side ordered.").) Finally, Zhuo testified that he viewed the 2018 price list as a starting offer to negotiate, indicating that he did not view the price as fixed. (Zhuo, T3, 578:18-24.)

The Court finds that under both principles of general contract interpretation and the UCC, ACU was obligated to provide Vision with orders of all sizes, including the orders they made on January 10, 2018 and January 19, 2018. ACU's failure to do so constitutes a breach of contract.

21

### c) Material Breach of Contract

ACU alternatively argues that the non-acceptance of the two orders on January 10, 2018 and January 19, 2018 were non-material breaches of the contract. (Def. Proposed Findings of Fact and Conclusions of Law at 24-28.)

> A breach is 'material' if a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract.

*City of Atl. City v. Zemurray St. Cap., LLC*, No. 14-5169, 2017 WL 6638203, at *11 (D.N.J. Dec. 29, 2017) (quoting 23 Williston on Contracts § 63:3 (4th ed.)).

The Court finds ACU's rejection of the orders on January 10, 2018 and January 19, 2018, and its communication to Vision that it would no longer fill small orders, constitute material breaches of the Exclusive Distribution Agreement. (*See* PX-106; PX-169; DX-7; DX-9.) Although the orders were for small amounts (*see id.*), based on the nature of Vision's business, these sample parts were crucial to securing customers and for testing. As Vision's engineering manager Joe Blackwell testified, Vision outfitted sample windows that it sent to customers, which the customers used to ensure the casement hardware fit properly in their windows. (Blackwell, T1, 217:20-25, 218:1-17.) Blackwell also testified that, for every window, Vision had to undertake testing. (*Id.* at 213:15-214:2.) Zhuo was aware of this process. Liang testified that he and Zhuo discussed Vision's sales process as well as the potential to make "millions of dollars" through their deal, with the caveat that it would take time. (Liang, T1, 72:8-73:18, 76:23-77:2.) Zhuo also testified that in a January 2017 phone conversation with Liang, Liang informed Zhuo that prior samples ACU had supplied did not fit windows Vision was outfitting and that Vision required more samples. (Zhuo, T3, 439:22-440:21.) And ACU Hardware U.S.A. employee John Quach testified, via deposition

excerpts, that Zhuo understood the purpose of giving samples to customers as part of the sales process for casement windows. (Quach, T2, 296:11-18.)

Because sample parts and small orders were integral to Vision's sales process, ACU's rejection of the orders on January 10, 2018 and January 19, 2018 and decision to stop filling Vision's small orders constituted a material breach of the contract.

### 2.    Breach of the Exclusivity Provision

Vision's second theory for breach of contract is that ACU violated the exclusivity provision in the Exclusive Distribution Agreement. The Court rejects Plaintiff's argument that ACU violated the exclusivity provision of the Exclusive Distribution Agreement.

The exclusivity provision provides: "[ACU] hereby grants to [Vision], and [Vision] hereby accepts from [ACU], an irrevocable, exclusive right and license to distribute the Products[14] in the Territory for the Term of the Agreement." (P1 ¶ 2.1 (the "Exclusivity Provision").) ACU moved *in limine* to exclude evidence that ACU breached the Exclusivity Provision, noting that this theory of liability does not appear in the Complaint and Vision never moved to amend the Complaint. (*See* ECF 307-4.) At trial, the Court denied ACU's motion *in limine* to exclude evidence on the breach of the Exclusivity Provision. (Tr., T1, 15:24-21:16.)

It is Plaintiff's burden to show by a preponderance of the evidence that ACU breached the contract, and the evidence offered regarding the Exclusivity Provision was unpersuasive. *See L&T Fashion*, 2019 WL 692949, at *1. To support this theory of liability, Vision primarily relies on ACU's admissions (by way of non-response) to its RFAs 1 through 5, 12 through 15, and 53. (*See*

---

[14] The Agreement states: "The products which are the subject of this Agreement are Window (primarily Casement) Hardware and Door Hardware, and other materials provided by Supplier for distribution and use in combination with such door and window (primarily casement) hardware[.]" (PX-1 ¶ 1.3.)

Tr., T3, 535:18-536:2.) Even accepting these Requests for Admission as admitted (*see* RFA Opinion and Order at 6), the Court finds this evidence insufficient.

The first issue for Vision is the parties' differing interpretations of how the term "Products", as defined in the Exclusive Distribution Agreement, should be interpreted. Vision argues in its post-trial briefing that the Exclusive Distribution Agreement covered both casement and non-casement products. (Pl. Proposed Findings of Fact and Conclusions of Law at 23-24.) The definition of "Products" in the Agreement is ambiguous, particularly the clause "Window (primarily Casement) Hardware". (PX-1 ¶ 1.3.) *See Taylor*, 933 F.2d at 1232. Considering the bargaining history and parties' conduct, the Court concludes that the window products covered under the Agreement are limited to casement products. Liang testified extensively about his efforts to create a casement-specific line, which led him to connect with Zhuo specifically to develop a casement line. (Liang, T1, 65:12-71:3.) Zhuo similarly testified that he and Liang never discussed non-casement window parts (Zhuo, T3, 590:15-17), and he understood the Agreement to only cover casement parts. (*Id.* 427:12-20.) Zhuo also testified that Liang told Zhou he could continue to sell non-casement window parts to existing customers. (Zhuo, T3, 430:4-14, 590:3-11.) He further testified that Vision did not order any non-casement window parts from ACU. (*Id.* at 590:12-14.) Despite this overwhelming evidence that the parties understood the Agreement to cover only casement window hardware, Liang testified that he believed the Agreement covered both casement and non-casement products. (Liang, T1, 81:4-23.) The Court finds this after-the-fact testimony unpersuasive. Because the Agreement applies only to casement products, RFA 53 does not alone establish liability.[15] RFA 53 states: "Admit that during the term of the November

---

[15] Even if RFA 53 alone was enough for Vision to meet its burden, Vision admitted into evidence only its first set of RFAs, not the second set, which include RFA 53. (*See* PX-256.) In other words, Vision's counsel referenced RFA 53, but did not admit a document containing its language at trial. The RFAs at PX-256 are deemed admitted pursuant to the RFA Opinion and Order.

2015 Distribution Agreement, Defendants have sold products into the U.S. in violation of the terms Agreement with Plaintiff." (*See* ECF 328-3.) The RFAs do not include a definition of "products." (*See id.*) This admission could therefore refer to non-casement products, which are not covered by the Agreement.

The second issue for Vision is that the time period contemplated by the RFAs is not clear. The First Requests for Admission, which include RFAs 1 through 5 and 12 through 15, are dated October 31, 2019. (*See* PX-256.) Plaintiff filed its Complaint on April 12, 2018. (ECF 1.) Thus, Vision terminated the contract no later than April 12, 2018. These RFAs ask whether ACU has sold casement products in the United States to customers other than IWC "after" November 10, 2015, November 10, 2016, November 10, 2017, November 10, 2018, and October 1, 2019.  (PX-256.) These RFAs provide no outer-limit date; in other words, the admissions can be read to concede that ACU sold casement products in the United States in late 2018 or early 2019, after Vision terminated the contract but before the Vision served the RFAs. The Court therefore finds these admissions of no meaningful value in determining whether ACU breached the exclusivity provision of the Exclusive Distribution Agreement.

The evidence at trial is no more helpful to Vision. ACU employee John Quach testified through deposition excerpts that ACU U.S.A. sold "other hardware" to customers in the United States other than IWC, but did not specify the time period or type of hardware. (*See* Quach, T2, 295:8-12.) Zhuo testified that ACU Canada did not sell any casement hardware to customers in the U.S. other than IWC (Zhuo, T3, 509:24-25) and Quach testified that he declined to sell casement window components to two customers. (Quach, T3, 595:9-597:18.) For all these reasons, Vision has not met its burden of proof on this theory of liability.

### 3.    Breach of the Price Provision

Vision next argues that ACU breached the Agreement by improperly exercising its discretion to set prices. (Pl. Proposed Findings of Fact and Conclusions of Law at 22-23 ("Zhuo in bad faith attempted to place minimum quantity requirements on Vision's orders, require full carton orders, and ***charge higher prices than he charged other customers while he knew he could not do those things under the contract***.") (emphasis added).)

### a)    ACU's Obligations Under the Price Provision

The relevant provision of the Agreement provides: "The price payable by Distributor for each Product shall be no greater than the best price [ACU]'s Factory provides its largest customers." (P1 ¶ 5.1 (the "Price Provision").) As to the phrase "best price," the parties appear to agree that they understand that ACU was obligated to provide Vision a lower price for each product than it offered its biggest customers. (*See* Zhuo, T3, 461:13-462:3; Liang, T1, 175:1-2.) The Court finds it clear that the benchmark for best price is for prices set by ACU's factory in China ("ACU's Factory") for the ACU Factory's customers; to the extent prices are set by other branches of ACU, including their headquarters in Canada or their branch in the U.S., such prices could be lower than those payable by Vision. *See Baldwin*, 636 F.3d at 76 ("The words of the contract clearly manifest the parties' intent if they are capable of only one objectively reasonable interpretation.") The contract itself recognizes that ACU Canada and its factory in China are separate entities; "Supplier" is defined under the Contract as both "Acu [sic] Plasmold, Inc., an Ontario Canada corporation…and its factory Hangmen Qiangdi Plasitic Co, Ltd. in Hangmen City, Guangdong, China." (PX-1 at 1.)

As the New Jersey Supreme Court has instructed, the Court should read contracts "as a whole in a fair and common sense manner." *Boyle v. Huff*, 314 A.3d 793, 798 (N.J. 2024) (quoting

*Hardy ex rel. Dowdell v. Abdul-Matin*, 965 A.2d 1165, 1169 (N.J. 2009)). "[W]ords and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose." *Id.* (quoting *Republic Bus. Credit Corp. v. Camhe-Marcille*, 887 A.2d 185, 188 (N.J. Super Ct. App. Div. 2005)). When reading the contract as a whole, the Court concludes that the parties intended to use prices offered by ACU's Factory as the benchmark for the Price Provision.[16]

### b)    The 2018 Price Increase

The Court finds that Vision did not prove at trial by a preponderance of the evidence that ACU breached the Price Provision in the Exclusive Distribution Agreement by quoting Vision higher prices in the 2018 price list. Liang testified that the increase in the 2018 price list was "20 to 30 percent" for key products; according to Liang, "no supplier" would send such an increase, which he called "crazy." (Liang, T1, 184:20-185:4, 204:4-17, 205:16-24.) He further testified that nothing occurred in the industry to warrant such a large price increase. (*Id.* at 204:23-205:5.) But Liang also testified that he had "no hard evidence" that ACU violated the Price Provision. (*Id.* at 206:14-16.) And although Vision offered admissions in RFA numbers 29-32 and 36-45 that ACU charged customers, including a customer named Mennie Canada, lower prices than it offered Vision, these RFAs do not establish that (i) those prices were set by ACU's factory or (ii) that any of those customers were ACU's biggest. (PX-256.) RFAs 35 and 36, which are also relevant, state that "ACU Plasmold's factory in China charged Vision Industries Group more than it charged other US customers for the same products purchased by Vision Industries Group" and "ACU Plasmold's factory in China charged Vision Industries Group more than it charged customers in Canada for the same products purchased by Vision Industries Group." (*Id.*) These RFAs, however,

---

[16] Neither party offered evidence as to whether ACU Canada offered different prices.

neither reference all other customers nor establish that any of the "other customers" or "customers" were ACU Factory's biggest.

Further, Zhuo testified that even considering the 2018 price increase, Vision "still got the best price." (Zhuo, T3, 461:22-23.) He also testified that the rate ACU charged Vision in 2018 was less than the Factory's biggest customer at that time, whom he identified as "Ayunn in Shanghai." (Zhuo, T3, 461:4-462:10.) Zhuo's testimony that he expected to negotiate the prices further with Liang does not alter the Court's conclusion. (*See* Zhuo, T3, 506:3-25, 577:20-578:10, 578:18-24, 582:3-9.) This understanding shows that, at most, Zhuo did not view the 2018 prices as final, but rather as a starting offer.

In sum, Vision's primary evidence is Liang's testimony regarding the prices ACU charged Vision, including that the increase in price on certain products was "crazy." (Liang, T1, 205:16-24.) While the Court does not doubt the genuineness of Liang's reaction, Vision seems to assume, or expects the Court to assume, that the prior prices ACU quoted Vision were aligned with the market or other customers, such that evidence of a 20 to 30 percent increase on certain key components is sufficient proof that ACU violated the Price Provision. But the key factor here, which Vision does not specify, is the actual prices ACU charged Vision as compared to other customers, not necessarily the percentage increase on Vision year over year.

For the foregoing reasons, the Court does not find a breach of the Price Provision.[17]

### C.      Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff's second cause of action is breach of the implied covenant of good faith and fair dealing. (*See* ECF 1, Compl.) Plaintiff argues that ACU breached the implied covenant of good

---

[17] Although Vision relied on the 2017 price list instead of 2018 price list in submitting its orders on January 3, 2018 and January 19, 2018 (*see* PX-106; PX-169), the Court's finding that ACU did not breach the Price Provision does not alter the Court's decision that ACU breached the contract by refusing to complete Vision's orders for the reasons stated in Section III.B.1, *supra.*

faith and fair dealing by (i) refusing to fill orders; (ii) violating the exclusivity provision of the Distribution Agreement and (iii) artificially raising its 2018 prices. (Pl. Proposed Findings of Fact and Conclusions of Law at 24-26.)

### 1.      Legal Standard

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001) (citing *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997)). "In order to state a claim for breach of duty of good faith and fair dealing under New Jersey law ... there need not be an express contract term imposing the obligation on Defendant[]." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 531 (D.N.J. 2008). "Rather, '[a]lthough the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term.'" *Id.* (quoting *Wilson*, 773 A.2d at 1126 (N.J. 2001)). "Among other things, a defendant may breach the implied covenant of good faith and fair dealing if the plaintiff's 'reasonable expectations are destroyed when [the] defendant acts with ill motives and without a[n]y purpose,' or the plaintiff 'relies to its detriment on [the] defendant's intentional misleading assertions.'" *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 463 (D.N.J. 2020) (first and third alterations in original) (quoting *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005)). Plaintiff also must show "bad motive or intention." *Dewey*, 558 F. Supp. 2d at 531 (quoting *Wilson*, 773 A.2d at 1130). Finally, a plaintiff "cannot maintain a breach of the implied covenant of good faith and fair dealing claim that is duplicative of its breach of contract claim." *Red Hawk*, 449 F. Supp. 3d at 463 (citing *Adler Eng'rs, Inc. v. Dranoff Props., Inc.*, No. 14-921, 2014 WL 5475189, at *11 (D.N.J. Oct. 29, 2014)).

For transactions involving merchants and the sale of goods, the UCC defines good faith in the case of a merchant as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." N.J. Stat. Ann. § 12A:2–103(1)(b). Where, as here, a party is vested with the exercise of discretion under a contract, that party "must exercise discretion reasonably and with proper motive." *Wilson*, 773 A.2d at 1128 (citation omitted). As the New Jersey Supreme Court held in *Wilson*, "a party exercising its right to use discretion in setting price under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." 773 A.2d at 1130. "Such risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial." *Id.*

### 2.    Whether ACU Breached the Implied Covenant of Good Faith and Fair Dealing

Turning to Plaintiff's contentions, the Court first rejects Plaintiff's theory that ACU breached the implied covenant of good faith and fair dealing by refusing to fill orders and selling products in violation of the Exclusivity Provision. (*See* Pl. Proposed Findings of Fact and Conclusions of Law at 24-26.) These are the exact same bases as Vision's breach of contract claim (*see supra* Section III.A-B.) The same conduct cannot form the basis of both claims. *See Red Hawk*, 449 F. Supp. 3d at 463.

Next, Vision argues that "ACU artificially raised prices to Vision as a means of terminating the agreement," which breached the implied covenant of good faith and fair dealing. (Pl. Proposed Findings of Fact and Conclusions of Law at 25 (citing Liang, T1, 175:23-176:17).) At the outset, the Court notes that although both Liang and Zhuo referenced the 2018 price list repeatedly in testimony, neither party offered the list itself into evidence. Considering the evidence presented at

trial, Vision has not met its burden of proof in proving that ACU breached the implied covenant of good faith and fair dealing based on its 2018 price increase. Liang testified that the price increase was 20 to 30 percent higher for certain key products in 2018, which, in his view, showed that Zhuo wanted to terminate the contract. (Liang, T1, 176:7-17, 184:22-185:4, 203:18-204:22.) Zhuo, conversely, provided a couple of different reasons for the increase. First, he maintained that 21 out of 51 pieces of inventory on the price list had a price increase in 2018 due to the increased cost of zinc (Zhuo, T2, 401:24-403:18), the same basis ACU provided Vision at the time. (*See* DX-2.) He also testified that in 2017 ACU had provided Vision with a discount to assist Liang in obtaining business, but then raised the price back up in 2018. (Zhuo, T3, 470:25-471:19, 472:2-473:15.) Finally, Zhuo testified that the aggregate increase of the 2018 price list was only 7.38%, notwithstanding the 20 to 30 percent increase on certain products. (*Id.* at 459:22-460:1.)

Without evidence of the price lists over the years or external proof regarding zinc prices, the Court's decision rests primarily on the credibility of the witnesses. The Court is skeptical that an increase in zinc prices tells the entire story, and a reversal of a prior discount may be closer to the truth. In any case, what is clear is that Zhuo was frustrated by Vision's minimal orders over the prior two years. Zhuo, who had expected millions of dollars in sales from his agreement with Liang, was angry that the agreement was not panning out the way he had hoped. (*See id.* at 446:14-22, 519:16-520:15.) The Court concludes that Zhuo increased prices to make more money from a deal he felt was short-changing him.

But such a finding does not mean ACU breached the implied covenant of good faith and fair dealing. Under the Agreement, although ACU could exercise discretion in setting the price, this discretion was not limitless. Instead, the price ACU could offer Vision for each product was capped at "the best price Supplier's Factory provides its largest customers." (PX-1 ¶ 5.1.) Under

31

New Jersey law, "the duty of good faith and fair dealing cannot alter the clear terms of an agreement and may not be invoked to preclude a party from exercising its express rights under such an agreement." *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 518 (D.N.J. 2009), *aff'd*, 374 F. App'x 341 (3d Cir. 2010) (quoting *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 267 (3d Cir. 2008)). "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." *Wilson*, 773 A.2d 1121 at 1130 (2001). Therefore, the improper motive element of a good faith performance claim is not satisfied where a defendant exercised the discretion expressly afforded to it under the agreement to "maximize [its] profits." *Wilson*, 773 A.2d at 1128. Vision contends Zhuo artificially raised the prices in 2018 to terminate the agreement (*see* Pl. Proposed Findings of Fact and Conclusions of Law at 25), but the Court finds credible Zhuo's testimony that he did not intend to terminate the Agreement. (Zhuo, T3, 564:3-5.) Zhuo's testimony that he was surprised Liang made no attempt to negotiate down the price list supports the Court's conclusion that he intended the parties' agreement to continue. (*Id.* at 506:3-25, 582:3-9.) For the foregoing reasons, Vision has not carried its burden of proving that ACU breached the implied covenant of good faith and fair dealing.

> **D.    Defendant's Counterclaims**

The Court briefly addresses ACU's counterclaims as contained in its amended Answer, which it filed on October 12, 2018. (ECF 22, "Answer".) The Answer contains three counterclaims: (1) declaratory judgment that the Agreement is terminated (Answer ¶¶ 59-71); (2) declaratory judgment that the Agreement is rescinded based on mistake (*id.* ¶¶ 72-82); and (3) declaratory judgment that ACU may treat the Agreement as terminated as a result of Plaintiff's anticipatory breach, *i.e.*, its failure to purchase goods (*id.* ¶¶ 83-88).

The Court finds that ACU has abandoned these counterclaims because they are omitted from the Final Pretrial Order. (ECF 246.) "A final 'pretrial order when entered limits the issues for trial and in substance' supersedes the pleadings 'covered by the pretrial order.'" *Krys v. Aaron*, 312 F.R.D. 373, 376–77 (D.N.J. 2015) (quoting *DiNenno v. Lucky Fin Water Sports, LLC*, 837 F. Supp. 2d 419, 423 (D.N.J. 2011)). "Failure to raise any 'claims, issues, defenses, or theories of damages' therefore generally results in waiver, 'even if they appeared in the complaint.'" *Id.* at 377 (quoting *Bornstein v. Cnty. of Monmouth,* No. 11–5336, 2015 WL 2125701, at *8 (D.N.J. May 6, 2015)). "[I]t is 'established law' that claims or defenses set forth in the pleadings, but omitted from the final pretrial order, may be deemed abandoned." *Id.* at 379 (quoting *Metal Processing, Inc. v. Humm,* 56 F. Supp. 2d 455, 471 (D.N.J. 1999)). ACU also did not mention these claims in its post-trial briefing. (*See* ECF 362-1; ECF 364.) By not including these counterclaims in the Final Pretrial Order or its post-trial briefing, ACU has waived them. *Klatch v. Sugarloaf Twp.*, 172 F. App'x 404, 406–07 (3d Cir. 2006) (litigant "affirmatively waived her right to pursue her federal claims by repeatedly characterizing, including in her pretrial submissions, her sole remaining claim as one [state law claim].").

Finally, ACU will not be prejudiced by this decision. Its counterclaims sought declaratory judgment that the Agreement was terminated. Based on testimony at trial, this issue is not in dispute; Liang testified that he understood the Agreement was terminated. (*See* Liang, T1, 136:1-2.) Vision's counsel likewise argued that the Agreement is terminated. (*See* Tr., T1, 42:18-20, 44:15-25.) For these reasons, the Court finds ACU's counterclaims are waived.

### E.      **Plaintiff's Damages**

Plaintiff has established a material breach of contract based on ACU's decision to stop fulfilling orders less than ACU's minimum order quantity. (*See* Section III.B.1, *supra*.)

In support of its damages from ACU's breach, Plaintiff introduced an expert report and expert testimony of Rebecca Fitzhugh, a forensic accountant. (*See* Fitzhugh, T2, 302:16-21.) Defendant conceded to Fitzhugh's qualifications as an expert. (Tr., T3, 306:25-307:1.) The Court found, based on the parties' stipulation and Fitzhugh's testimony on her background, that she could testify as an expert in the area of forensic accounting. (Tr., T3, 307:8-10.)

Fitzhugh opines on three types of economic damages Vision incurred as a result of ACU's breach of contract: (1) expenses Vision incurred to create a market for ACU's casement hardware (PX-210 ("Fitzhugh Expert Report")) ¶¶ 25-33); (2) lost profits from unconsummated sales of casement hardware to seven of Vision's existing customers (*id.* ¶¶ 34-59); and (3) damages due to the alleged violation of the Exclusivity Provision (*id.* ¶¶ 61-71). The Court will address the first two theories, beginning with Vision's lost profits. The Court rejects damages resulting from the alleged violation of the Exclusivity Provision because the Court has determined that ACU did not breach the Exclusivity Provision. (*See* Section III.B.2, *supra*.)

### 1.    Lost Profits from Seven Customers

Vision argues that it incurred damages for lost profits related to unconsummated orders for casement window hardware from seven existing customers. (Pl. Proposed Findings of Fact and Conclusions of Law at 6-28.) Fitzhugh opined that these damages totaled $1,101,000 for the initial term of the Agreement and $2,553,000 for the renewal term of the Agreement, for a total of $3,654,000.[18] (P210 ¶¶ 56, 58; *see also* Fitzhugh, T2, 318:13-16.) Fitzhugh also calculated prejudgment interest for the estimated lost profits from the expected sales to seven existing customers during both the initial and renewal terms of the Agreement. (PX-210 ¶¶ 57, 59.)

---

[18] Fitzhugh defines the initial term of the Agreement as November 10, 2015 through November 10, 2020 and the renewal term of the Agreement as November 10, 2020 through November 10, 2025. (PX-210 ¶¶ 47-48.)

Under the UCC, in addition to direct damages, a buyer may recover "any incidental and consequential damages provided" in the statute. N.J. Stat. Ann. § 12A:2–713; *see also Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.*, 944 F. 2d 1131, 1147 (3d Cir. 1991). Consequential damages "include reasonably foreseeable lost profit damages." *Strassle v. Bimbo Foods Bakeries Distribution, Inc.*, No. 12-3313, 2013 WL 1007289, at *6 (D.N.J. Mar. 13, 2013) (citing N.J. Stat. Ann. § 12A:2–715(2)(a) ("Consequential damages resulting from the seller's breach include any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise[.]")). In general, "[c]laims for lost profits damages are governed by the standard of reasonable certainty." *Schwartz v. Menas*, 279 A.3d 436, 438 (N.J. 2022). "Anticipated profits that are remote, uncertain or speculative…are not recoverable." *Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co.*, 21 A.3d 1151, 1158–59 (N.J. 2011) (quoting *Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co.*, 543 A.2d 1020, 1033 (N.J. Super. Ct. App. Div. 1988)); *see also George H. Swatek, Inc. v. N. Star Graphics, Inc.*, 587 A.2d 629, 631 (N.J. Super. Ct. App. Div. 1991) ("Consequential damages [under N.J. Stat. Ann. § 12A:2–715] are only recoverable where they are reasonably foreseeable at the time the contract was entered into." (internal citation omitted)).

Vision fails to prove its lost profit damages were reasonably foreseeable. Its contention that it would make any profits from its seven existing customers on its casement line, much less over $3.6 million, is speculative for three reasons. First, due to Vision's business model of stocking its inventory before customers place purchase orders, Vision offers essentially no documentary evidence that these seven existing customers were close to actually purchasing casement hardware. (*See* Liang, T1, 63:24-64:18; Prignano, T2, 236:16-237:15; Paesano, T2, 255:6-23.) Vision

provided quotes to these customers stating the cost of each hardware piece for a complete window along with the total cost per window (*See* PX-90-PX-101), but the customers never completed purchase orders.

Second, even assuming the seven customers did make commitments to buy casement hardware from Vision, as Vision argues (*see* Liang, T1, 93:14-94:4; Earp, T2, 282:12-283:15), the quantity each customer planned to or was expected to purchase is uncertain. In her expert report, Fitzhugh states: "Vision's estimates of the number of casement windows each customer would expect to manufacture, and thus the amount of hardware Vision would need to supply, are based on the customers' representations of the number of casement windows they make each year." (PX-210 ¶ 39.) However, the Court finds speculative the underlying evidence supporting the figures included in Fitzhugh's expert report presumably showing each of the seven customers' expectations of casement window production.[19] (*See* PX-210 Exs. 12-a–12-g.)

Third, Fitzhugh's calculation of lost profits from unconsummated sales to seven of Vision's existing customers is based on "historical sales to each of the seven customers[.]"[20] (PX-210 ¶ 40; *see also* PX-245 (historical sales).) This sales data was based on non-casement product lines, which, in contrast to the casement products, were established branches of Vision's business. (Fitzhugh, T2, 335:17-336:17, 375:25-376:19.) Although new businesses can recover lost profit

---

[19] In support of these figures, Fitzhugh points to the quotations provided to customers (PX-90-PX-101) and to the deposition of T.J. Tirendi, appended to her expert report as Exhibit 26. However, in the portions of Tirendi's deposition that Fitzhugh relies upon, Tirendi discusses only two potential customers and explicitly disclaims knowledge of the exact purchase estimates that those two customers gave Vision. (*See* PX-210 ¶ 39 n.33 (citing Ex. 26, Deposition of T.J. Tirendi, April 23, 2019, 94:3-9, 99:23-100:3, 100:17-23, 102:6-8, 103:9-13).) The Court notes that although Fitzhugh's expert report was admitted into evidence (PX-210), the deposition transcript of T.J. Tirendi was not separately admitted into evidence, and Tirendi did not testify at trial. Because this deposition transcript was not admitted separately into evidence, the Court considers it only to the extent it informed Fitzhugh's opinions as stated in her expert report, and not for the truth of the matters asserted therein. Vision has also offered PX-199 in support of these figures; this document, which is undated, was created by Liang and includes no separate support for the figures in the column "Etd Annual Casements per Customer". (PX-199; *see also* Liang, T1, 99:1-11.)

[20] To reach the final figures of lost profits, Fitzhugh engaged in a number of further calculations, none of which are relevant to the Court's conclusion here. (*See* PX-210 ¶¶ 40-60.)

damages, "it is substantially more difficult for a new business" than an established business to do so. *Schwartz*, 279 A.3d at 438 (citing Restatement (Second) of Conts. § 352, cmt. b (ALI 1981)). As Liang himself testified, the casement business is unique; Liang categorized casement windows in the U.S. as "a high-end product," covering, along with "slider[ ]" windows, only 20 to 25 percent of the market as compared to 75 to 80 percent for hung windows. (Liang, T1, 68:12-23; *see also* Paesano, T2, 262:4-18.) Vision has not demonstrated that its historical sales data for other products is relevant to its potential sales of casement products.

For the reasons stated, the Court will not grant Vision damages for lost profits related to unconsummated orders for casement window hardware from seven existing customers.

### 2. Reliance Damages

Vision alternatively requests that the Court grant reliance damages for expenses it paid to build a market in casement hardware amount to $251,000.00. (Pl. Proposed Findings of Fact and Conclusions of Law at 28-30; PX-210 ¶ 73.) These damages are based on advertising expenses ($17,630.06 (PX-210 Ex. 4; PX-238)), trade show expenses ($65,265.19 (PX-210 Ex. 5, PX-239)), payroll ($164,599.00 (PX-210 Ex. 6, PX-240)), sample purchases ($1,776.25 (PX-210 Ex. 7, PX-241)), testing ($300.00 (PX-210 Ex. 8, PX-242)), and miscellaneous expenses ($1,120.24 (PX-210 Ex. 9, PX-243)).[21]

Vision can recover reliance damages as an alternative to lost profits. *Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d. 491 (3d Cir. 1987) (citing Restatement (Second) of Conts. §§ 347, 349 (ALI 1981)) (applying Pennsylvania law); *see also* N.J. Stat. Ann. §§ 12A:1-305(a), 12A:2-715. Plaintiff has entered into evidence the summaries of expenses that Fitzhugh put together, including, except for payroll expenses, citations to the underlying document's bates

---

[21] The total for the amounts shown in PX-238 through PX-243 is $250,690.74.

number, date, document number, document type, and description of the documents relied upon; along with invoices for certain advertising and trade show expenses. (*See* PX-210 Exs. 4-9; PX-235; PX-238-PX-243.)[22]

The Court finds credible witness testimony, including Fitzhugh's testimony, that Vision expended resources in reliance on the Agreement with ACU. (Fitzhugh, T2, 325:4-327:8; Liang, T1, 198:5-12.) These damages were reasonably foreseeable when Vision and ACU contracted, except insofar as Vision seeks payroll expenses for employees Glen Paesano and Denise Prignano. There are two reasons that the Court declines to include Paesano and Prignano's salary in the calculation of reliance damages. First, for these two employees, Vision seeks a percentage of their salaries, which it calls an "estimate" for the time they spent on casement products. (PX-240.) However, although both Paesano and Prignano testified, neither offered support for the amount of time they spent on the casement line. Second, there is no evidence, and Vision does not argue, that it paid Paesano and Prignano more than it otherwise would have if it was not pursuing the casement line. For these reasons, Vision has not "[laid] a foundation which will enable the trier of the facts to make a fair and reasonable estimate" of Vision's damages with regard to these employees.[23] *World v. Funicelli*, No. A-3137-23, 2025 WL 2264844, at *8 (N.J. Super. Ct. App. Div. Aug. 8, 2025) (quoting *Totaro, Duffy, Cannova & Co., LLC v. Lane, Middleton & Co., LLC*, 921 A.2d 1100, 1108 (N.J. 2007)).

Based on the above, the Court awards Vision $147,797.00 in damages. These damages include advertising expenses, trade show expenses, payroll for Jiamao Liu, testing, and

---

[22] The Court concludes that ACU does not object to the accuracy of the figures cited therein because ACU objected to these exhibits only "to the extent that damages are not going to be established in this case" and for relevance. (Tr., T1, 89:9-13, 90:2-5, 90:9-25; Tr., T2, 326:5-13.)

[23] The same concern does not apply to employee Jiamao Liu, whose entire role was dedicated to the casement line. (Liang, T1, 86:19-21; Blackwell, T1, 217:12-17.)

miscellaneous expenses, minus the $102,893.74 Fitzhugh attributed to Paesano and Prignano's salaries.

### 3.    Mitigation

ACU argues that Vision has failed to mitigate its damages. (Def. Proposed Findings of Fact and Conclusions of Law at 28-30.) Under New Jersey law, parties injured by a breach of contract must take reasonable steps to mitigate their damages. *State v. Ernst & Young, L.L.P.*, 902 A.2d 338, 348 (N.J. Super. Ct. App. Div. 2006). "Whether a plaintiff's mitigation efforts were reasonable is a question of fact." *OFI Int'l, Inc. v. Port Newark Refrigerated Warehouse*, No. 11-06376, 2015 WL 140134, at *9 (D.N.J. Jan. 12, 2015). Similarly, under the New Jersey UCC, Section 12A:2-712(1), "[a]fter a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." This provision is applicable here, a breach "[w]here the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance." N.J. Stat. Ann. § 12A:2–711(1).

The Court finds credible Liang's testimony that Vision put in reasonable efforts to replace the products ACU had agreed to provide under the Agreement, including efforts to work with their main supplier in China. (Liang, T1, 136:15-138:8.) Because Vision made good faith efforts to reasonably mitigate their damages, *i.e.*, the expenditures in building the casement market, the Court rejects ACU's argument that a failure to mitigate precludes or reduces Vision's damages.

### 4.    Prejudgment Interest

In addition to damages, Vision seeks prejudgment interest. (Pl. Proposed Findings of Fact and Conclusions of Law at 30.) An award of prejudgment interest in contract cases is "based on

39

equitable principles." *Litton Indus., Inc. v. IMO Indus., Inc.*, 982 A.2d 420, 430 (N.J. 2009) (quoting *Cnty. of Essex v. First Union Nat'l Bank*, 891 A.2d 600, 608 (N.J. 2006)).

In diversity cases, federal courts must apply state law to award prejudgment interest. *Jarvis v. Johnson*, 668 F.2d 740, 746 (3d Cir. 1982). "Under New Jersey state law, the purpose of prejudgment interest is to 'compensate the plaintiff for the loss of income that would have been earned on the judgment had it been paid earlier.'" *Amba v. Rupari Food Servs., Inc.*, No. 10-4603, 2016 WL 6471019, at *3 (D.N.J. Oct. 31, 2016) (quoting *Thabault v. Chait*, 541 F.3d 512, 533 (3d Cir. 2008)). The "district court may exercise [its] discretion [to award prejudgment interest] upon 'considerations of fairness' and prejudgment interest may be denied 'when its exaction would be inequitable.'" *Id.* (alterations in original) (quoting *Thabault*, 541 F.3d at 533). Awards of prejudgment interest in contracts cases are calculated as follows:

> New Jersey Court Rule ("N.J. Ct. R.")] 4:42-11(a)(ii) sets the interest rate for judgments in tort actions, which absent unusual circumstances, is also used for contract-based claims. Absent unusual circumstances…courts should refer to N.J. Ct. R. 4:42–11(b) when determining the rate of pre-judgment interest to be awarded." . . .

> Pursuant to N.J. Ct. R. 4:42–11(a)(iii), for judgments exceeding the monetary limit of the Special Civil Part, which is $15,000…prejudgment interest shall be calculated at the rate provided in subparagraph (a)(ii) plus 2% per annum. The applicable interest rate is calculated by adding 2% to the Cash Management Fund Rate.

*USI Int'l Inc. v. Festo Didactic Inc.*, No. 15-8451, 2023 WL 3996360, at *3 (D.N.J. June 14, 2023) (internal quotations and citations omitted).

Considering equitable principles here, the Court will award prejudgment interest. The Court determines that the prejudgment interest starts to accrue from the date of filing the Complaint in this court, on April 12, 2018, until the first day of trial on May 5, 2025. *See SMP Props., LLC v. Encore Realty, LLC*, No. 20-6676, 2024 WL 1975502, at *5 (D.N.J. May 3, 2024).

Plaintiff shall submit an affidavit which establishes the amount of prejudgment interest and a proposed order in accordance with New Jersey Rules of Court 4:42-11 within fourteen (14) days.

40

## IV.    CONCLUSION

For the reasons stated above, the Court finds that ACU breached the Exclusive Distribution Agreement and concludes that reliance damages in the amount of $147,797.00 are warranted. Plaintiff shall submit a proposed form of judgment denoting a damages amount consistent with these findings plus prejudgment interest. An appropriate order follows.

/s/ Jamel K. Semper
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:      Clerk
cc:        Cari Fais, U.S.M.J.
           Parties

41